# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **JACOB RUSH, individually and as** | : | **Case No. 1:07-cv-01068** |
| **administrator of the estate of Gilbert** | : | |
| **Rush Jr., John Rush, Krysten Blevins,** | : | **Judge Kathleen O'Malley** |
| **Kameron Rush, Bobbi Jo Dick,  and** | : | |
| **Melissa Hedrick,** | : | |
| **c/o Alphonse A. Gerhardstein** | : | |
| **and David B. Malik** | : | **FIRST AMENDED** |
| **617 Vine Street, Suite 1409** | : | **COMPLAINT AND JURY DEMAND** |
| **Cincinnati, OH  45202** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **CITY OF MANSFIELD, OHIO** | : | |
| **30 North Diamond Street** | : | |
| **Mansfield, OH 44902,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **RICHLAND COUNTY, OHIO** | : | |
| **50 Park Avenue East** | : | |
| **Mansfield, OH 44902,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **CITY OF ONTARIO, OHIO** | : | |
| **1926 Park Avenue West** | : | |
| **Ontario, OH 44862,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **CITY OF SHELBY, OHIO** | : | |
| **23 West Main Street** | : | |
| **Shelby, OH 44875,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **CITY OF LEXINGTON, OHIO** | : | |
| **44 West Main Street** | : | |
| **Lexington, OH 44904** | : | |
| | : | |
| **and** | : | |

**Eric Bosko**                                          :
**Mansfield Division of Police**                        :
**30 North Diamond St.**                                :
**Mansfield, OH 44902,**                                :
**individually and in his official capacity,**          :
                                                        :
**and**                                                 :
                                                        :
**John Wendling**                                       :
**Mansfield Division of Police**                        :
**30 North Diamond St.**                                :
**Mansfield, OH 44902,**                                :
**individually and in his official capacity,**          :
                                                        :
**and**                                                 :
                                                        :
**Lance Combs**                                         :
**Shelby Police Department**                            :
**15 Central Ave.**                                     :
**Shelby, OH 44875,**                                   :
**individually and in his official capacity,**          :
                                                        :
**and**                                                 :
                                                        :
**David Mack**                                          :
**Shelby Police Department**                            :
**15 Central Ave.**                                     :
**Shelby, OH 44875,**                                   :
**individually and in his official capacity,**          :
                                                        :
**and**                                                 :
                                                        :
**Richard Miller**                                      :
**Mansfield Division of Police**                        :
**30 North Diamond St.**                                :
**Mansfield, OH 44902,**                                :
**individually and in his official capacity,**          :
                                                        :
**and**                                                 :
                                                        :
**A.S.O.R.T.**                                          :
**Richland County Sheriff's Office**                    :
**597 Park Avenue East**                                :
**Mansfield, OH 44905,**                                :
                                                        :
                **Defendants.**                         :

# I.  PRELIMINARY STATEMENT

1.  This civil rights action challenges the use of excessive force when executing a

    nighttime search warrant by a police tactical squad at the residence of Gilbert Rush,

    Jr., resulting in his death.  Defendants suspected that the Rush home contained

    stolen baby furniture of little worth.  The plaintiffs had a history of cooperating with

    law enforcement and even utilizing police services.  Had the Defendants simply

    knocked on the door and clearly identified themselves they would have been

    granted entry and would have been permitted to search the premises.  Instead,

    Defendants employed tactical units and procedures based on false, unverified and

    untrustworthy information from confidential informants known to have a bias

    against the Rush family.  The manner in which Defendants raided the premises

    prevented the occupants from recognizing the intruders as police and unnecessarily

    resulted in the use of high powered weaponry completely out of proportion to the

    underlying theft of baby furniture and clothes that Defendants sought to investigate.

    Through this action Plaintiffs seek compensation for their injuries and they seek to

    end police abuse by limiting high risk search warrant executions to situations where

    they are truly needed and where the least amount of force necessary to the situation

    is employed.

# II. JURISDICTION

2.  Jurisdiction over the federal civil rights claims is conferred on this Court by 28

    U.S.C. §§ 1331 and 1343(3) and (4). Jurisdiction over the state law claims is

    conferred by 28 U.S.C. § 1367(a).  Venue is proper in this Division.

### III. PARTIES

3.  Plaintiff Jacob Rush has at all times relevant to this action been a resident of the State of Ohio.  He sues on his own behalf and on behalf of the next of kin as administrator of the estate of his father, Gilbert Rush Jr., deceased.

4.  Plaintiff John Rush has at all times relevant to this action been a resident of the State of Ohio.  John Rush is a son of Gilbert Rush Jr.

5.  Plaintiff Krysten Blevins has at all times relevant to this action been a resident of the State of Ohio.  She sues on her own behalf and on behalf of her minor son Kameron Rush.  Kameron Rush is the son of John Rush and Krysten Blevins.

6.  Plaintiff Bobbi Jo Dick has at all times relevant to this action been a resident of the State of Ohio.

7.  Plaintiff Melissa Hedrick has at all times relevant to this action been a resident of the State of Ohio.

8.  Defendant Eric Bosko is a law enforcement officer employed by the City of Mansfield and at all times relevant to this action acted under color of law.  He is sued individually and in his official capacity.

9.  Defendant John Wendling is a law enforcement officer employed by the City of Mansfield and at all times relevant to this action acted under color of law.  He is sued individually and in his official capacity.

10. Defendant Lance Combs is a law enforcement officer employed by the City of Shelby, Ohio, is a member of the ASORT unit, and at all times relevant to this action acted under color of law.  He is sued individually and in his official capacity.

11. Defendant Richard Miller is a law enforcement officer employed by the City of Mansfield, Ohio, is a member of the ASORT unit, and at all times relevant to this action acted under color of law.  He is sued individually and in his official capacity.

12. Defendant David Mack is a law enforcement officer employed by the City of Shelby, Ohio, is a member of the ASORT unit, and at all times relevant to this action acted

13. Defendants City of Mansfield, City of Shelby, City of Lexington and City of Ontario are municipalities organized under the laws of the State of Ohio.

14. Defendant Richland County is a unit of local government organized under the laws of the State of Ohio.

15. Defendant ASORT is a regional law enforcement organization made up of units of local government that belong to the Richland County Sheriffs Association.

### IV. FACTS

**A.  Search Warrants Under Federal and State Law**

16. The Fourth Amendment to the United States Constitution protects the right of persons to be "secure in their houses" and prohibits "unreasonable searches and seizures."  The Amendment allows search warrants "upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized."

17. Ohio has implemented the Fourth Amendment and the comparable provisions in the Ohio Constitution through statutes and court rules.  Under Ohio law all search warrants for items or persons located in a residence must be served during the

daytime unless the judge authorizing the search specifically allows the officers to execute the search at night.  Ohio Cr. Rule 41(C).

18. Whether executing warrants during the day or at nighttime, law enforcement officers must knock and identify themselves as police and give the occupants of the residence a reasonable time to recognize them as law enforcement officers and open the door to permit entry.

19. All search warrants must be executed in a reasonable manner.  All force used in the execution of a search warrant must also be reasonable.

**B.  The Search Warrant for Baby Furniture**

20. From 2003 to December 26, 2007 Krysten Blevins resided at 796 Pennsylvania Ave., Mansfield, Ohio with Deandrea Whyel.

21. During that period Krysten Blevins was a minor and Deandrea Whyel served as her legal guardian.

22. While Krysten Blevins was residing in her home Deandrea Whyel was managing a theft ring.  Specifically, Deandrea Whyel would take orders for merchandise from various people and arrange to have the items stolen from local retail stores.

23. On September 29, 2006, Kameron Rush was born.  Kameron is the child of Krysten Blevins and John Rush.

24. Krysten Blevins did not want to raise her baby in the midst of people involved in a theft ring so she requested that the Richland County Juvenile Court permit John Rush's father, Gilbert Rush Jr., to serve as her legal guardian and that she and Kameron be permitted to reside with Gilbert Rush Jr. and John Rush at 2619 Park

Avenue East. Krysten Blevins' caseworker completed a report outlining abuse in the home of Deandrea Whyel.

25. In an in camera interview with the Magistrate, Krysten Blevins told the Magistrate about abuse and property thefts that had taken place while she was in Deandrea Whyel's home. The Magistrate found that Krysten Blevins was not receiving proper care, was in danger of physical or emotional harm and that Deandrea Whyel had abused and neglected children in the home.

26. On December 26, 2006, the Juvenile Court issued an ex parte emergency order appointing Gilbert Rush Jr. as the legal guardian of Krysten Blevins and Kameron Rush and authorizing Krysten and Kameron to reside in the Rush household. At this time Krysten Blevins was seventeen years old.

27. Krysten Blevins then promptly moved with John Rush and Kameron Rush to 2619 Park Ave. East in Mansfield.  At that time Gilbert Rush Jr.'s disabled brother, Tom Rush, also resided in the home.  Also in the home was the owner, Melissa Hedrick, Gilbert Rush Jr.'s girlfriend of seven years.

28. The Rush residence was situated on approximately 27 acres, well back from the public road.

29. The Rush family were long time hunters and they included venison, rabbit, frogs, turkey and squirrel as part of their diet.  They hunted with various guns that had been kept in the family for many years.  Most of their hunting was done on their own property.  The guns were openly stored in two locked gun cabinets in the kitchen of the house.

30. In January of 2007, the Department of Children's and Family Services completed a home study that evaluated the home of Gilbert Rush Jr. Background checks were completed on all residents of the house and home visits were conducted.  The family successfully passed these reviews.

31. At the time of the home study and at all times relevant to this case all of the guns were openly present in the house.  The Rush family did not hide the fact that they enjoyed hunting as part of their lifestyle.

32. The Rush family had no fear of law enforcement.  In addition to submitting to the home study, in the fall of 2006 and early 2007 the Rush family requested assistance from law enforcement officers at their home and in connection with their vehicles on several occasions.  These requests for police assistance included a report of harassing phone calls, a possible attempted break-in, a complaint of vandalism by Deandre Whyel and her partner Yolanda Harvey on the van of John Rush, and a medical emergency experienced by Melissa Hedrick.  The Rush family freely opened their home to law enforcement during these contacts.

33. After completion of the home study, the Court gave Gilbert Rush Jr. permanent custody of Krysten Blevins and Kameron Rush.

34. On information and belief, Deandrea Whyel harbored ill will toward Gilbert Rush, Jr. for his role in causing Krysten Blevins and Kameron Rush to be removed from her home.

35. Beginning in 2006 and continuing at all times relevant to this case Defendant Bosko was pursuing an investigation which he referred to as case # 2360 involving thefts of property from local retail stores including Wal-Mart.

36. On or about February 9, 2007,  Defendant Bosko served a warrant for stolen property at 796 Pennsylvania Ave., the residence of Deandrea Whyel.  He seized 83 separate allegedly stolen items from the premises at 796 Pennsylvania Ave.

37. Shortly after the execution of the warrant at 796 Pennsylvania Ave., Defendant Bosko began utilizing Deandrea Whyel as a confidential informant.  He referred to Ms. Whyel as #07-07.

38. On February 28, 2007, Defendant Bosko signed an affidavit requesting a warrant to search the Rush Residence at 2619 Park Ave. East.  At approximately 4:50 p.m. a Mansfield Municipal Court Judge signed the search warrant and authorized execution of the warrant at night. The officers executing the warrant were directed to search for allegedly stolen baby clothes and furniture, audio equipment, allegedly illegal prescription medicine and "firearms."

39. A substantial portion of the information cited by Defendant Bosko in support of his request for a nighttime warrant was provided by confidential informants, including Deandrea Whyel and her former husband and fellow thief, Robert Whyel. Defendant Bosko knew these informants to be unreliable and motivated by animosity toward Krysten Blevins, John Rush and Gilbert Rush.

40.  Defendant Bosko's reliance on the unverified and untrustworthy information from the confidential informants in securing the nighttime search warrant for the Rush household was unreasonable.

41. In relying on the untrustworthy, false and unverified information from the confidential informants as a basis for seeking the nighttime search warrant,

Defendant Bosko acted negligently, recklessly, intentionally and with deliberate indifference to the constitutional rights of the plaintiffs.

42. As the supervisor of Defendant Bosko, Defendant Wendling actively participated, acquiesced and affirmatively approved of the actions of Defendant Bosko with respect to the reliance on and use of the confidential informants to secure the nighttime search warrant for the Rush household and serve the warrant in the manner it was served.

43. Defendant Bosko had authority to present the request for a nighttime search warrant to be served at 2619 Park Ave. East to a municipal court judge upon the approval of his supervisor, Lt. Wendling.

44. Defendant Bosko acted as a policymaker for the City of Mansfield with respect to the decision to present the request for the nighttime search warrant affidavit to be served at 2619 Park Ave. East to a municipal court judge.

45. Prior to presenting the request for a nighttime search warrant for 2619 Park Ave. East to a municipal court judge, Defendant Bosko secured the approval of his supervisor, Defendant Wendling.

46. Defendant Wendling had authority to approve the request for a nighttime search warrant to be served at 2619 Park Ave. East.

47. Defendant Wendling acted as a policymaker for the City of Mansfield with respect to the decision to present the request for the nighttime search warrant affidavit to be served at 2619 Park Ave. East to a municipal court judge.

**C.  ASORT Executes the Baby Furniture Warrant**

48.  Defendant Bosko, relying on the same false, unverified, and  untrustworthy information from the confidential informants, requested that the nighttime warrant be served at the Rush household with the assistance of the ASORT team.

49. Defendants Combs, Miller and Mack agreed to deploy two ASORT Teams in response to the request of Defendant Bosko.

50. At the time of the execution of the nighttime warrant at the Rush residence on February 28, 2007, Defendant Lance Combs was the Commander of the ASORT teams.  He made the decision to deploy the ASORT Teams, and he participated in planning for and executing the nighttime warrant at the Rush residence.

51. Defendant Lance Combs was a policymaker with respect to the decision to use the ASORT Teams for the execution of the nighttime search warrant at the Rush residence on February 28, 2007.

52. At the time of the execution of the nighttime warrant at the Rush residence on February 28, 2007, Defendant Rich Miller was a Team Leader of one of the ASORT teams.  He made the decision to deploy his ASORT Team, and he participated in planning for and executing the nighttime warrant at the Rush residence.

53. Defendant Rich Miller was a policymaker with respect to the decision to use the ASORT Team for the execution of the nighttime search warrant at the Rush residence on February 28, 2007.

54. At the time of the execution of the nighttime warrant at the Rush residence on February 28, 2007, Defendant Dave Mack was a Team Leader of one of the

ASORT teams.  He made the decision to deploy his ASORT Team, and participated in planning for and executing the nighttime warrant at the Rush residence.

55. Defendant David Mack was a policymaker with respect to the decision to use one of the ASORT Teams for the execution of the nighttime search warrant at the Rush residence on February 28, 2007.

56. The execution of the search warrant at 2619 Park Ave. East was planned by Defendants Bosko, Combs, Miller and Mack.  In developing their operational plan for the execution of the warrant the defendants unreasonably relied on the same untrustworthy, unverified and inaccurate confidential informant information referred to above.

57. On February 28, 2007, Officers employed by the City of Mansfield, the City of Ontario, the City of Lexington, the City of Shelby, and the Richland County Sheriff Department, working through ASORT, proceeded to the Rush home at 2619 Park Ave. East in Mansfield to serve the search warrant.

58. On the evening of February 28, 2007, Jacob Rush and Bobbi Jo Dick were visiting the rest of the family and intended to stay the night.  Tom Rush, who normally resided in the home, was visiting his daughter and not home that evening.

59. The occupants of the house all went to bed before the search warrant was executed.

60. After the family went to bed there were no lights in the yard.  There were also no lights along the public roadway in front of the house.  There were two dogs on chains tied to trees in the yard.  These dogs would normally bark when persons came to the house.

61. At approximately 11:00 p.m. the occupants of the house heard a loud boom and heard someone attempting to make a forced entry.  The dogs had not barked so they feared that strangers had killed or silenced the dogs and were now breaking into the house.

62. At no time prior to entry of the ASORT teams did any of the occupants of the house know that the people attempting entry into the house were law enforcement officers.

63. Had the occupants of the house known that the people attempting entry were police officers then they would have opened the door and permitted the officers to enter.

64.  The officers, relying on the untrustworthy, unverified, and incorrect information from the confidential informants, attempted to forcibly enter the door into the kitchen off the breezeway.  One of the confidential informants had stated that the door opened toward the inside of the house.  In fact, that door opened out and could not be breached with the tools used by the ASORT Team.

65. The failure to breach the kitchen door caused officers to stack up in the breezeway.

66. The ASORT officers were all wearing tactical gear with black uniforms and many carried guns with flashlights mounted on their gun muzzles.  Their uniforms included black helmets and their faces were covered with black masks known as nomex hoods.

67. John Rush quickly took Krysten Blevins, baby Kameron Rush, and Bobbi Jo Dick into the bathroom and locked the bathroom door.

68. Gilbert Rush Jr., Jacob Rush and Melissa Hedrick went into the kitchen.  They looked out of the windows but could only see dark forms and moving bright lights

and did not identify the figures outside as police officers. Gibert Rush Jr. told Jacob to call the police.

69. None of the occupants in the Rush residence identified the figures outside as police officers.

70. Given the conditions at the residence at the time of the execution of the search warrant it was foreseeable by defendants that the occupants of the house would not be able to determine that the people seeking entry were police officers.

71. Given the conditions at the residence at the time of the execution of the search warrant it was foreseeable by defendants that the occupants of the house would assume that the people seeking entry were burglars or criminals.

72. Given the conditions at the residence and the recent history of events involving members of the Rush family, including threatening phone calls to the Rush residence and reports to the police from the Rush family, it was foreseeable by defendants that if the officers executing the warrant properly identified themselves as police officers the occupants of the house would cooperate with them.

73. Given the conditions at the residence and the recent history of events involving members of the Rush family, including threatening phone calls to the Rush residence, it was foreseeable by defendants that if the the officers executing the warrant failed to identify themselves as police officers the occupants of the house would assume that the ASORT teams were criminals and that would cause the family to defend itself.

74. After hearing the noise, Gilbert Rush Jr. looked out the kitchen window while holding one of his hunting rifles.

75.  An ASORT officer shot at Mr. Rush when Mr. Rush was at the kitchen window. Mr. Rush then discharged his weapon through the window.

76. A bullet or debris struck Mr. Rush in the head and Mr. Rush cried out in pain and agony.

77. Multiple officers then fired high powered automatic weapons and more than 13 large caliber high powered rifle bullets pierced the darkness and entered the house through the walls and the front and side kitchen windows.

78. Eventually the ASORT Teams entered the house by forcibly opening the front door.

79. Two ASORT Team members entered the kitchen and shot Mr. Rush as he sat on the kitchen floor.

80. The shooting of Mr. Rush was excessive, unreasonable and completely unnecessary.

81. The bullets fired by the ASORT officers riddled the home and passed very close to the five month old baby residing in the home.

82. The ASORT Team members took all of the occupants out of the house, including the baby, into custody.  The officers used excessive force with the occupants and were verbally and physically abusive to the residents.  All of the residents were terrified.

83. No search for the alleged stolen baby furniture and other property described in the warrant was conducted that evening.

84. In attempting to execute the search warrant, the officers working for defendants did not provide reasonable notice that they were law enforcement officers to the persons at the residence.

85. The use of deadly force by the ASORT teams under the operational plan utilized on February 28, 2007 was excessive, unreasonable and undertaken knowing that the plan posed an unreasonable risk to citizens who were simply accused of property crimes.

**D.  Policies and Practices, Abuse of Power**

86. The search conducted of Plaintiffs was unreasonable.  The search was part of a pattern and practice by defendants of executing search warrants at night without knocking and announcing the presence of law enforcement and without providing residents a reasonable opportunity to respond to the knock.

87. The defendants, through their customs, policies, patterns and practices have each acted negligently, intentionally, recklessly, and with deliberate indifference to the constitutional rights of the Plaintiffs.

88. The actions of the defendants reflect an arbitrary abuse of government power, which shocks the conscience.

89. The policies, customs, patterns and practices of defendants were the moving force behind the constitutional violations suffered by the Plaintiffs.

90. Although the policy makers were on notice of the obvious need to train and supervise police in these areas, defendants failed to train and supervise the individual police officers who conducted these searches in proper use of  the ASORT Teams, proper surveillance, proper development of an operational plan, proper search procedures, proper use of force procedures and proper procedures regarding the investigation of serious crimes.  The policy makers failed to develop and institute adequate reality based training programs relating to the serving of

nighttime search warrants by ASORT. The policy makers also failed to institute adequate rules, regulations policies and procedures relating to the verification of information provided by confidential informants. The reliance by Defendants upon information provided by the confidential informants in these instances was unreasonable.  As such, defendants were deliberately indifferent to the rights of citizens subject to investigation and searches, including the Plaintiffs.

**E.  Injuries and Property Damage**

91. As a result of the wrongful acts of defendants the Plaintiffs have suffered permanent physical and psychic injury, pain and trauma, severe emotional distress and mental anguish, property damage, and numerous other physical, emotional and psychological injuries.

92. As a result of the wrongful actions of Defendants, the next of kin of Gilbert Rush Jr. have sustained great pain and suffering, loss of inheritance, and severe emotional distress.

93. As a proximate cause of the conduct of Defendants, the next of kin of Gilbert Rush Jr. have suffered mental anguish and damages for loss of his society over their life expectancies, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

94. As a proximate cause of the conduct of Defendants, Gilbert Rush Jr. suffered an unnecessary shooting before his death and endured severe conscious suffering, physical pain, anguish and then death.

**V. FIRST CLAIM FOR RELIEF - §1983**

95. The Defendants have, under color of law, deprived Plaintiffs of clearly established

rights, privileges and immunities secured by the Fourth and Fourteenth

Amendments to the United States Constitution of which a reasonable person would

have known.  These rights include, but are not limited to, the right to due process of

law and the right to be free of unreasonable searches and seizures.

## VI.    SECOND CLAIM - WRONGFUL DEATH

61. Gilbert Rush Jr. was shot and died as a result of injuries inflicted by Defendants.  His

death was preceded by conscious pain and suffering.  The death of Gilbert Rush Jr.

resulted in damages to his next-of-kin pursuant to Ohio Revised Code Section 2125.02.

## VII. THIRD CLAIM – ASSAULT AND BATTERY

62. The Defendants have intentionally and maliciously applied and threatened to apply

unlawful and unnecessary force to Plaintiffs.

## VIII. FOURTH CLAIM– NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

63. The Defendants have negligently inflicted serious emotional distress on Plaintiffs.

## IX. FIFTH CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

64.  The Defendants have intentionally inflicted serious emotional distress on Plaintiffs

## X. JURY DEMAND

65. Plaintiff requests a jury on all claims triable to a jury.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Award Plaintiffs compensatory damages against defendants in an amount

to be shown at trial;

B.      Award Plaintiffs punitive damages against any individual defendants as appropriate, but not against any units of government, in an amount to be shown at trial;

C.      Order the units of local government to apologize to Plaintiffs;

D.      Award Plaintiffs reasonable attorney fees pursuant to 42 U.S.C. § 1988 and any other applicable law;

E.      Award Plaintiffs prejudgment interest and post judgment interest;

F.      Award Plaintiffs such other and further relief, as the Court deems appropriate.

Respectfully submitted,

s/ Alphonse A. Gerhardstein
Alphonse A. Gerhardstein (0032053)
Trial Attorney for Plaintiffs
Gerhardstein & Branch, Co LPA
617 Vine Street Suite 1409
Cincinnati, Ohio 45202
(513) 621-9100
Fax (513) 345-5543
agerhardstein@gbfirm.com

David B. Malik (0023763)
Attorney for Plaintiffs
8437 Mayfield Road, Suite 103
Chesterland, OH 44026
(440) 729-8260
(440) 729-8262 fax
dbm50@earthlink.net

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2008, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has

entered an appearance by operation of the Court's electronic filing system.  Parties may

access this filing through the Court's system.


s/ Alphonse A. Gerhardstein
Attorney for Plaintiff