UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JACOB RUSH, et al., | ) | |
| | ) | Case No. 1:07CV1068 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | JUDGE KATHLEEN O'MALLEY |
| | ) | (Magistrate Judge Mchargh) |
| CITY OF MANSFIELD, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| | ) | |

CONTENTS

I.      SUMMARY JUDGMENT                                    2

II.     FACTUAL BACKGROUND                                  5

III.    SECTION 1983                                        8

IV.     ASORT                                               10
        A.  ASORT's Motion for Summary Judgment            11

V.      DOCTRINE OF QUALIFIED IMMUNITY                      22
        A.  Excessive Force                                 26
               1.  Flash-Bang Device and
                       Initial Attempt to Enter             28
               2.  Shots at Kitchen Window                  33
               3.  Shots in Kitchen                         38
               4.  Bosko and Wendling                       40
               5.  Officer Miller                           44
               6.  Combs and Mack                           49

VI.     MUNICIPAL LIABILITY                                 51
        A.  Municipality Liability Through Actions
               of Final Policymakers                        53
        B.  Failure to Supervise                            59
        C.  Ratification                                    61
        D.  ASORT                                           65

VII.    STATE LAW CLAIMS                                    66

VIII.   MOTIONS TO STRIKE                                   66

IX.     SUMMARY                                             71

McHARGH, Mag.J.

The plaintiffs Jacob Rush and others (collectively, "Rush") have filed an

action under 42 U.S.C. § 1983, alleging five claims against defendants City of

Mansfield, Ohio; Richland County, Ohio; and other governmental entities and

individuals. The first claim is a federal claim under Section 1983, alleging

constitutional violations of "the right to due process of law and the right to be free of

unreasonable searches and seizures" under the Fourth and Fourteenth

Amendments to the U.S. Constitution. (Doc. 75, Am. Compl., at ¶ 60.)

The other four claims are state law claims alleging wrongful death, assault

and battery, negligent infliction of emotional distress, and intentional infliction of

emotional distress. Id. at ¶¶ 61-64.

The action arose from a nighttime police raid to enforce a search warrant

related to an alleged stolen property ring.[1] See generally doc. 75, Amended

Complaint. A fuller factual background is provided in Section II., below.

Several of the defendants have filed motions for summary judgment. The

City of Ontario (hereinafter, "Ontario") has filed a motion for summary judgment on

its own behalf. (Doc. 167.) Defendant Richland County ("Richland") has filed a

motion for summary judgment (doc. 168) as well, supported by a reply

---

[1] Other plaintiffs have filed claims, also arising out of nighttime police raids
to enforce warrants, against several of the same defendants in Bowles v. City of
Mansfield, No. 1:07CV2276 (N.D. Ohio filed Apr. 11, 2007), and Cline v. City of
Mansfield, No. 1:07CV1070 (N.D. Ohio filed Apr. 11, 2007). Much of the discovery
to date has overlapped in these three cases. See, e.g., doc. 73-74.

memorandum (doc. 200). In addition, a motion for summary judgment (doc. 169) has been filed by the City of Mansfield ("Mansfield"), Mansfield Police Det. Eric Bosko ("Bosko"), Officer Richard Miller ("Miller"), and Lt. John Wendling ("Wendling") (collectively, "the Mansfield defendants"), also supported by a reply (doc. 204).

Also, defendants ASORT[2], City of Shelby ("Shelby"), City of Lexington ("Lexington"), Shelby Police Capt. Lance Combs ("Combs") and Sgt. David Mack ("Mack") have filed their own motion for judgment (doc. 170), as well as a reply (doc. 201). Finally, defendant ASORT has filed a motion for summary judgment (doc. 171) on its own behalf, supported by a reply memorandum (doc. 202).

With leave of court (doc. 186), the plaintiffs have filed a single memorandum in opposition to these motions. (Doc. 192.)

## I. SUMMARY JUDGMENT

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations

---

[2] ASORT stands for "Allied Special Operations Response Team," a tactical team formed by the Richland County Chiefs of Police Association. (Doc. 171, brief, at 1.) ASORT is sometimes cited by the parties as "A.S.O.R.T." but for consistency's sake, the court will use "ASORT."

that issues of fact may exist. See Bryant v. Commonwealth of Kentucky, 490 F.2d 1273, 1275 (6th Cir. 1974). The Supreme Court has held that:

> . . . Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e) requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324.

The Sixth Circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), has interpreted Celotex and two related cases, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith Radio, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for summary judgment motions. Street points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. Street, 886 F.2d at 1479.

3

The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Id.  In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion.  Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229 (6th Cir. 1990).

The plaintiffs argue that summary judgment should be held unconstitutional, in violation of the Seventh Amendment's right to trial by jury.  (Doc. 192, at 63-65.) The Sixth Circuit has rejected that argument.  McDaniel v. Kindred Healthcare, Inc., No. 08-5384, 2009 WL 255677, at *1 (6th Cir. Feb. 3,  2009); Cook v. McPherson, No. 07-5552, 2008 WL 904736 (6th Cir. Apr. 2, 2008); but see In re Zyprexa Prod. Liability Litig., 489 F.Supp.2d 230, 263-264 (E.D. N.Y. 2007) (Weinstein, J.) (expressing concern of "a tilting of the scales of justice away from injured plaintiffs").  The Supreme Court has not ruled in support of this proposition, and until then, this court will continue to apply Federal Rule 56, as it must.

4

## II.  FACTUAL BACKGROUND

The following factual background is based primarily[3] on plaintiffs' factual recitation.  See generally doc. 192, at 2-6; see also doc. 75, Am. Compl., at ¶¶ 20-83.  To the extent that it is based on evidence cited to the record, that evidence and any inferences drawn from that evidence, for the purposes of these motions for summary judgment, is construed in the light most favorable to Rush, as the party opposing the motions.  Kraus, 915 F.2d at 229.

Plaintiffs are all persons who were in the Rush/Hedrick home at 2619 Park Avenue East in Mansfield, Ohio on the night of February 28, 2007:  Jacob Rush, individually and as the administrator of the estate of Gilbert Rush, Jr.; Bobbi Jo Dick, former girlfriend of Jacob Rush; Melissa Hedrick, the partner of Gilbert Rush, Jr.; John Rush; John's infant son K.R.; and K.R.'s mother, Krysten Blevins.  Defendants are the Allied Special Operations Response Team (ASORT), Richland County and the Cities of Mansfield, Shelby, Lexington, and Ontario.  ASORT is a tactical law enforcement team made up of officers from the County and the four cities set out above.  Defendants also include the following persons sued in their official and individual capacities:  ASORT Commander Lance Combs and ASORT Team Leaders Richard Miller and David Mack; Mansfield Police Detective Eric

---

[3] The court did not adopt factual assertions by plaintiffs which were unsupported by the record.  For example, as suggested by the defendants, the court disregarded any "unsupported contentions regarding the subjective knowledge of Gilbert Rush, Jr."  (Doc. 201, at 4.)

Bosko and Mansfield Police Lieutenant John Wendling.  See generally doc. 192, at 2-6; see also doc. 75, Am. Compl., at ¶¶ 20-83.

On February 28, 2007, the occupants were settled in for the night at the Rush/Hedrick home.  The lights were off and their semi-rural setting was quiet and peaceful.  Jacob and Bobbi Jo were visiting that night.  They were in a bedroom with John, Krysten, and baby K.R., who had recently taken up residence at the home Gilbert shared with his life partner, Melissa Hedrick.  Id.

Krysten Blevins, age 17 at the time, had chosen to move into the Rush/Hedrick household on December 26, 2006, after several years in the home of her previous foster parent, Deandrea Whyel.  Krysten had been forced to steal from Wal-Mart and other stores by Deandrea Whyel, and Krysten cited that abuse to the Richland County Juvenile Court as one of the reasons she wanted to leave the Whyel home.  The Juvenile Court approved her move and appointed Gilbert Rush Jr. as her legal guardian.   A family plan was agreed to under which Krysten would go to school, participate in programming to ensure healthy development for the baby, and refrain from stealing.  Id.

While Krysten was living at the Rush/Hedrick home in January and February 2007, Richland County Children's Services was visiting the home and providing services.  The Rush/Hedrick household welcomed these government services.  Gilbert Rush, Jr. was a generous, kind man who helped everyone he knew.  He served as an anchor for the entire Rush family.  Id.

6

In February 2007, Eric Bosko was a Detective assigned to the Juvenile Unit of the Mansfield Police Department.  Defendant Wendling was his supervisor.   In late 2006 and early 2007, Bosko was investigating a retail theft ring at Wal-Mart and other stores in the Mansfield area.  He discovered that Deandrea Whyel was involved in the ring and recruited her as a confidential informant.  Deandrea Whyel convinced Detective Bosko to investigate her "ex-foster daughter" Krysten Blevins.  That meant searching the Rush/Hedrick home for allegedly stolen property.  She also claimed that the Rush household was a dangerous place.  As a result Bosko applied to the Mansfield Municipal Court and secured a search warrant with permission to execute the warrant at night.  Id.

Mansfield Police Chief Phil Messer approved the use of the ASORT Team to execute the night time warrant.  Critical to his approval was the report that that "one person in the house had a gun and carried it around and another person was known to have a weapon near the kitchen."   In fact the guns in the Rush/Hedrick were used for hunting and safely stored in cabinets.  The Richland County Children Services had noted on its home study that the guns were safely stored.  Defendant Bosko did not tell the Chief that the guns were safely stored.  The Chief conceded that if he had known that the guns were stored in cabinets, "he would have asked a lot more questions" before approving use of the ASORT team.  Bosko continued passing inaccurate information about weapons and other matters in the Rush/Hedrick household when he met with the ASORT Team causing them to develop a tactical plan that included heavy weaponry.  Id.

7

The operational plan was developed and implemented by defendants Combs, Miller and Mack on February 28, 2007.  The ASORT team arrived at the Rush home under cover of darkness, approaching in an unmarked van with the lights off. The officers disembarked and prepared to enter the darkened house.  Id.

The officers commenced knocking and announcing inside the breezeway, and exploded a flash-bang device during that same time period.  Approximately two weeks before, the family had reported to the Richland County Sheriff that they had received a call threatening "to kill you and your family."  Gilbert Rush Jr. turned on the kitchen light and appeared at the kitchen window with his single-shot shotgun. An ASORT team member shot first and Gilbert Rush Jr. responded.  Then multiple assault weapons were discharged into the kitchen.  The Team gained entry through the front door.  Two members ran to the kitchen and shot Gilbert Rush who was seated on the floor with blood running down his face.  Gilbert's gun had no ammunition.  Less than two minutes expired from the explosion of the flash bang to the final shooting of Gilbert Rush Jr.  See generally  doc. 192, at 2-6; see also doc. 75, Am. Compl., at ¶¶ 20-83.)


## III.  SECTION 1983

"The purpose of [42 U.S.C.] § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992); McKnight v. Rees, 88 F.3d 417, 419 (6th Cir. 1996), aff'd, 512 U.S.

8

399 (1997) (quoting Wyatt).  To prove a claim under Section 1983, the plaintiff must identify a right secured by the Constitution or laws of the United States, and the deprivation of that right by a person acting under color of state law.  Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994).  The threshold question, therefore, is whether the defendant deprived the plaintiff of a right secured by the Constitution or laws of the United States.  Kallstrom v. City of Columbus, 136 F.3d 1055, 1060 (6th Cir. 1998).

Rush alleges a constitutional violation of "the right to due process of law and the right to be free of unreasonable searches and seizures" under the Fourth and Fourteenth Amendments to the U.S. Constitution.  (Doc. 75, Am. Compl., at ¶ 60.) In particular, Rush identifies the constitutional deprivation as "an unreasonable seizure through excessive force during the execution of the search warrant."  (Doc. 192, at 7-8.)  Gilbert Rush was shot and killed, and the remaining plaintiffs "were terrorized when they endured a hail of bullets."  Id. at 20.  A claim of excessive force involves an alleged violation of the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 388 (1989); King v. Boyd, 194 F.3d 1312, 1999 WL 1024030, at *2 (6th Cir. 1999) (TABLE, text in WESTLAW), cert. denied, 530 U.S. 1265 (2000).

Although the parties discuss at length the investigation, issuance, and service of the search warrant, Rush does not allege a constitutional violation regarding the search warrant itself:  "This case does not challenge the warrant." (Doc. 192, at 49.)

9

## IV. ASORT

The first issue to be resolved is the legal status of defendant ASORT. The amended complaint names ASORT as a "regional law enforcement organization made up of units of local government that belong to the Richland County Sheriffs Association." (Doc. 75, at ¶ 15.) ASORT has moved for summary judgment on the grounds that it "is not a legal entity capable of being sued." (Doc. 171, at 1, 4.)

According to ASORT's brief in support of its motion for summary judgment, ASORT "is a tactical team, similar to S.W.A.T. that was formed by the Richland County Chiefs of Police Association[4] . . . in order to respond to tactical operations and high risk situations." (Doc. 171, brief in support, at 1.) RCCPA is "a private organization composed of the chief law enforcement officers for the Richland County Sheriff's Department, the Mansfield Police Department," and the police departments for the cities of Lexington, Ontario, Shelby, Belleville and Butler. Id.

In a separate joint motion for summary judgment filed by ASORT, along with the Cities of Shelby and Lexington (plus Combs and Mack), ASORT is said to be "a multi-district special operations law enforcement agency created and administered by" the RCCPA. (Doc. 170, at 2.) It is claimed that ASORT is not a separate corporate entity, and has no operating budget. Id. at 3.

The status of ASORT is not consistently expressed by its co-defendants. According to co-defendant Richland County, ASORT is "a multi-jurisdictional police

---

[4] The court will refer to this group as RCCPA, rather than "R.C.C.P.A."

tactical team consisting of members from the Richland County Sheriff's Office and various police departments throughout Richland County." (Doc. 168, at 4.)  ASORT "responds to tactical and high risk search warrant situations."  Id.  ASORT's commander "reports to the Chiefs of Police Association Board which is made up of all the Chiefs of Police from the police departments within Richland County as well as the Sheriff of Richland County."  Id.

Co-defendant City of Mansfield says that ASORT is a "highly-trained group of officers from different departments in Richland County." (Doc. 169, at 5, quoting DX E, ASORT Manual, at 1.)  And co-defendant City of Ontario characterizes ASORT as "a mutual aid arrangement consisting of Richland County police agencies and the Richland County Sheriff." (Doc. 167, at 3.)

## A.  ASORT's Motion for Summary Judgment

In its motion, ASORT contends that it is not a legal entity capable of being sued.  (Doc. 171, at 4.)  ASORT states that the members of the RCCPA did not intend to create a separate legal entity when ASORT was formed.  Id. at 5.  ASORT argues that it does not have its own operating budget, and that team members remain employees of their home law enforcement agencies, governed by the practices of their home departments even when on ASORT assignment.  Each department remains responsible for the salary, equipment, training and discipline of its members.  Id. at 6.

ASORT points out that Ohio police departments have no independent legal status, but are merely sub-departments of the municipalities that operate them.  Id.

11

at 6.  ASORT argues that subdivisions of governmental agencies are not entities

capable of being sued.  Id. at 4.  However, ASORT does not contend that it is a

subdivision of a governmental agency, nor does it contend that ASORT itself is a

police department.  See doc. 171, brief in support, at 1.  Rather, ASORT states that

it is a "tactical team," formed by RCCPA, which in turn is "a private organization"

composed of local police chiefs and the county sheriff.  Id.

The ASORT Manual itself provides minimal assistance in this inquiry.  The

Manual's definition of ASORT reads as follows:

> ASORT, (Allied Special Operations Response Team), was formed
> through the Richland County Association of Chiefs of Police (RCACP)
> consisting of all Richland County police agencies and the Richland
> County Sheriff.  ASORT personnel are drawn from various police
> agencies in Richland County.

(Doc. 169, DX E, and doc. 170, DX A, ASORT Manual, at 1.)  The section concerning

"organizational structure" states:

> ASORT was formed through the Richland County Chiefs Association.
> Therefore, decisions concerning ASORT shall be voted on by the
> Association.  A minimum of three (3) votes are required; (Example:
> Personnel guidelines, Standard Operating Procedures and
> Equipment).

Id. at 2.

12

Rush responds that it is clear that ASORT is a "person" under Section 1983.[5] (Doc. 192, at 23-25.) Rush points out that although states are not "persons" under Section 1983, local governments are considered "persons." Id. at 23, citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989), and Berry v. City of Detroit, 25 F.3d 1342, 1345 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1995). Not only municipalities, but also "other local government units" are included among those "persons" to whom Section 1983 applies. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978). The Sixth Circuit has reasoned that, under Will , those entities which are not arms of the state should generally be considered "persons" for purposes of Section 1983. Alkire v. Irving, 330 F.3d 802, 812 n.7 (6th Cir. 2003).

Rush contends that "ASORT is not incorporated, and is best described as an unincorporated association." (Doc. 192, at 23.) Rush argues that ASORT should be considered "simply an unincorporated association of local governments." Id.

_____

[5] Section 1983 provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

Will v. Michigan Dep't of State Police, 491 U.S. 58, 60 n.1 (1989) (quoting 42 U.S.C. § 1983).

"ASORT is a group of governmental units that are acting together to provide tactical police services." Id. at 24.  Rush states that many types of local government entities have been held to be "persons," including those made up of multiple local governments.  Id. at 24.  In addition, ASORT should be considered an association, and associations are considered "persons."  Id. at 25.

Rush notes that an unincorporated association may be sued under Civil Rule 17(b)(3).[6]  (Doc. 192, at 25-26, citing Fed. R. Civ. P. 17(b)(3).)  Civil Rule 17 governs the capacity to sue or be sued in federal court.  Fed. R. Civ. P. 17.  The capacity to sue or be sued for parties other than individuals or corporations is determined by the law of the state where the court is located, with two exceptions.  Fed. R. Civ. P. 17(b)(3).  The relevant exception here provides:

> a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws.

Fed. R. Civ. P. 17(b)(3)(A) (emphasis added).

Thus, under Rule 17(b), "in an action where a substantive federal right as distinguished from a right arising under local state law is involved, the capacity of an unincorporated association to sue or be sued will be governed by federal law."

---

[6] The State of Ohio has also departed from the common law norm, and permits an unincorporated association to sue or be sued "as an entity under the name by which it is commonly known and called."  Ohio Rev. Code § 1745.01; Tanner v. Columbus Lodge No. 11, Loyal Order of Moose, 44 Ohio St.2d 49, 50-51, 337 N.E.2d 625, 626 (1975).

Wilson & Co. v. United Packinghouse Workers of Am., 181 F.Supp. 809, 815 (D. Iowa 1960); see generally Fed. R. Civ. P. 17(b)(3)(A).

ASORT contends that Rush must identify an Ohio statute that establishes ASORT as a separate legal entity.  (Doc. 202, at 3.)  ASORT argues that Ohio Rev. Code § 737.04 suggests that a multijurisdictional entity such as ASORT possesses no separate legal existence.  Id. at 3-4.  However, where "a federal substantive right is claimed, federal courts must apply federal and not state law in determining what constitutes an unincorporated association for capacity purposes."  Associated Students of Univ. of Cal. at Riverside v. Kleindienst, 60 F.R.D. 65, 67 (C.D. Cal. 1973) (citing cases).

An unincorporated association has been defined by federal courts as "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective."  Id. (quoting Local 4076, United Steelworkers v. United Steelworkers, 327 F.Supp. 1400, 1403 (W.D. Pa.1971) (union local)).  See also Prewitt Enterprises, Inc. v. OPEC, 353 F.3d 916, 922 n.6 (11th Cir. 2003), cert. denied, 543 U.S. 814 (2004) (Organization of Petroleum Exporting Countries).  That definition seems apt here, and fairly describes the relationship of the various defendants.  See generally Matje v. Leis, 571 F.Supp. 918, 924 (S.D. Ohio 1983) ("Regional Enforcement Narcotics Unit" may properly be sued as unincorporated association).

Federal courts have found other voluntary associations involving governmental entities (although their purposes and activities differ from ASORT) to

15

be "persons" under Section 1983.  In Wright v. Arkansas Activities Ass'n, 501 F.2d 25, 27-28 (8th Cir. 1974), the Eighth Circuit found a voluntary association to be a "person" under Section 1983.  The association was not created by state statute or the state constitution, nor was it an agency of the state, but rather the association was established by local school systems on a voluntary basis.  The court found that the association was not immune from suit, and was a "person" under Section 1983.  Wright, 501 F.2d at 28.

The Fifth Circuit, in Walsh v. Louisiana High School Athletic Ass'n, 616 F.2d 152, 156 (5th Cir. 1980), cert. denied, 449 U.S. 1124 (1981), came to the same conclusion.  The voluntary association in Walsh was not a regularly constituted agency of the state, nor was its existence provided for by statute or the state constitution, and the court concluded that the association was a "person" for purposes of Section 1983.  Walsh, 616 F.2d at 156.

In its reply, ASORT responds that the issue of whether ASORT is a "person" is not relevant to their argument that ASORT does not possess a "separate legal existence from the individual political subdivisions of which it is comprised."  (Doc. 202, at 1.)  On the contrary, the court finds ASORT is an unincorporated association which is amenable to suit.  Matje, 571 F.Supp. at 918; Associated Students, 60 F.R.D. at 67; Wilson, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A).  Rush argues that defendants have not identified any type of immunity, sovereign or otherwise, which would protect ASORT from suit.  (Doc. 192, at 25.)

16

ASORT argues in favor of a "general presumption that in the absence of a specific state statute mandating that the multijurisdictional task force was a separate entity, the Court was to look at the intent of the founders to determine whether or not they intended to create a separate legal entity." (Doc. 202, at 3, citing Timberlake v. Benton, 786 F.Supp. 676 (M.D. Tenn. 1992).)

In Timberlake, the district court did not apply a "general presumption." Rather, the court analyzed whether a local drug task force (the 19th Judicial District Drug Task Force), created pursuant to the Tennessee Code Annotated, was "a person subject to suit under 42 U.S.C. §1983." Timberlake, 786 F.Supp. at 682. The court recognized that courts have not been uniform in their approach to the meaning of "person." Id. The task force director argued that he was not amenable to suit in his official capacity since the task force was not a person subject to suit under Section 1983. Id.

The court noted that the task force resembled a police department, in the sense that it was comprised of police officers, and functioned to enforce the law. However, it was distinguishable from a police department in that:

> . . . the Task Force is not a department of any one city. It encompasses several counties and cities. It has a board of directors independent of any one city, and a unique source of funding. The authority for creation of the Task Force comes from two provisions of Tennessee law.

Timberlake, 786 F.Supp. at 682.

The Tennessee statute allowed two or more public agencies to enter into agreements for joint cooperation, and allowed the possibility of creating a separate

17

legal entity for this purpose. Id. Where no legal entity was created, the mutual aid agreement was required to provide for the manner of acquiring, holding, and disposing of real property. Id. at 683 n.1. Also, the parties to the agreement were required to form a joint board responsible for administering the task force. Id. at 683 n.2. Despite the organizational structure required by the Tennessee statute, the court found that the provisions of the agreement at issue "tend to indicate that no distinct entity was created." Id. at 682.

The court in Timberlake pointed out that the state statute permitted cities and counties to enter into mutual aid agreements "without the creation of a separate legal entity." Id. at 683. The court "believe[d] that the creation of a legal entity capable of being sued should not be left to chance." With that view, the court found that the task force was "a joint undertaking of several counties and cities and not a 'person' amenable to suit under § 1983." Id.

This court is not persuaded by the reasoning of Timberlake. The mutual aid agreement which led to the formation of the task force at issue can hardly be said to be the result of "chance." The agreement included provisions for a Board of Directors, the acquiring, holding, and disposing of real property, and provisions for mutual indemnity. While the task force may not have constituted a "separate legal entity" under Tennessee law, the task force's creation and existence was not a random or "chance" occurrence, but rather a deliberate action.

More importantly, the analysis of the task force's legal capacity to be sued in a federal Section 1983 action should have continued under Civil Rule 17, rather

than ending solely under Tennessee law.  Having found that the task force had no legal capacity to be sued under Tennessee law, the court should have gone on to apply federal law to determine if the task force was an unincorporated association capable of being sued.  Associated Students, 60 F.R.D. at 67; Wilson, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A) ("other unincorporated association with no such capacity [to be sued] under that state's law may . . . be sued under its common name").

Another case cited by ASORT, Hervey v. Estes, 65 F.3d 784 (9th Cir. 1995), relied substantially on the incomplete analysis put forth in Timberlake.  See Hervey, 65 F.3d at 792 (citing Timberlake).  In Hervey, the plaintiffs sued the Tahoma Narcotics Enforcement Team (TNET) and other defendants, alleging excessive force during a "military-style raid" to search for a meth lab on rural property.  Id. at 786.  The court stated that "TNET is composed of several local, county, and state governmental entities," and that it "is not a municipality or local governmental entity, it is an intergovernmental association."  Id. at 791-792.

Relying on the flawed Timberlake analysis, the court stated that TNET "is only subject to suit if the parties that created TNET intended to create a separate legal entity."  Hervey, 65 F.3d at 792 (citing Timberlake, 786 F.Supp. at 682-688)[7].  The court noted that, under Washington law (and similar to the Tennessee law in

---

[7] Hervey also cites to Maltby v. Winston, 36 F.3d 548, 560 n.14 (7th Cir. 1994), which mentions Timberlake in passing.  Under Illinois law, the task force in question was subject to suit under state law (and thus implicitly under Fed. R. Civ. P. 17(b)(3)).

Timberlake), "public agencies entering into an agreement for joint or cooperative action may, but need not, establish a separate legal entity." The court found that the TNET agreement did not contemplate a separate legal entity. Id. The court found that:

> The agreement creating TNET does not indicate from what authority it springs. Absent some indication from either state law or from the enabling document that anyone intended TNET to be a formal independent entity . . . we conclude that it is not an entity subject to suit under section 1983.

Hervey, 65 F.3d at 792. Having determined TNET's lack of legal status under Washington state law, the court never proceeded to apply federal law under Civil Rule 17.

ASORT also cites Brown v. Fifth Judicial Dist. Drug Task Force, 255 F.3d 475 (8th Cir. 2001), and Eversole v. Steele, 59 F.3d 710, 716 n.6 (7th Cir. 1995), in support of its arguments. (Doc. 171, at 4.) In Brown, the court of appeals held that the district court's dismissal of a case against a drug task force, on the basis that it was not a legal entity capable of being sued, was not plain error. Brown, 255 F.3d at 476. The court found plaintiff's argument that the task force was an unincorporated association "plausible" under Rule 17, id. at 477, but found no "plain error" in the district court's ruling. In its plain error analysis, the court cited Eversole and Hervey, among others, which found that similar drug task forces were not separate legal entities subject to suit. Id. at 477. The court in Brown concluded that "it seems to us that the District Court committed no error. In any case, the error, if there was one, is certainly not 'plain.'" Id. at 478.

20

Hervey, and its reliance on Timberlake, has already been discussed.  Eversole provides even shakier support for the conclusion at issue.  The court in Eversole was discussing the issue of whether certain individual defendants possessed final policymaking authority.  Eversole, 59 F.3d at 715-716.  During this discussion, in the footnote cited by ASORT, the court simply states that the drug task force "was not an official entity."  Id. at 716 n.6.

Whether considered a "joint undertaking," Timberlake, 786 F.Supp. at 683, or "an intergovernmental association," Hervey, 65 F.3d at 792, the task forces in those cases would certainly appear to be the type of "other local government units to be included among those persons to whom § 1983 applies."  Monell, 436 U.S. at 690.  Having found that they had no legal capacity to be sued under state law, Federal Civil Rule 17(b)(3)(A) would then apply, and a determination whether the task force was an unincorporated association capable of being sued should have followed.

In the case before this court, the formation and purpose of ASORT, and the structure and composition of ASORT and its teams, was not "left to chance."  A structure and Manual were put into place to govern the composition and procedures of ASORT and its teams.  (Doc. 169, DX E, and doc. 170, DX A, ASORT Manual.)  Similarly, the decision to deploy ASORT to serve the search warrant, and the composition, role, and procedures of the ASORT team which served the warrant were not random events, but deliberate choices, guided by ASORT policies.  The ASORT team which served the warrant was a pre-existing group (with two additions from the other ASORT team), organized in advance for the very purpose

21

of serving warrants, not a random group of police officers from different jurisdictions spontaneously composed for mutual assistance, for example, to respond to an unexpected disaster or riot. Under these circumstances, the fact that ASORT may not exist as a "legal entity" under Ohio law does not serve to provide ASORT with a de facto immunity from federal suit under Section 1983.

For the reasons discussed more fully earlier, the court finds that ASORT is an unincorporated association which is amenable to suit under federal law. Matje, 571 F.Supp. at 918; Associated Students, 60 F.R.D. at 67; Wilson, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A). For purposes of Section 1983, then, the court finds ASORT is a "person" which may be sued under Section 1983. ASORT's motion for summary judgment (doc. 171) should be DENIED, because it has failed to demonstrate that it is entitled to judgment as a matter of law.

## V. DOCTRINE OF QUALIFIED IMMUNITY

Several of the individual defendant officers have invoked the doctrine of qualified immunity in their motions for summary judgment.

Mansfield Police Det. Bosko, Officer Miller, and Lt. Wendling contend that they are entitled to qualified immunity from plaintiffs' claims. (Doc. 169, at 14-32.) They argue that the immunity protects them both from a claim regarding the investigation and issuance of the search warrant (id. at 15-22), as well as the claim of excessive force (id. at 22-32).

22

Shelby Police Capt. Combs and Sgt. Mack also assert that they are entitled to qualified immunity.  (Doc. 170, at 17-30.)  They claim that their reliance on the information provided by Det. Bosko's investigation and affidavit was reasonable. Id. at 18-21.  They also argue that the operational plan to serve the warrant, and their involvement in the service of the warrant, were objectively reasonable.  Id. at 21-26.  Finally, they contend that any force used during the service of the warrant was reasonable,  based upon the circumstances.  Id. at 26-30.

The issue of qualified immunity must be addressed at the earlier possible point in the litigation.  Pearson v. Callahan, 129 S.Ct. 808, 815 (2009); Saucier v. Katz, 533 U.S. 194, 200-201 (2001).  The Supreme Court has stated that the inquiry regarding qualified immunity is distinct from the merits of the excessive force claim itself.  Saucier, 533 U.S. at 204; Dunigan v. Noble, 390 F.3d 486, 491 n.5 (6th Cir. 2004).

A government official who is performing a discretionary function is entitled to qualified immunity from suit[8] as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson, 129 S.Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999).  In other words, any "objectively reasonable" action by a state officer, as assessed in the light

---

[8] Qualified immunity is an immunity from suit, rather than a mere defense to liability.  Pearson, 129 S.Ct. at 815 ; Saucier, 533 U.S. at 200; Dunigan, 390 F.3d at 490.

23

of clearly established law at the time of the conduct at issue, will be protected by qualified immunity.  Painter, 185 F.3d at 567.  Qualified immunity can be defeated if the official "knew or reasonably should have known" that the action he took would violate the constitutional rights of the plaintiff.  Harlow, 457 U.S. at 815.  Qualified immunity is a purely legal question which must be determined early in the proceedings.  Saucier, 533 U.S. at 200; Siegert v. Gilley, 500 U.S. 226, 232 (1991).

The defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question.  Rich v. City of Mayfield Heights, 955 F.2d 1092, 1095 (6th Cir. 1992).  (The defendants here have met their initial burden:  it is uncontested that the police officers were acting in their official capacities.)

The burden then shifts to the plaintiffs.  The ultimate burden of proof is on the plaintiffs to show that the defendants are not entitled to qualified immunity.  Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005); Cartwright v. City of Marine City, 336 F.3d 487, 490-491 (6th Cir. 2003) (citing Rich, 955 F.2d at 1095); Hamilton v. Myers, 281 F.3d 520, 531 (6th Cir. 2002).  Upon the assertion of qualified immunity, the plaintiffs must put forward "specific, nonclusory factual allegations" that would defeat the immunity.  Siegert, 500 U.S. at 236 (Kennedy, J., concurring).

The Supreme Court recently held that the "two-step sequence" previously required by Saucier v. Katz "should no longer be regarded as mandatory," and that district courts have discretion in "deciding which of the two prongs of the qualified

24

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S.Ct. at 818.  The two factors which are relevant to demonstrate whether or not the defendants are  entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."  Pearson, 129 S.Ct. at 815-816 (internal citations omitted); see also  Saucier, 533 U.S. at 201.

Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." Saucier, 533 U.S. at 201.  The relevant inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 199 (2004); Saucier, 533 U.S. at 202.  If the law does not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Saucier, 533 U.S. at 201.  See also Pearson, 129 S.Ct. at 816 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

"In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." Dunigan, 390 F.3d at 491 (citing Saucier, 533 U.S. at 202; Anderson, 483 U.S. at 639).

25

## A.  Excessive Force

The constitutional violation as identified by Rush is "an unreasonable seizure through excessive force during the execution of the search warrant." (Doc. 192, at 7-8.)  "This case does not challenge the warrant."  Id. at 49.  Rush's claims challenge "the actions of the ASORT team as excessive force."  Id. at 1, 20.  Rush has not sued the two officers who fired the fatal shots.  Id. at 20.

Rush urges that the constitutional violation, that is, the use of excessive force, "flow[s] from the unreasonable manner in which the operation was designed and executed." (Doc. 192, at 18.)  Rush contends that "the injury was caused by the severely flawed raid plan itself."  Id. at 19.

Claims that officers used excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard.  Brosseau, 543 U.S. at 197; Saucier, 533 U.S. at 204; Graham, 490 U.S. at 394-95.  Determining whether the officer's actions were objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest."  Graham, 490 U.S. at 396; Russo v. City of Cincinnati, 953 F.2d 1036, 1044 (6th Cir. 1992).  If the amount of force used to accomplish the arrest is objectively reasonable, then no constitutional violation occurred.  Michaels v. City of Vermillion, 539 F.Supp.2d 975, 983-984 (N.D. Ohio 2008) (citing Baker v. City of Hamilton, 471 F.3d 601, 606 (6th Cir. 2006)).

26

In particular, the reasonableness of the officer's decision depends on the officer's "knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."  Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 762 (2nd Cir. 2003) (quoting Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996)).  See also Dunigan, 390 F.3d at 494; Dickerson v. McClellan, 101 F.3d 1151, 1161-1162 (6th Cir. 1996) (citing cases).  The Sixth Circuit has rejected the argument that police officers "should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry."  Dickerson, 101 F.3d at 1161; see also Chappell v. City of Cleveland, 584 F.Supp.2d 974, 991 (N.D. Ohio 2008) (quoting Livermore v. Lubelan, 476 F.3d 397, 406 (6th Cir. 2007)).

The law is clearly established "that if a suspect threatens an officer with a weapon or threatens another person with serious physical harm or death, deadly force is authorized in self-defense or defense of another person."  Dickerson, 101 F.3d at 1163 (citing Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)).  See also Whitlow v. City of Louisville, No. 00-6557, 2002 WL 1455317, at *9 (6th Cir. July 1, 2002).

"If the officer reasonably (even if wrongly) believes that his conduct is reasonable under the circumstances, summary judgment based on qualified immunity is appropriate. Qualified immunity can apply even in the case of an officer's mistaken belief, if that belief is reasonable."  Wilson v. City of Des Moines, 293 F.3d 447, 450 (8th Cir. 2002) (citing Saucier, 533 U.S. at 206).

27

In Dickerson, the Sixth Circuit adopted a "segmenting" approach to excessive force cases.  Whitlow, 2002 WL 1455317, at *9; Dickerson, 101 F.3d at 1161-1162; Chappell, 584 F.Supp.2d at 991 (quoting Livermore, 476 F.3d at 406). Under this analysis, the court examines "whether the force used . . . was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances."  Livermore, 476 F.3d at 406 (quoting Dickerson, 101 F.3d at 1161).

### 1.  Flash-Bang Device and Initial Attempt to Enter

Rush suggests beginning the segmenting analysis with the detonation of the flash-bang device, which it is argued disoriented the residents.  (Doc. 192, at 18.) The court agrees that this event was the beginning of the quick-moving sequence of events which led to the shooting death of Gilbert Rush.  There is a factual dispute as to whether the flash-bang was detonated simultaneously[9] with the knock-and-announce, or shortly afterwards.

The Rush plaintiffs do not specifically allege a discrete Fourth Amendment violation in the initial attempt to enter.  However, they contend that the method of entry was unreasonable, in that the officers failed to effectively knock and

---

[9] Plaintiffs rely on their expert's opinion, in part, to support their contention that the flash-bang was detonated "at the same time as the announcement." See, e.g., doc. 192, at 14 n.50.  Expert testimony is insufficient to create questions of material fact in the context of a motion for summary judgment, where there is consistent deposition testimony on the issue.  See Lewis v. Adams County, No. 06-3893, 2007 WL 1228644, at *8 (6th Cir. Apr. 26, 2007); Chappell, 514 F.Supp. 2d at 993-94.  See generally doc. 113, Combs dep., at 110, 150-151, 179 (flash-bang tossed after announcing began.)

announce, and failed to effectively identify themselves as police officers.  (Doc. 192, at 14-15.)  Thus, their actions "predictably" led to Gilbert Rush grabbing a gun in self-defense and his subsequent death.  Id. at 15-16, 18.  The violent entry and Gilbert Rush's death "flow from the unreasonable manner in which the operation was designed and executed."  Id. at 18.

The plaintiffs point out that the police "have a duty to properly identify themselves."  Id. at 14.  See generally Hudson v. Michigan, 547 U.S. 586, 589 (2006).  "Not one of the residents . . . understood that the police were outside their home on February 28, 2008.  Initiating the encounter with a huge and disorienting explosion obscured any 'announcement' that may have been made by the [ASORT] team."  Id.  Although the residents heard yelling outside, they "were unable to discern any particular words until after the police broke down the front door."  Id. at 14 n.49.

At the time of the incident, Jacob Rush and Bobbi Jo Dick were asleep in one bed.  (Doc. 183, Blevins dep., at 19; doc. 178, John Rush dep., at 16; doc. 124, Jacob Rush dep., at 17.)  John Rush was awake, lying on the other bed in the same bedroom.  (Doc. 183, Blevins dep., at  19; doc. 178, John Rush dep., at 15.)  Krysten Blevins was also awake, holding baby Kameron, in the same room.  (Doc. 183, Blevins dep., at 19; doc. 178, John Rush dep., at 16.)

Gilbert Rush and Melissa Hedrick were in a separate bedroom.  Gilbert, at least, was sleeping.  Blevins and John Rush both heard him snoring.  (Doc. 183,

Blevins dep., at 20; doc. 178, John Rush dep., at 18.)  Hedrick was not asleep.  (Doc. 177, Hedrick dep., at 11.)

John Rush heard "a loud boom" and saw "a big flash" in the window.  (Doc. 178, John Rush dep., at 15.)  He exclaimed, "What the hell's going on?" (Doc. 178, John Rush dep., at 16.)  Meanwhile, Jacob testified he was awakened by "a big bang."  (Doc. 124, Jacob Rush dep., at 17, 22; see also doc. 178, John Rush dep., at 16.)  Jacob heard "banging on the door" and then he ran toward the kitchen.  (Doc. 124, Jacob Rush dep., at 17.)  As Jacob ran toward the kitchen, he passed his father Gilbert coming out of his bedroom.  (Doc. 124, Jacob Rush dep., at  18-19.)  His father asked him, "What the hell's going on?" and Jacob responded, "It sounds like somebody broke in."  (Doc. 124, Jacob Rush dep., at 19; see also doc. 177, Hedrick dep., at 11.)

Jacob was the first one into the kitchen, with his brother John right behind him, followed by their father, Gilbert.  (Doc. 124, Jacob Rush dep., at 17, 20; see also doc. 177, Hedrick dep., at 15.)  John also testified that Jacob entered the kitchen first, followed by him.  (Doc. 178, John Rush dep., at 17.)

The occupants testified that, although they heard people yelling outside, and banging on the doors, they could not understand what the people outside were saying.  (Doc. 183, Blevins dep., at 21; doc. 124, Jacob Rush dep., at 21, 75; doc. 178, John Rush dep., at 36-37.)  They saw bright lights shining into the windows, but could not see who was holding the lights.  (Doc. 178, John Rush dep., at 19, 88-90; doc. 177, Hedrick dep., at 12, 15, 18.)  None of the occupants testified to hearing

"police" or "search warrant" until the ASORT team burst through the front door.
(Doc. 178, John Rush dep., at 19; doc. 177, Hedrick dep., at 25-26; doc. 174, Dick
dep., at 28, 31, 61; doc. 124, Jacob Rush dep., at  50, 101.)

The Fourth Amendment requirement is that the police knock and announce
their presence, then wait a reasonable time before a forced physical entry.  See, e.g.,
Wilson v. Arkansas, 514 U.S. 927, 936 (1995) (Fourth Amendment violation "if
police officers enter without prior announcement"); United States v. Pinson, 321
F.3d 558, 565 (6th Cir.), cert. denied, 540 U.S. 912  (2003) (citing cases).  There is no
constitutional requirement that they be heard or understood, so long as the
announcement is loud enough to be audible.  See generally Brigham City, Utah v.
Stuart, 547 U.S. 398, 406-407 (2006) (officer could not be heard above tumult within
residence); United States v. Banks, 540 U.S. 31, 33 (2003) (resident was in shower
and heard nothing until door breached); Pierce v. Burkart, No. 03-74250, 2005 WL
1862416, at *5 (E.D. Mich. Aug. 4, 2005) ("Testimony by occupants of the home that
they did not hear the police knock and announce does not give rise to a reasonable
inference that the police failed to do so and thus is insufficient to defeat summary
judgment").  Under the Rush plaintiffs' theory, the flash-bang had already been
detonated, which woke the residents.  Although the residents claim that they could
not understand what was being said, they did testify to hearing audible yelling
outside and banging on the doors.  (Doc. 192, at 14 n.49.)  Several of the residents
responded to the noise by running into the kitchen to investigate.  The officers
identify the "yelling" and banging as their announcement of "police."  (Doc. 169, at

31

8; doc. 170, at 7-8; see, e.g., doc. 173, Wheeler dep., at 62, 82-83; doc. 124, Miller dep., at 52-53; doc. 115, Mack dep. at 77.)

Miller, the ASORT team leader, testified that the plan was to deploy the initial flash-bang device after the team had knocked and announced their presence. (Doc. 124, Miller dep., at 46-47, 52; see also doc. 113, Combs dep., at 179; doc. 115, Mack dep., at 78.) Combs testified that he "saw them [ASORT team] start their knock-and-announce," then he threw the device "in the air so that trying to get it to detonate somewhere around maybe a little bit above window level on the opposite side of the house." (Doc. 113, Combs dep., at 110.) Combs also stated, "When he started knocking and yelled, police, search warrant is when I switched hands and then threw the distraction device over in that corner and it detonated." Id. at 150-151.

At deposition, Combs testified that seven or eight seconds passed between the time of the knock-and-announce and the detonation. Id. at 179; see also id. at 150-151. However, in his after-action statement, Combs had stated: "The device detonated in mid-air and I simultaneously heard the team loudly and clearly shouting, police, search warrant." Id. at 180.

Combs testified that the device created a "loud boom" when detonated, which was intended to "cause a substantial distraction." (Doc. 113, Combs dep., at 151-152.) He testified that the resulting blast pressure wave and flash do not have the same effect when used outside, as here, that it would have when used inside, as it generally was used. Id. at 153-155. The plaintiffs have not alleged that the use of

32

the flash-bang by Combs is a constitutional violation per se.  Nevertheless, regardless of the factual dispute over the timing, the court would not find that the use of the initial flash-bang device itself by Combs, outside, was an application of excessive force.

The most favorable view of plaintiffs' facts is that, after the detonation of the flash bang outside of the home, they encountered individuals who were "banging and yelling," whom they could not visually identify because of distracting light coming from lights pointed into the windows.  Such facts fail to support a reasonable inference that the officers neglected to knock and announce their presence, sufficient to preclude qualified immunity under the circumstances.

### 2.  Shots at Kitchen Window

The next segment would be when Sheriff's Deputy Robert Gouge shot his weapon at Gilbert Rush standing at the kitchen window.  Although this exchange of gunfire was not fatal, it is material to the analysis.  See, e.g., Claybrook v. Birchwell, 274 F.3d 1098, 1105 (6th Cir. 2001) (initial exchange relevant).

The ASORT team was unable to enter through the back door as planned, so they redirected their efforts toward the front door, and moved in that direction.  As the team was redeploying, Deputy Gouge noticed Gilbert Rush at the kitchen window.  Rush contends:  "An ASORT team member shot first and Gilbert Rush Jr. responded."  (Doc. 192, at 5.)  Rush cites to the Gouge deposition in support.  Id. at 5 n.28.

33

Gouge testified at deposition as follows:

A.  . . . And shortly thereafter, I see Mr. Rush pointing a shotgun at Officer Gillis' head, at which time I fired on Mr. Rush.

Q.  Then what happened?

A.  There was a large explosion that went by the right side of my face.

(Doc. 124, Gouge dep., at 18.)  At another point in his deposition, Gouge testified:

Q.  Then what happened?

A.  That's when Mr. Rush – well, that's when I seen Mr. Rush standing in the window with the shotgun.

Q.  Then what happened?

* * * * *

A.  At that point I observed Gilbert Rush standing there and pointing a shotgun at Officer Gillis.

Q.  So how much of him did you see?

A.  His upper torso.

Q.  From?

A.  Elbow height up.

Q.  And what – how was he holding the gun?

A.  He had it shouldered, right hand on the pistol grip and left hand on the front of the stock.

* * * * *

Q.  Then what happened?

A.  That's when I fired on Mr. Rush.

* * * * *

34

Q.  And then what happened?

A.  That's when the blast went off by the side of my face.

Q.  So what does that mean, the blast went off by the side of your face?

A.  He attempted to shoot me in the face with a shotgun.

(Doc. 124, Gouge dep., at 42-43.)

The testimony of Jacob Rush, who was in the kitchen with Gilbert Rush, is contradictory.  At one point he states that Gilbert Rush did not point the shotgun at the window prior to any shooting.  (Doc. 124, Jacob Rush dep., at 28-29.)  Later in the same deposition, however, he testified as follows:

Q.  And if I'm understanding correctly, as your dad was shot he had that weapon shouldered; is that correct?

A.  Yeah.

Q.  And it was pointing out the window?

A.  Pretty much, yes.

* * * * *

Q.  . . . the gun was trained out the kitchen window?

A.  Basically, yes, the barrel was.

* * * * *

Q.  The gun was shouldered on his right shoulder?

A.  To his right shoulder.

Q.  And it was pointed to the direction at that window?

A.  Yes.

35

Q. And after those shots came in the window your dad's weapon discharged?

A. Yes.

(Doc. 124, Jacob Rush dep., at 98-99.)

The plaintiffs argue that, under the circumstances of this case, including the previous anonymous threats against the Rush family, the nighttime raid, the blinding lights and loud, distracting noises, it was predictable that Gilbert Rush might act to protect his family in self-defense. (Doc. 192, at 18.) The plaintiffs contend that "it was unreasonable for those planning this tactical raid to put the ASORT Team and the family in this position." Id. They assert that "the injury was caused by the severely flawed raid plan itself." Id. at 19.

The court's review is "limited to officers' actions in the moments preceding the shooting and . . . other actions leading up to that moment are deemed irrelevant." Chappell, 584 F.Supp.2d at 991 (citing Livermore, 476 F.3d at 406; Dickerson, 101 F.3d at 1162). Thus, this court has rejected an argument that factual disputes related to obtaining a warrant, or a decision to execute the warrant in the dark, could lead to a conclusion that the use of deadly force was unreasonable. Id. at 991. See also Whitlow, 2002 WL 1455317, at *8. The Sixth Circuit has ruled that actions by undercover police officers which violated policy, and caused the suspect to be unable to identify undercover officers as police, even if unreasonable, "may not weigh in consideration of the use of excessive force." Claybrook, 274 F.3d at 1105 (citing Dickerson, 101 F.3d at 1161-1162).

36

As mentioned earlier, it is clearly established "that if a suspect threatens an officer with a weapon or threatens another person with serious physical harm or death, deadly force is authorized in self-defense or defense of another person." Dickerson, 101 F.3d at 1163 (citing Garner, 471 U.S. at 11-12).  See also Whitlow, 2002 WL 1455317, at *9.  The reasonableness of the decision to employ force depends on the officer's "knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." Cowan, 352 F.3d at 762.  See also Dunigan, 390 F.3d at 494; Dickerson, 101 F.3d at 1161-1162 (citing cases).  In testimony referenced by the plaintiffs, Gouge stated that he saw Rush pointing a shotgun at Officer Gillis's head, and fired in defense of Gillis. (Doc. 124, Gouge dep., at 18, 42-43.)  There is corroboration in Jacob Rush's testimony that  Gilbert Rush was pointing the shotgun out the window.  (Doc. 124, Jacob Rush dep., at 98-99.)

Because the plaintiffs fail to establish a genuine issue of fact on the knock and announce issue, the fact that Gilbert Rush may not have understood what the officers were "yelling" would not render Deputy Gouge's actions unreasonable under the circumstances.  As a result, Gouge's response to Rush's decision to point a weapon at the officers was not unreasonable.

Although Deputy Gouge is not a defendant in this case, doc. 192, at 20, the court would not find that his use of force in this instance was objectively unreasonable.  If the force used is objectively reasonable, then no constitutional

violation occurred. Michaels, 539 F.Supp.2d at 983-984 (citing Baker , 471 F.3d at 606).

### 3.  Shots in Kitchen

The last segment is the fatal shooting of Gilbert Rush in the kitchen, after the ASORT team had entered the residence.  Rush has not named the two officers who fired the fatal shots as defendants.  (Doc. 192, at 20.)

None of the surviving plaintiffs saw who did the actual shooting of Gilbert Rush.  (Doc. 177, Hedrick dep., at 26, 42; doc. 124, Jacob Rush dep., at 36-38, 42-44, 46-47, 103-104; see also doc. 183, Blevins dep., at 56.)  Officer Bammann testified that when he entered the kitchen, Rush had the shotgun pointed at his chest, he feared for his life, and he fired at Rush.  (Doc. 112, Bammann dep., at 102, 104, 139-141.)  Officer Frazier also testified that Rush was pointing the shotgun at them as they entered the kitchen.  (Doc. 124, Frazier dep., at 44.)  Rush points to no evidence which directly contradicts the testimony of these officers.  See, e.g., doc. 192, at 6, 16.  See generally Whitlow,  2002 WL 1455317, at *10.

As already discussed, "if a suspect threatens an officer with a weapon or threatens another person with serious physical harm or death, deadly force is authorized in self-defense."  Dickerson, 101 F.3d at 1163 (citing Garner, 471 U.S. at 11-12).  See also Whitlow,  2002 WL 1455317, at *9.  The reasonableness of the decision to employ force depends on the officer's "knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to

employ deadly force." Cowan, 352 F.3d at 762.  See also Dunigan, 390 F.3d at 494; Dickerson, 101 F.3d at 1161-1162 (citing cases).

Although Officers Bammann and Frazier are not defendants in this case, doc. 192, at 20, the court would not find that their use of force in this instance was objectively unreasonable.  They were aware that Gilbert Rush, or some armed person in the kitchen, had already fired at their fellow officers.  They encountered him armed, with a shotgun pointed at them, and had no reason to know that it was not loaded.  If the force used is objectively reasonable, then no constitutional violation occurred.  Michaels, 539 F.Supp.2d at 983-984 (citing Baker,  471 F.3d at 606).

Rush again, without specifically alleging a discrete Fourth Amendment violation, contends that the entry was unreasonable, in that the officers failed to knock and announce, prior to their entry.  (Doc. 192, at 15.)  Rush contends that the "police" announcements stopped after the officers left the outside kitchen door, and did not resume until they had actually entered the residence.  Id. at 15 n.51.  The defendants respond that the officers announced their presence as "police" as they entered through the front door, and the plaintiffs have admitted that they were aware at that point that it was the police who were entering.  See, e.g., doc. 169, at 10; doc. 170, at 10.  The Supreme Court has rejected as improper an announcement which takes place as the officers come through the door; the announcement should be made prior to any entry.  See Wilson, 514 U.S. at 929. 936.

39

However, the court finds that there would not be any constitutional violation of the knock-and-announce rule under the circumstances.  As just discussed, the officers were aware that someone in the house had already fired at their fellow officers.  Thus, there were exigent circumstances permitting an unannounced entry.  See, e.g., Wilson, 514 U.S. at 936 (officers under fire need not knock and announce).

Most of the allegations against the individual named defendants have not been discussed during this segmenting analysis, because those defendants were not directly involved in the actual use of excessive force.

### 4.  Bosko and Wendling

Rush has the burden of proof to show that the defendants are not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.  As discussed earlier, Bosko and Wendling are entitled to qualified immunity as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson, 129 S.Ct. at 815; Painter, 185 F.3d at 567.

As to Bosko, Rush argues that he made false allegations and acted with a regardless disregard for the truth when he briefed ASORT prior to the raid. (Doc. 192, at 50.)  "It is the misrepresentations to ASORT knowing the tactical team would rely on those facts . . . which makes Defendants Bosko and Wendling liable for the excessive force," under Rush's theory.  Id. at 50 n.171.  Rush claims that Bosko should be not be protected by qualified immunity, and instead held liable under Section 1983, because he communicated "materially false statements

knowingly, or in reckless disregard for the truth," which "unambiguously signal[led] a need for force causing the use of excessive force." Id. at 51, citing Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir. 1989), and Floyd v. City of Detroit, 518 F.3d 398 (6th Cir. 2008).

Floyd was an excessive force case involved an unarmed suspect. When two police officers encountered the man, one officer shot at him and missed. The second officer then shot him in the chest. The court found that the first officer's "own use of deadly force escalated the situation by unambiguously signaling that such force was called for. " Floyd, 518 F.3d at 406-407. The fact that the first officer's shot missed did not absolve him of responsibility for his participation in the unreasonable seizure. Id. at 407. In Floyd, the court's ruling on qualified immunity involved the factual circumstances at the time that the actual decision to employ deadly force was made, not (as here) decisions made hours, if not days, earlier. Floyd is inapposite.

The court in Hill ruled that "[a]n action under § 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth." Hill, 884 F.2d at 275. See also Hale v. Kart, 396 F.3d 721, 724-726 (6th Cir. 2005) (omission of critical information with intent to mislead). However, the Rush plaintiffs have repeatedly assured the court that their cause of action here centers on the excessive force claim, and that they are not challenging the validity per se of the warrant as a

41

discrete constitutional claim.  See, e.g., doc. 127, at 6, 11; doc. 192, at 49.  Hill does not provide support for the excessive force claim.

As to Wendling, Rush contends that Wendling is not entitled to qualified immunity because he "acquiesced in the misrepresentations" that Bosko allegedly made.  (Doc. 192, at 52.)  Wendling had personal knowledge of facts concerning investigation, and was present at the ASORT briefing, thus he "could see . . . that Bosko was misrepresenting the facts to ASORT."  Id.

 The theory, in summary, is that because "Bosko made false allegations and acted with reckless disregard for the truth when he provided facts to ASORT prior to the raid," the ASORT team approached the Rush residence to serve the warrant at night, ready and primed (unnecessarily, in plaintiffs' view) for the possibility of an armed confrontation with supposedly dangerous and unstable residents.  (Doc. 192, at 50 n.171.)  Wendling acquiesced in these  misrepresentations.  Ultimately, this led to the use of excessive force against Gilbert Rush by ASORT team members.

This court has ruled that factual disputes related to how a search warrant was obtained, or how to execute the warrant, are not material to the resolution of an excessive force claim.  Chappell, 584 F.Supp.2d at 991-992; see also Whitlow, 2002 WL 1455317, at *8.  The qualified immunity analysis is to "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force."  Chappell, 584 F.Supp.2d at 991 (quoting Livermore, 476 F.3d at 407).  Rush points to no evidence of the involvement of Bosko or Wendling in the

actual shooting of Gilbert Rush,[10] and in fact neither Bosko nor Wendling seems to have been at the residence at the time of the shooting.  See doc. 106, Bosko dep., at 150-151; doc. 108, Wendling dep., at 32-36.  Under the circumstances of this case, the court finds that the involvement of Bosko and Wendling is too distant to support a denial of qualified immunity as to a claim of excessive force.  See Livermore, 476 F.3d at 407 (court should disregard actions which occurred in hours and minutes leading up to shooting; instead, focus on "split-second judgments" made immediately prior to alleged use of excessive force); Dickerson, 101 F.3d at 1161-1162 (limit scope of inquiry to moments preceding shooting); Chappell, 584 F.Supp.2d at 991.

The Rush plaintiffs have failed to carry their burden of proof to show that Bosko and Wendling are not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.  They have failed to designate specific facts showing that there is a genuine issue of material fact as to whether Bosko and Wendling are entitled to qualified immunity on the excessive force claim.  The facts that they have alleged do not make out a violation of the constitutional right to be free from excessive force, so far as Bosko and Wendling are concerned.  The Mansfield defendants' motion for summary judgment (doc. 169) should be GRANTED on the issue of qualified immunity as it pertains to Bosko and Wendling.

---

[10] Indeed, "Plaintiffs have not sued the two officers who shot the fatal shots." (Doc. 192, at 20.)

### 5.  Officer Miller

Rush argues that "the ASORT Commander and Team Leaders established and implemented an operational plan in this case that for[e]seeably resulted in the use of excessive force at the Rush/Hedrick home," and thus they are not entitled to qualified immunity.  (Doc. 192, at 55.)  The plaintiffs' theory is that ASORT's operational plan prevented the occupants from recognizing the ASORT team as police officers due to the fact that the raid was conducted at night, with the use of bright tactical lights and a flash-bang device.  Id. at 34-37.  Because the police officers were not recognized as such, Gilbert Rush took defensive actions to defend his family, and he was killed.  Id. at 36.  Rush contends that "the injury was caused by the severely flawed raid plan itself."  Id. at 19.

Mansfield Officer Miller was the Team Leader of the ASORT team which served the warrant.  (Doc. 170, at 4, citing doc. 124, Miller dep., at 30, 34.)  It was the team leader's responsibility to determine whether to accept or deny a particular request for assistance, to review the search warrant, to develop the operational plan and assign duties to other team members, and to brief the team prior to carrying out the operation.  Id. at 3-4, citing doc. 113, Combs dep., at 65, 91.

Rush contends that Miller, along with Combs and Mack "are the most culpable officers because they are the ones who orchestrated the raid."  (Doc. 192, at 56.)  Rush quotes the Chappell case to the effect that:

> . . . it is objectively unreasonable for an officer to encounter a suspect in a confined, darkened area without identifying himself as a police officer, that doing so is more than mere negligence, and that any

44

deadly force caused by that conduct is constitutionally impermissible. Yates [v. City of Cleveland], 941 F.2d 444, 447 [(6th Cir.1991)].

(Doc. 192, at 55, quoting Chappell, 584 F.Supp.2d at 1002.)  However, in Chappell, it was the two police detectives who actually shot the suspect who were denied qualified immunity.  This aspect of Chappell is distinguishable on the factual circumstances present in this case.  Miller was not one of the officers who shot Gilbert Rush, and this aspect of Chappell would not support a denial of qualified immunity to him.

Rush states that the facts in this case are similar to those in Combs v. Wilkinson, 315 F.3d 548 (6th Cir. 2002).  (Doc. 192, at 56.)  Combs involved a Section 1983 suit against several state corrections officers and their supervisors, "alleging that corrections officers used excessive force in quelling a disturbance at Mansfield Correctional Institution."  Combs, 315 F.3d at 551.  The Sixth Circuit reversed a grant of summary judgment to one of the supervisors, Lt. Moroney.  Id. at 559.  Moroney had developed the tactical plan to regain control of the unit, which was reviewed and approved by the Warden.  Moroney had decided to use chemical agents prior to the Special Response Team (SRT)'s entry to quell the disturbance. He assigned two teams to break windows and deploy the chemical agents.  Id. at 551-552.

An investigating committee found that Moroney inadequately briefed the SRT members prior to their entry into the unit, and that "no instructions were

45

given concerning the extraction of inmates from their cells." Id. at 559.  This led to onsite supervisors losing control of the SRT members' actions.

In addition, the committee found that "at least four explosive distraction devices, 113 explosive gas devices, and six canisters of pepper mace were used to quell the disturbance," which could have caused the air concentration level to reach a lethal level.  Id.  The committee found that Moroney, as onsite commander, "'failed to maintain fundamental control of the operation' and that the SRT's 'use of gas, mace, and distraction control devices was excessive, uncontrolled, and clearly compromised the safety of staff and inmates.'"  Id.

Finally, the committee found that SRT members used "questionable force" in restraining the inmates and extracting them from their cells.  The committee concluded that "[a] general loss of control existed in the manner in which inmates were controlled, restrained, and escorted from the cell block." Id. at 559.

The Combs  court found genuine issues of material fact existed as to Moroney's liability.  Id. at 559.  The court determined that "a reasonable jury could find that Moroney 'implicitly authorized, approved, or knowingly acquiesced' in the use of excessive force against the inmates.  Id.

This court disagrees that Combs is factually similar to the circumstances here.  First of all, there is no allegation that Miller "implicitly authorized, approved, or knowingly acquiesced" in the use of excessive force against Gilbert Rush, and the court does not find this to be the case.  The plaintiffs have failed to demonstrate that the operational plan adopted by Miller provided no guidance for ASORT team

46

members, which led to a loss of control over the situation similar to that which occurred in Combs.  Team members were guided by the ASORT Manual and their home departments' use of force policies.  (Doc. 172, Messer dep., at 18-19; doc. 170, DX A, ASORT Manual, at 13-14.)

Rush contends that the policy of "detonating the flash bang at the same time as the knock and announce," along with the bright tactical lights, "was the moving force behind the constitutional violations [i.e., excessive force] in this case."  (Doc. 192, at 37.)  However, Miller as team leader testified that the plan was to deploy the initial flash-bang device after the team knocked and announced their presence.  (Doc. 124, Miller dep., at 46-47, 52; see also doc. 113, Combs dep., at 179.)

Generally, a nighttime execution of a search warrant is reasonable where the grounds in the affidavit supporting nighttime execution are supported by reasonable cause.  United States v. Smith, 941 F.2d 1210, 1991 WL 158699, at *7 (6th Cir. 1991) (TABLE, text in WESTLAW).  Rush is not challenging the warrant, and the state court found the search warrant to be properly supported.  (Doc. 123, DX B, at 4-7.)  Similarly, the use of a flash-bang device may be reasonable under proper circumstances, for example, where the police believed that the suspect was armed and previously had a history of violence.  United States v. Dawkins, No. 01-6151, 2003 WL 22905305 (6th Cir. Nov. 24, 2003). See also Bing v. City of Whitehall, 456 F.3d 555, 569 (6th Cir. 2006) (rejecting excessive force claim where use of flash-bang device inside house was reasonable under the circumstances); Kirk v. Watkins, 182 F.3d 932, 1999 WL 381119, at *3 (10th Cir. 1999) (TABLE,

47

text in WESTLAW) (use of flash-bang device is "neither per se objectively reasonable nor unreasonable"). See generally doc. 124, Miller dep., at 15-16 (history of violence), 36-37 (presence of weapons).

The plaintiffs have failed to demonstrate that the operational plan adopted by Miller was objectively unreasonable, either through the planned use of a flash-bang device, or through the nighttime execution of the search warrant, such that it caused the use of excessive force. The court's focus must remain on the excessive force claim, not the reasonableness of the service of the warrant. Dickerson, 101 F.3d at 1161; Chappell, 584 F.Supp.2d at 991. Unlike in Chappell, for example, the officers did not encounter Rush in a confined, darkened area without attempting to identify themselves as police officers. Under the circumstances of this case, the court finds that the involvement of Miller in establishing an operational plan is too removed from the alleged use of excessive force to support a denial of qualified immunity. See Livermore, 476 F.3d at 407; Dickerson, 101 F.3d at 1161-1162; Chappell, 584 F.Supp.2d at 991.

The Rush plaintiffs have failed to carry their burden of proof to show that Miller is not entitled to qualified immunity. Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491. They have failed to designate specific facts showing that there is a genuine issue of material fact as to whether Miller is entitled to qualified immunity on the excessive force claim. The facts that they have alleged do not make out a violation of the constitutional right to be free from excessive force, so far as Miller is concerned. The Mansfield defendants' motion for summary judgment

48

(doc. 169) should be GRANTED on the issue of qualified immunity as it pertains to Miller.

### 6.  Combs and Mack

Shelby Police Capt. Combs and Sgt. Mack also assert that they are entitled to qualified immunity.  (Doc. 170, at 17-30.)  They claim that the operational plan to serve the warrant, and their involvement in the service of the warrant, were objectively reasonable.  Id. at 21-26.  They also contend that any force used during the service of the warrant was reasonable, based upon the circumstances.  Id. at 26-30.

Rush contends that Combs and Mack, along with Miller, "are the most culpable officers because they are the ones who orchestrated the raid."  (Doc. 192, at 56.)  Although Shelby Capt. Combs was the ASORT Commander at the relevant time, he participated in the raid simply as another team member.  (Doc. 113, Combs dep., at 20, 105-107, 109.)  Shelby Sgt. Mack was the other Team Leader, but assisted in this operation simply as a team member.  (Doc. 115, Mack dep. at 10-11, 55; doc. 113, Combs dep., at 108.)  As discussed earlier, Mansfield Officer Miller was the Team Leader of the ASORT team which served the warrant.  (Doc. 124, Miller dep., at 30, 34.)

Rush contends that the operational plan was developed and implemented by Combs, Miller and Mack.  (Doc. 192, at 5.)  Combs and Mack assert that "the operational plan developed prior to service of the search warrant incorporated an announcement prior to any forcible entry to the residence."  (Doc. 170, at 21; see

49

doc. 124, Miller dep., at 46, 52.)  They state that there is no indication that the operational plan had any course of action which would result in a Fourth Amendment violation.

As discussed earlier, the court's focus remains on the excessive force claim, not the reasonableness of the service of the warrant.  Dickerson, 101 F.3d at 1161; Chappell, 584 F.Supp.2d at 991.  Under the circumstances of this case, the court finds that the involvement of Combs and Mack in assisting Miller to establish an operational plan is too far removed from the alleged use of excessive force to support a denial of qualified immunity.  See Livermore, 476 F.3d at 407; Dickerson, 101 F.3d at 1161-1162; Chappell, 584 F.Supp.2d at 991.

The Rush plaintiffs have failed to carry their burden of proof to show that Combs and Mack are not entitled to qualified immunity.  Untalan, 430 F.3d at 314; Cartwright, 336 F.3d at 490-491.  They have failed to designate specific facts showing that there is a genuine issue of material fact as to whether Combs and Mack are entitled to qualified immunity on the excessive force claim.  The facts that they have alleged do not make out a violation of the constitutional right to be free from excessive force, so far as Combs and Mack are concerned.  The Shelby defendants' motion for summary judgment (doc. 170) should be GRANTED on the issue of qualified immunity as it pertains to Combs and Mack.

## VI.  MUNICIPAL LIABILITY

The defendants include the Cities of Mansfield, Ontario, Shelby, and Lexington, as well as the County of Richland, Ohio.  (Doc. 75, at ¶¶ 13-14.)

Before a municipality can be held liable under Section 1983, the plaintiffs must show that their alleged injuries were the result of some "policy or custom" attributable to the municipality.  Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995); Leach v. Shelby County Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989), cert. denied, 495 U.S. 932 (1990) (quoting Monell, 436 U.S. at 690).  An official policy "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell, 436 U.S. at 690. Thus, before a municipality can be held liable under Section 1983, a plaintiff must show that his injuries were the result of some "policy or custom" attributable to the city.  Vann, 72 F.3d at 1049; Leach, 891 F.2d at 1245 (quoting Monell, 436 U.S. at 690).

Under Monell, a municipality is liable only where its policies are the "moving force" behind the constitutional violation.  City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Monell, 436 U.S. at 694).  The plaintiffs cannot base their claims against a city solely on the police officers' conduct, because respondeat superior is not available as a theory of recovery under section 1983.  Monell, 436 U.S. at 691.

Although cases applying Monell most often discuss "municipalities," Ohio counties lack sovereign immunity, and are not considered arms of the State of Ohio.

51

S.J. v. Hamilton County, Ohio, 374 F.3d 416, 419-420 (6th Cir. 2004).  Thus,
Richland County does not have (nor does it assert) sovereign immunity, and is
subject to a Monell analysis.  See generally Pembaur v. City of Cincinnati, 475 U.S.
469, 483-484 (1986) (Ohio county liable); Powers v. County of Lorain, No.
1:05CV1596, 2006 WL 2899896, at *3 (N.D. Ohio Oct. 9, 2006), aff'd, 2008 WL
162897 (6th Cir. 2008) (applying Monell); Simms v. Athens County Sheriff's Office,
No. 2:02CV1096, 2005 WL 2233232, at *10 (S.D. Ohio Sept. 14, 2005) (same).

The defendant City of Ontario argues that Rush cannot show that the city
has an official policy or practice which was the moving force behind the alleged
constitutional violation.  (Doc. 167, at 3-8.)

Richland County contends that there was no constitutional violation because
the ASORT team properly executed the search warrant.  (Doc. 168, at 11-13)  Any
use of force was reasonable and appropriate under the circumstances.  Id. at 14-16.
Nonetheless, Richland argues that Rush cannot point to any Richland County policy
or custom which was the cause of the alleged injuries.  Id. at 9-11.

The defendant City of Mansfield asserts that the plaintiffs cannot establish
an unconstitutional policy or practice by the city which would enable them to
recover against Mansfield.  (Doc. 169, at 32-35.)  The Cities of Shelby and Lexington
also contend that the claims against them fail as a matter of law.  (Doc. 170, at 30-
34.)  They argue that Rush can show no official policy from an official policymaker
which was the moving force behind the alleged violations.  Id. at 32.

52

## A.  Municipality Liability Through Actions of Final Policymakers

Rush argues that each of the defendant local governments can be liable under Section 1983 "based on one of three theories:  (1) the action was taken pursuant to a formal policy; (2) the action was taken pursuant to a longstanding practice or custom; and (3) the action was taken by a person serving as a 'final policymaker.'" (Doc. 192, at 29, citing Monell, 436 U.S. 658).  Here, Rush contends that the defendants "are bound by the actions taken at the direction of final policy makers, ASORT Commander, Lance Combs and ASORT Team Leaders, Richard Miller and David Mack, with respect to the execution of the search warrant at the Rush/Hedrick home."  Id.

The Supreme Court has concluded that Section 1983 cannot be interpreted to incorporate doctrines of vicarious liability.  Pembaur, 475 U.S. at 479; Monell, 436 U.S. at 691.  Thus, for there to be municipal liability under Section 1983, liability for wrongful conduct is limited to actions for which the city is actually responsible. Pembaur, 475 U.S. at 479.  The Court noted  that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."  Id. at 480; see also Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir.), cert. denied, 510 U.S. 826 (1993).

A plurality of the Court stated:

Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.  The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of

53

> that discretion.  The official must also be responsible for establishing
> final policy respecting such activity before the
> municipality can be held liable.  Authority to make municipal policy
> may be granted directly by a legislative enactment or may be
> delegated by an official who possesses such authority, and of course,
> whether an official had final policymaking authority is a question of
> state law.

Pembaur, 475 U.S. at 481-483 (plurality opinion) (internal citations omitted).  The

focus is on the "final policymaking authority" for "the action alleged to have caused

the particular constitutional or statutory violation at issue." Jett v. Dallas

Independent Sch. Dist., 491 U.S. 701, 737 (1989); see also City of St. Louis v.

Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion).

"Mere authority to exercise discretion while performing particular functions

does not make a municipal employee a final policymaker unless the official's

decisions are final and unreviewable and are not constrained by the official policies

of superior officials ." Feliciano, 988 F.2d at 655 (citing Praprotnik, 485 U.S. at 127

(plurality)).  Another consideration is "whether the employee . . . formulates plans

for the implementation of broad goals." Miller v. Calhoun County, 408 F.3d 803,

814 (6th Cir. 2005).

A municipality is not liable merely because an official had authority to act on

its behalf, rather, the official must have "final authority to establish municipal

policy with respect to the [challenged] action." Praprotnik, 485 U.S. at 139

(Brennan, J., concurring) (quoting Pembaur, 475 U.S. at 481).  The distinction

between the discretion to act and policymaking authority is important because

municipal liability for an official's discretionary acts "would be 'indistinguishable'

54

from respondeat superior liability."  Feliciano, 988 F.2d at 656 (citing Praprotnik, 485 U.S. at 126).

Rush contends that "the government entities that make up ASORT delegated to the ASORT commander and the team leaders unfettered discretion to direct the ASORT teams on operational missions."  (Doc. 192, at 32.)  Rush relies on the following deposition testimony, of Richland County Sheriff Sheldon, in support of that assertion:

> Q.  And once Captain Combs or Officers Miller or Mack determined how to deploy the ASORT team they don't have to go to any other bosses in any of the other departments to get approval for their plan, right?
>
> * * * * *
>
> A.  They're the tactical people.  They make that decision.
>
> Q.  As far as tactical policy goes, they're the top decision-makers, is that right?
>
> A.  That's correct.

(Doc. 192, at 32, quoting doc. 109, Sheldon dep., at 37-38.)

Rush also refers to the deposition testimony of Mansfield Police Chief Messer:

> Q.  And dealing with that individual incident who has the authority to determine the assignment of the personnel and the actual operation plan?
>
> A.  When you say assignment of personnel, specifically are you referring to ASORT members?
>
> Q.  Yes.
>
> A.  The commander or on-scene supervisor of the ASORT team.

55

(Doc. 192, at 32, quoting doc. 172, Messer dep., at 12.)

Rush argues that this evidence shows that "unfettered discretion in conducting ASORT operations" was delegated to ASORT leaders Combs, Miller and Mack.  (Doc. 192, at 33.)  Because the ASORT leaders "had authority to deploy ASORT officers and develop operation plans and they did not need any additional approvals to execute an operational plan," the court is urged to find that Combs, Miller and Mack were policymakers for the governments involved.  Id.

Richland County responds that the ASORT leaders "had merely discretionary authority over tactical operations of the ASORT team."  (Doc. 200, at 6, citing Messer dep., at 14, 18.)  Richland asserts that the use of force policy governing ASORT team members is provided by the ASORT Manual, and the policies of the home agency of each individual ASORT member.  (Doc. 168, at 6.)  While ASORT leaders "may have made tactical decisions, . . . they did not make final policy because the members of the [RCCPA] had final say on policy for the ASORT team."  (Doc. 200, at 7.)

The Mansfield defendants point out that the deposition testimony cited by Rush "addresses only the authority of the ASORT commanders and team leaders to create an operational plan and make ASORT personnel assignments."  (Doc. 204, at 18.)  They contend that discretion over the tactical aspects of law enforcement does not constitute policymaking authority for Section 1983 purposes.  Id. at 19-20.  They assert Rush has not demonstrated that authority to make discretionary decisions over personnel or an operational plan rises to the level of policymaking authority,

56

especially where it is not free from supervisory review, has nothing to do with the implementation of broad goals, and has no impact on the ongoing policy of the municipality.  Id. at 20.

In his deposition, Mansfield Police Chief Messer had testified on the topic of use-of-force policies:

> Q.  When an ASORT team is deployed and they use deadly force, whose policies are they following in the use of that deadly force?
>
> A.  Their home agency's policies each again reference to the manual refers you – it provides general guidelines in some areas, but it always refers you back to the home agency's policies.
>
> Q.  An ASORT team has multiple people on it; right?
>
> A.  That's correct.
>
> Q.  And typically the ASORT team will have representatives from different home agencies; right?
>
> A.  That's correct.
>
> Q.  What action is taken, if any, to ensure that the home agency policy with respect to the use of deadly force are compatible with each other so an ASORT team following various home agency policies can act as a team?
>
> * * * * *
>
> A.  The manual lies or outlines minimum force policies including deadly force policies and then it says that further restrictions of a home agency which must be followed as well.  So there are general restrictions within the manual itself as to deadly force and other use of force procedures.

(Doc. 172, Messer dep., at 18-19.)

Beyond the portions quoted by Rush, Sheriff Sheldon's deposition had

continued on the topic of policy as follows:

> Q. With respect to the Richland County Sheriff's Office employees who
> engaged in the execution of the search warrant at 2619 Park Avenue
> East did they follow all of the Richland County Sheriff's Office policies
> that were -- that applied to their work that night?
>
> MR. DOWNEY: Objection. You can answer.
>
> A. I believe so.
>
> Q. And what policies would apply to a Richland County sheriff deputy
> working for ASORT at 2619 Park Avenue East?
>
> MR. DOWNEY: Objection. You can answer.
>
> A. Generally use of force or response and resistent [sic] policies,
> generally it's a matter of semantics, basically the same thing, but
> policies for each agency are generally very, very similar to one another
> and in compliance with the Ohio Revised Code.

(Doc. 109, Sheldon dep., at 38.)

Municipal liability attaches only where the officer in question possesses final

authority to establish municipal policy with respect to the action ordered.

Pembaur, 475 U.S. at 481.  Rush has alleged that the defendants used excessive

force during the execution of the search warrant.  (Doc. 192, at 7-8, 20.)

Rush points to the Messer and Sheldon depositions to argue that "unfettered

discretion in conducting ASORT operations" was delegated to ASORT leaders

Combs, Miller and Mack.  (Doc. 192, at 33.)  They claim the testimony demonstrates

that the ASORT leaders "had authority to deploy ASORT officers and develop

operation plans" without specific approval.  Id.  The court agrees with the

defendants that the evidence put forward by Rush concerns tactical discretion, that is, methods or procedures used for short-range objectives, rather than authority relating to long-term policy considerations.  More importantly, Rush has offered no evidence that Combs, Miller, or Mack had any input whatsoever on the relevant use-of-force policies.  See generally doc. 172, Messer dep., at 18-19; doc. 109, Sheldon dep., at 38.

The court cannot find, on the basis of the evidence offered by Rush, that Combs, Miller and Mack were "final policymakers" for the governments involved.

### B.  Failure to Supervise

As to the City of Mansfield, Rush proposes an alternate theory of liability. Rush alleges that Mansfield's failure to supervise Det. Bosko was so serious that it amounts to deliberate indifference to the rights of persons with whom the Mansfield police come into contact.  (Doc. 192, at 52-53, citing Leach, 891 F.2d at 1247-1248.)

A city can be liable under Section 1983 for the inadequate training of its employees.  City of Canton, 489 U.S. at 388.  The inadequacy of police training may serve as the basis for Section 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Id.  See also King, 1999 WL 1024030, at *2.  Only where a failure to train reflects a deliberate or conscious choice by a municipality can a city be liable for such a failure under Section 1983.  Id. at 389.

A supervisor's failure to control or train the officer is not actionable under Section 1983 unless the supervisor

> . . . either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.

Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999), cert. denied, 530 U.S. 1264 (2000) (quoting Hays v. Jefferson County, Ky., 668 F.2d 869, 874 (6th Cir.), cert. denied, 459 U.S. 833 (1982)).  See also McQueen v. Beecher Community Schools, 433 F.3d 460, 470 (6th Cir. 2006); Leary v. Daeschner, 349 F.3d 888, 903 (6th Cir. 2003).

Rush's theory is that Bosko was not properly supervised because his investigation, leading to the issuance of the warrant, was incomplete, and the extent of his reliance on confidential informants was improper.  Proper oversight by Mansfield and specifically Lt. Wendling was lacking.  (Doc. 192, at 52-55.)

Merely demonstrating improper behavior is insufficient.  See, e.g., Shehee, 199 F.3d at 300.  Rush does not state that Mansfield or Wendling either encouraged the specific incident of excessive force, or in some other way directly participated in the use of excessive force.  See Shehee, 199 F.3d at 300.  Rush must show, at a minimum, that Mansfield or Wendling "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct," here, the use of excessive force.  Shehee, 199 F.3d at 300; see also McQueen, 433 F.3d at 470-471 (necessary to show that employee inflicted the underlying constitutional harm).  Rush has failed to make the necessary showing to support liability for a failure to supervise.

60

## C.  Ratification

Rush contends that the municipal defendants have ratified ASORT's unconstitutional use of  force, because they failed to conduct a thorough investigation of the shooting death of Gilbert Rush.  Also, the investigation reached incorrect conclusions, according to Rush, and was not designed to discover what actually happened.  (Doc. 192, at 56-59.)

The investigation was conducted by Capt. Larry Faith of the Richland County Sheriff's office.  (Doc. 179, Faith dep., at 15-16, 67; doc. 201, DX 100, Faith report.)  The defendants assert that the investigation was proper and thorough, and included review of witness statements, as well as those of the officers involved, review of physical evidence and the coroner's report, and a review of the Bureau of Criminal Investigation (BCI)'s report[11].  (Doc. 201, at 27; doc. 200, at 7-9.)   The defendants point out that Rush has presented "no evidence that Richland County had a past history of ratifying the use of deadly force and ASORT relied upon this policy when they executed the warrant at the Rush residence."  (Doc. 200, at 9.)

Faith testified that he "was supposed to find out what happened," through his investigation.  (Doc. 179, Faith dep., at 15.)  The purpose of the investigation was to gather facts to present "to the prosecutor or grand jury to determine if there's any wrongdoing on anybody's part."  (Doc. 109, Sheldon dep., at 22-23; see also doc. 179,

---

[11] BCI's role was to collect physical evidence and reconstruct the scene.  (Doc. 179, Faith dep., at 70.)

Faith dep., at 16.)  The investigation took into account the use of force policies of the Mansfield and Richland defendants.  (Doc. 179, Faith dep., at 17-19.)

Faith reported that he had the occupants of the house interviewed.  (Faith report, at 6.)  He also spoke with Capt. Combs.  Id.  A BCI agent reconstructed the shooting scene.  Id.  Faith received written statement from the officers who fired shots, but decided "we would not take formal statements from the officers."  (Faith report, at 6; see also doc. 179, Faith dep., at 15.)  The officers were not interviewed because their attorney(s) objected.  (Doc. 179, Faith dep., at 78-80.)  All the officers were taken to the scene and asked to recreate their actions.  (Faith report, at 7.)  After review of all the evidence, Faith found the shooting to be justified.  Id. at 32-33.

The Sixth Circuit has cautioned that "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification.  Otherwise, the City would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from respondeat superior liability."  Feliciano, 988 F.2d at 656 (citing Praprotnik, 485 U.S. at 127).  The court stated that "[r]atification of a subordinate's action requires more than acquiescence – it requires affirmative approval of a particular decision made by a subordinate."  Id. (citing Praprotnik, 485 U.S. at 130).  See also Vergara v. City of Waukegan, 590 F.Supp.2d 1024, 1040 (N.D. Ill. 2008) (to establish liability based on ratification, must show that final policymaker approved subordinate's decision and basis for it).

62

Rush cites Wright v. City of Canton, 138 F.Supp.2d 955 (N.D. Ohio 2001), which notes that "the Sixth Circuit has twice found that a municipality ratifies its employees' unconstitutional acts by failing to meaningfully investigate those acts." Wright, 138 F.Supp.2d at 966 (citing Leach v. Shelby County Sheriff, 891 F.2d 1241 (6th Cir. 1989), and Marchese v. Lucas, 758 F.2d 181 (6th Cir. 1985)).  The district court in Wright asserted that the plaintiff could establish his municipal liability claim by showing that a final policymaker approved an investigation into the conduct that was so inadequate as to constitute a ratification of the alleged use of excessive force.  Wright, 138 F.Supp.2d at 966.

In Wright, the court found that the evidence supported the plaintiff's  claim of excessive force in the course of an arrest.  Wright, 138 F.Supp.2d at 962.  The plaintiff-arrestee "suffered massive injuries" while in the custody of the arresting officers.  Id.  The officers claimed that the injuries resulted from a single fall, but an examining physician found that his injuries were "not consistent with a single application of force."  Id. at 962-963.

The court in Wright found that the plaintiff had provided "evidence showing the investigation was not designed to discover what actually happened to [plaintiff] while in [the officers'] custody."  Id. at 966.  The investigating police captain never interviewed the physician and thus did not discover that the officers gave three different stories as to how the arrestee suffered his injuries, and that the doctor believed that the plaintiff could not have been injured simply as a result of a single takedown.  Id. at 966-967.

63

The cases cited by Wright do not involve a single incident, but rather a pattern of misconduct.  In Leach, the Sixth Circuit found that the county sheriff should have been aware of a pattern of inadequate care for disabled inmates, and he failed to investigate such an incident and punish those responsible, "in effect ratifying their actions."  Leach, 891 F.2d at 1247.  Rather than acquiescence in a single discretionary decision, the ratification in Leach concerned one in a series of repeated misconduct.  Id. at 1247-1248 (numerous similar incidents).  In Marchese as well, "the responsible governmental entity took absolutely no action in the face of several prior incidents which should have required an investigation into the employee's conduct."  Dyer v. Casey, 72 F.3d 129, 1995 WL 712765, at *2 (6th Cir. 1995) (TABLE, text in WESTLAW).

Here, the court finds Rush has failed to demonstrate that Faith did not conduct a meaningful investigation.  Faith reviewed the statements of the witnesses involved (both the family and the police), and reviewed the physical evidence at the scene.  Although it might have been preferable to interview the officers, Faith was prevented from doing so by legal concerns, not by a failure to pursue that avenue of investigation.  Faith also considered the application of the relevant use of force policies.  The court cannot find that the investigation was so inadequate as to constitute a ratification of the alleged use of excessive force.  See Wright, 138 F.Supp.2d at 966.  Neither has Rush demonstrated any affirmative approval by any of the defendants of the particular decision regarding the use of the allegedly excessive force.  See Feliciano, 988 F.2d at 656 (citing Praprotnik, 485 U.S. at 130).

64

Rush has failed to designate specific facts showing that there is a genuine issue for trial on the Monell issue.  The defendants' motions for summary judgment (doc. 167, 168, 169, and 170)  should be GRANTED on the issue of municipal liability.

### D.  ASORT

ASORT asserts that it "is not a separate corporate entity." (Doc. 170, at 3.) The court has found ASORT to be an unincorporated association.  (See supra, at Sect. IV.A.)

Rush's federal claims against ASORT allege a constitutional violation, namely, "the actions of the ASORT team as excessive force." (Doc. 192, at 1, 20.)  In other words, the constitutional violation as identified by Rush is "an unreasonable seizure through excessive force during the execution of the search warrant." Id. at 7-8.

ASORT argues that the Section 1983 claims against ASORT fail because:

. . . there has been no showing by Plaintiffs that any express policy or custom of ASORT . . . was the moving force behind the alleged constitutional violations.  Absent is any evidence that any express policy or custom of ASORT . . . called for police officers to violate individual constitutional rights when serving warrants or when determining the appropriate amount of force to be used.

(Doc. 170, at 32.)  This argument is made under the theory of municipal liability pursuant to Monell and related cases.  Id. at 30-34.  However, ASORT does not contend that it is a municipality, see generally doc. 171, and the court agrees that it is not, thus an immunity analysis under Monell does not apply to ASORT.

65

However, the court has found that the disputed actions of ASORT members Combs, Gouge, Bammann and Frazier were not objectively unreasonable.  If the force used is objectively reasonable, then no constitutional violation occurred.  And if there is no underlying constitutional violation, there can be no cause of action for excessive force under Section 1983 against ASORT.  See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); see generally 42 U.S.C. § 1983.

## VII.  STATE LAW CLAIMS

The remaining claims (wrongful death, assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress) are based on Ohio law.  See doc. 75, Am. Compl., at ¶¶ 61-64.  Since the federal cause of action should be dismissed, the state causes of action should be dismissed for lack of jurisdiction.  United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966).  This principle may be raised sua sponte by the court.  See Abramson v. Abramson, 991 F.2d 799, 1993 WL 130193 at *4 (7th Cir. 1993) (TABLE, text in WESTLAW); Norton v. Cobb, 744 F.Supp. 798, 800-801 (N.D. Ohio 1990).

## VIII.  MOTIONS TO STRIKE

The defendants have filed motions to strike (doc. 203, 205), concerning Plaintiffs' Presentation DVD (see doc. 194), filed in support of the opposition to the motions for summary judgment.  The plaintiffs refer to the re-enactment on the DVD in support of their assertion that "[Gilbert Rush] could not see who it was that

66

was shining the [bright tactical] lights from outside." (Doc. 192, at 5 n.26.)  The
court is also referred to the first 21minutes of the DVD for unspecified "additional
facts."  Id. at 6.

Defendants argue that the DVD and the re-enactments contained therein
lack the foundation necessary to be admissible in support of a motion for summary
judgment.  (Doc. 203, at 14.)  They note that materials submitted for a ruling on
summary judgment must be supported by affidavits or authenticating testimony.
Id. at 6, citing Fed. R. Civ. P. 56, Fed. R. Evid. 901.  The plaintiffs must establish
that the DVD provides an accurate portrayal of the events.  The defendants argue
that:

> Plaintiffs cannot prove that the reenactment sequences substantially
> conform to the events that were observed by Gilbert Rush because (1)
> without testimony from Gilbert Rush regarding what he observed on
> [that night], Plaintiffs cannot establish that the conditions in the DVD
> substantially conform to what Gilbert Rush observed; and (2) the
> reenactment video is substantially different from the facts as testified
> to by other persons."

Id. at 7.

The defendants contend that the DVD as testimony regarding what Gilbert
Rush may or may not have been able to see from the kitchen windows "is nothing
more than inadmissible speculation and hearsay."  Further, based on their reading
of the deposition testimony, the re-enactment "is not an accurate and true
depiction" of what Gilbert Rush may or may not have observed on the night in
question.  (Doc. 203, at 5.)

The plaintiffs reply that the DVD is admissible and properly supported.

(Doc. 207.)

The Sixth Circuit has ruled that a video re-enactment is a form of experimental evidence.  United States v. Baldwin, 418 F.3d 575, 579 (6th Cir. 2005).  The court in Baldwin discussed the admissibility of such video evidence:

> . . . experimental evidence is admissible so long as the evidence is relevant and probative, and experimental evidence is deemed to have probative value if the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." Crown Cork & Seal Co. v. Morton Pharm., Inc., 417 F.2d 921, 926 (6th Cir. 1969).  The conditions of the experiment must be "substantially similar" to those of the event at issue, but "[a]dmissibility . . . does not depend on perfect identity between actual and experimental conditions." Persian Galleries, Inc. v. Transcon. Ins. Co., 38 F.3d 253, 258 (6th Cir. 1994) (citation and quotation marks omitted).  Where the conditions are substantially similar, "dissimilarities affect the weight of the evidence, not its admissibility."  Id. (citation and quotation marks omitted).

Baldwin, 418 F.3d at 579-580.

In Baldwin, the court upheld the exclusion of a videotaped re-enactment as a proper exercise of the trial court's discretion, where that court found the video had relevant differences from the actual situation, and found it was not a demonstration taken "under the same circumstances" as the events it purported to re-enact.  Id. at 578-579.  For example, the alleged kidnap victim had more room to manouevre in the back seat of a car, where the re-enactment took place with the front passenger seat forward, and the bindings on his wrists were knotted in a less restrictive manner.  Id.

68

In Persian Galleries, in contrast, the Sixth Circuit found the admission of a videotaped re-enactment was not an abuse of discretion.  Persian Galleries, 38 F.3d at 258.  The purpose of the videotape was to demonstrate that a theft could have been accomplished within a certain time frame.  The court found that the video "was substantially similar to the burglary scene," and thus the trial court did not abuse its discretion in admitting the re-enactment.  Id.

The court recognizes that the re-enactment cannot be based on the (non-existent) testimony of the deceased, Gilbert Rush, as to what he was able (or not able) to see on the night of his death.  However, there were other witnesses in the kitchen that night, who did testify as to the conditions existing at that time.  The lack of testimony from Gilbert Rush, in and of itself, would not preclude the court's consideration of the re-enactment, so long as the DVD portrayed conditions that were substantially similar to those testified to by the other survivors actually present in the kitchen.

More importantly, the defendants point to several differences, which they characterize as "substantial," between the conditions in the re-enactment and the deposition testimony of John and Jacob Rush.  (Doc. 203, at 8.)  Several of these differences are hardly substantial, in light of the purpose of the re-enactment (demonstrating the allegedly blinding effects of the police lights on Gilbert Rush).  For example, defendants state that the DVD does not depict binoculars at the window, when John Rush testified there were binoculars there, and the DVD provides no sound (other than a narrator) while the Rush brothers testified that

69

there was banging on the windows.  Neither of these differences are "substantial," insofar as they would impact the relevant, probative value of the re-enactment as to the issue of the plaintiffs' assertion that Gilbert Rush could not see who was shining the bright tactical lights from outside.  (Doc. 192, at 5 n.26.)

More significant are the assertions that (1) the DVD "was filmed without any lights," while there is testimony that the kitchen light was on; (2) the DVD "visually depicts a flash bang," while there is testimony that Gilbert Rush was sleeping and could not have seen the flash bang (albeit it may have awoken him); and (3) the DVD depicts light beams directed at the windows only, while there is testimony that there were also beams of light directed at the driveway.  (Doc. 203, at 8.)  All of these differences concern, to some extent, the light conditions existing in the kitchen at the time of the incident.  The second and third examples would not seem to have an effect on whether the bright tactical lights might have blinded Gilbert Rush temporarily, at the time during which they were actually shining into the window.  Nevertheless, dissimilarities of this type affect the weight of the evidence, not its admissibility.  Persian Galleries, 38 F.3d at 258.

In any event, the court based its recommendations herein on the written materials and documents provided by the parties.  The court did not rely on the DVD provided by Rush.  Even accepting as true, for the purposes of ruling on the motions for summary judgment, that Gilbert Rush may have been partially or fully blinded by the lights outside, the court would still not find that Deputy Gouge's use

of force was objectively unreasonable, in light of his perception that Gilbert  Rush was pointing a shotgun at a fellow officer.[12]

Thus, the motions to strike (doc. 203, 205) are DENIED as moot at this point, without prejudice to renew in form of a pre-trial motion in limine or otherwise.

## IX.  SUMMARY

The case before the court arises from circumstances surrounding the investigation of a theft ring and resulting in the execution of a search warrant at the home of several of the plaintiffs.  Most notably, during the warrant execution the homeowner was shot and killed by the police.

It is difficult to imagine a time when the challenges facing law enforcement were as daunting as they are today.  An emblem of that reality is that even an attempt to enforce minor infractions of the law all too often results in the need for police officers to engage in high risk, life-threatening conduct, in order to protect themselves or members of the public.  In recognition of that reality, however, while we are thankful for those who are willing to put themselves at risk on behalf of others, we expect that the police will reasonably limit high risk encounters when it is in their control to do so, particularly those involving the use of deadly force.

It is undisputed that the Rush home was targeted because police believed it contained evidence related to the stolen property ring.  Armed with probable cause,

---

[12] The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene.  Graham, 490 U.S. at 396.

71

the choice was made to seek a search warrant.  At some point, however, it was determined that the only way to safely execute the warrant was by employing a high risk, SWAT aided, dynamic night time entry.  Discounting the perspective of "hindsight" that inevitably attends the role played by the courts, it is difficult to conclude that this decision to go forward in this manner, balanced against the obvious potential peril and interests at stake, fulfilled the public's expectation that police will take care to avoid, or at least curb the escalation of, such high risk situations where it is within their power to do so.  Nevertheless, while the death of Gilbert Rush certainly represents a tragedy from any perspective, the court's obligation is to determine whether one or more of the defendants are entitled to summary judgment as a matter of law.

The court finds that ASORT is a "person" which may be sued under Section 1983, thus ASORT's motion for summary judgment on that basis (doc. 171) should be DENIED, because it has failed to demonstrate that it is entitled to judgment as a matter of law.

The City of Ontario's motion for summary judgment (doc. 167) should be GRANTED on the issue of municipal liability.  Richland County's motion for summary judgment (doc. 168) should be GRANTED on the same basis.

The Mansfield defendants' motion for summary judgment (doc. 169) should also be GRANTED; for the City of Mansfield on the issue of municipal liability, and for individual defendants Bosko, Miller, and Wendling on the basis of qualified immunity.

72

The Shelby defendants' motion for summary judgment (doc. 170) should be GRANTED as well; for individual defendants Combs and Mack on the basis of qualified immunity, and for the government defendants on the issue of municipal liability.

The defendants' motions to strike (doc. 203, 205) plaintiffs' presentation DVD are DENIED as moot.


<u>RECOMMENDATION</u>

It is recommended that ASORT's motion for summary judgment (doc. 171) be DENIED.  It is recommended that the other motions for summary judgment, (doc. 167), (doc. 168), (doc. 169), and (doc. 170), discussed above be GRANTED.

It is recommended that the motions to strike (doc. 203, 205) plaintiffs' presentation DVD be DENIED as moot.


Dated:   May 20, 2009                   /s/ Kenneth S. McHargh
                                          Kenneth S. McHargh
                                          United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

73