# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **JACOB RUSH,** *et al.*, | : | **Case No.  1:07-CV-1068** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **CITY OF MANSFIELD,** *et al.*, | : | **MEMORANDUM AND ORDER** |
| **Defendants.** | : | |

Before the Court is the Report and Recommendation (R&R) of Magistrate Judge Kenneth S. McHargh ("Judge McHargh").  (Doc. 212.)  In his R&R, Judge McHargh considers the Defendants' Motions for Summary Judgment (Docs. 167-171), as well as the Plaintiffs' Motion to Exclude the Defendants' Expert Testimony (Doc. 158) and the Defendants' Motion to Strike one of the Plaintiffs' Exhibits (Doc. 203).  He recommends that this Court grant in part and deny in part the Defendants' motions.  The Plaintiffs have filed a timely objection to this R&R (Doc. 214), as have the Defendants (Docs. 215-220), and the Court **SUSTAINS IN PART AND OVERRULES IN PART** those objections (Docs. 215-220).

As explained more fully below, the Motion to Exclude Testimony (Doc. 158) is **MOOT**, the Motion to Strike (Doc. 203) is **DENIED**, the Motion for Summary Judgment brought by ASORT[1] as to its capacity for suit (Doc. 171) is **DENIED**, the Motion for Summary Judgment brought by ASORT as to the substantive claims against it (Doc. 170) is **GRANTED IN PART AND DENIED IN PART**, the City of Mansfield's and Richland County's Motions for Summary Judgment (Docs. 168, 169) are **GRANTED IN PART AND DENIED IN PART**, all other municipal Defendants' Motions for

---

[1] ASORT is the acronym used by an entity known as the "Allied Special Response Team."

Summary Judgment (Docs. 167, 170) are **GRANTED**, and the individual Defendants' Motions for Summary Judgment are **GRANTED IN PART AND DENIED IN PART** (Docs. 169, 170).

## I.  BACKGROUND

This lawsuit arises under 18 U.S.C. § 1983 as well as state law.  The gravamen of the complaint is straightforward: the Plaintiffs assert that the Defendants violated their rights under the fourth and fourteenth amendments of the constitution:

> The Defendants have, under color of law, deprived Plaintiffs of clearly established rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution of which a reasonable person would have known. These rights include, but are not limited to, the right to due process of law and the right to be free of unreasonable searches and seizures and excessive force.

(Doc. 75 ("FAC") at ¶ 90.)  The particulars of this litigation, discussed below, are more complicated: they have led to hundreds of pages of briefing, thousands of pages of record evidence, and a 75-page R&R.

## II.  STANDARD OF REVIEW

### A.  Summary Judgment

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable

evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-

3

moving party to show that there is some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (emphasis in original) (internal quotations omitted)).

### B.  Report and Recommendation

On March 17, 2008, the Court referred this case to Judge McHargh for pretrial administration, pursuant to Title 28 of the United States Code, Section 636, and Local Rule 72.1.  In cases that are referred to a magistrate judge for preparation of an R&R, the district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *McClendon v. Challenge Fin. Investors Corp.*, No. 08-1189, 2009 U.S. Dist. LEXIS 17908, at *6-7 (N.D. Ohio Mar. 9, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).  A court is only required to conduct a *de novo* review of the portions of an R&R to which the parties have made an objection, and the parties have a "duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Cincinnati Ins. Co. v. Grand Pointe, LLC*, 501 F. Supp. 2d 1145, 1153 (E.D. Tenn. 2007) (quoting *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. Ohio 1986)).  In the absence of specific objections, a court may adopt conclusions reached by the magistrate judge without discussion. *See Thomas v. Arn*, 474 U.S. 140, 149-52, (1985); *Crum v. Sullivan*, 921 F.2d 642, 645 n.1 (6th Cir. 1990).

While this principle is universal, it is particularly appropriate here, given that Judge McHargh issued a thoughtful 75-page R&R in response to many thousands of pages of briefing and exhibits.[2]

### III. REQUIREMENTS FOR ESTABLISHING LIABILITY UNDER § 1983

All of the Plaintiffs' federal claims arise under 42 U.S.C. § 1983, which requires the Plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law."  *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted).  The Defendants in this action do not dispute that they acted under color of state law during any of the relevant events – accordingly, the question is simply whether the Plaintiffs suffered a depravation "of a right secured by the Constitution or laws of the United States" and were harmed thereby.  *Id.*  With respect to that question, not all unfair, unwise, or imprudent actions are constitutionally unreasonable.  *See Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).  Law enforcement officials are allowed "latitude for honest mistakes," even when those mistakes are difficult to understand with the benefit of hindsight.  *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987).  Nevertheless, each and every citizen has meaningful constitutional rights that law enforcement officials

---

[2] The Parties have attempted to incorporate the initial briefing on the motions for summary judgment into their objections, essentially defeating the purpose of the referral in the first instance:

> If a party files a general objection and incorporates other papers by reference and that approach undermines the purposes of the Magistrate's Act, that party will have waived the right to appeal.  *Neuman v. Rivers*, 125 F. 3d 315 (6th Cir. 1997).  While a district judge plainly has authority to go back through the record to determine whether a report and recommendation[] should be adopted, that approach would undermine the purpose of the Magistrate's Act to provide assistance of subordinate judicial officers to Article III judges.  If an Article III judge must repeat the process in which the magistrate judge engaged, instead of being directed to specific objections, what use is the reference?

*Gonzales v. Wolfe*, No. 1:04cv208, 2006 U.S. Dist. LEXIS 73370, at *3-4 (S.D. Ohio July 5, 2006), *adopted*, 2006 U.S. Dist. LEXIS 69073 (S.D. Ohio, Sept. 26, 2006), *aff'd*, 290 Fed. Appx. 799 (6th Cir. 2008); *cf. Gonzales*, 290 Fed. Appx. at 814 (accepting the unremarkable argument that a district court, rather than a Magistrate Judge, must ultimately review properly raised objections).  Obviously, not every incorporation by reference will be inappropriate, but given the vastness of the record and the degree to which the Parties have sometimes argued about that record without actually citing to it, they have failed to preserve a number of potential objections.

may not violate.  *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).  These rights are not lessened merely because law enforcement officials elect to execute a search warrant with a SWAT team.  *Holland v. Harrington*, 268 F.3d 1179, 1194-95 (10th Cir. 2001) ("At all times, SWAT officers no less than others . . . must keep it clearly in mind that we are not at war with our own people."); (*contra* Doc. 112 ("Bammann Dep.") at 61:12-62:9 ("If I'm at your house in a SWAT capacity we're not dealing with a normal law-abiding citizen I would say at that point.")).

If the Plaintiffs can show such a violation, they must then establish the propriety of recovery from any particular party.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007).  Although this analysis begins with the familiar requirement that a specific defendant proximately caused the constitutional deprivation, establishing proximate cause within the context of § 1983 is sometimes quite "murky."  *Wright v. City of Canton*, 138 F. Supp. 2d 955, 965 (N.D. Ohio 2001).  So, too, even when an individual law enforcement official has proximately caused the deprivation of a constitutional right, that official will not be held liable unless that right was "clearly established" and that official has caused the deprivation in an "objectively unreasonable manner."  *See Champion*, 380 F.3d at 901.

### A.  Individual Liability

While lawsuits under § 1983 frequently provide "the only realistic avenue for vindication of constitutional guarantees," *Champion*, 380 F.3d at 901 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)), those lawsuits also impose a cost on society, "including 'the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.'"  *Id.*  It has long been recognized that officials cannot perform their jobs safely or effectively if their every split-second decision is analyzed with knowledge gained only through hindsight.  *See Kostrzewa*, 247 F.3d at 639 (citing *Graham v. Connor*, 490 U.S. 386 (1989)).  Actions taken by law enforcement officials that appear unreasonable to a court weighing those actions over a period of months were not necessarily unreasonable when made in a matter of seconds under life-

threatening pressure.  *See id.*  The doctrine of qualified immunity provides a balance: it holds that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights  of which a reasonable person would have known."  *Champion*, 380 F.3d at 901.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-prong test for evaluating the claim of qualified immunity.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  Second, "if a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established."  *Id.*  A motion for summary judgment on qualified immunity grounds must be granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[3]  A court is not required to address the first question if it is evident that, even if a right was violated, that right was not clearly established at the time of the violation.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted

---

[3] Various panels of the Sixth Circuit have broken the two-prong Saucier test for qualified immunity into three-prongs:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred.  Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Champion*, 380 F.3d at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  The first two prongs of this test, of course, mirror the two prongs of *Saucier*.  The third prong explicitly examines the reasonableness requirement that other courts find implicit in *Saucier*.  *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005).  Some Sixth Circuit panels have held, however, that the three-prong approach is unnecessary in most cases, because "[i]n many factual contexts . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable."  *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006).

This Court believes the two-prong approach to be particularly appropriate in cases, such as this one, in which neither party addresses the three-prong approach in briefing.

to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The idea captured by the second prong of *Saucier* is that "an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. For this reason, plaintiffs bringing suit under § 1983 must show that "in the light of pre-existing law," a reasonable officer would have understood that the actions for which he now faces suit were unlawful. *Champion*, 380 F.3d at 902.[4]  This inquiry must be undertaken with respect to the specific situation that an individual defendant faced.  *See id*.  It is not enough, for example, to show that an officer's use of force exceeded the objective standard for reasonable force under *Graham*, rather, a plaintiff must show that any reasonable officer would have understood that the particular force he was using in that particular situation was excessive.  *See id*.  To do this, a plaintiff is not required to demonstrate the existence of a "fundamentally similar" or "materially similar" case.  *Grawey v. Drury*, 567 F.3d 02, 313-14 (6th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Specifically:

> the question is whether the defendants had fair warning that their actions were unconstitutional.  Thus, officials can still be on notice that their conduct violates established law even in novel factual circumstances.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* (citations and quotation markings omitted); *see also Champion*, 380 F.3d at 902 ("[T]he fact that various courts have 'not agreed on one verbal formulation of the controlling standard' does not by itself entitle an officer to qualified immunity." (quoting *Saucier*, 533 U.S. at 203)).  Because the focus is on whether the officer had fair notice that his conduct was lawful, reasonableness is judged against the backdrop of the law at the time of the conduct.

---

[4] To determine whether a right is clearly established, this Court must consider the decisions of the Supreme Court, followed by the decisions of this Circuit, followed by the decisions of other district courts within this Circuit, and finally the decisions of other circuits.  *Champion*, 380 F.3d at  902.

**B. Municipal Liability**

When plaintiffs seek to recover from a municipality, there is no requirement that a particular right be "clearly established," but the plaintiffs must show that the municipality itself was the proximate cause of any deprivation. *See Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992); *Ford v. County of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008). There is no vicarious liability under § 1983 for the alleged torts of a municipality's agents, rather:

> It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citation omitted). Simply put, to impose § 1983 liability upon a local governmental body, a plaintiff must show that the municipality itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992).[5]

A plaintiff can establish that a municipality is the proximate cause of a violation under any of five theories: (1) express municipal policy, *Monell*, 436 U.S. at 660-61, (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnick*, 485 U.S. 112, 127 (1988) (quotation omitted), (3) the decision of a person with final policymaking authority, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986), (4) the failure to act where the "inadequacy [of the

---

[5] This rule applies equally to private organizations that provide law enforcement: the Plaintiffs need not show that the right of which they were deprived was "clearly established," but they must demonstrate that the organization itself proximately caused any violation. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (collecting cases); *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996).

existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989),[6] or (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct, *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995); *see also Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Wright*, 138 F. Supp. 2d at 966 ("[Plaintiff] can establish his municipal liability claim by showing . . . [that] a final municipal policymaker approved an investigation . . . that was so inadequate as to constitute a ratification of their alleged use of excessive force.").

## IV. THE LEGAL STATUS OF ASORT

Prior to considering the substantive merits of the Plaintiffs' claims, this Court must consider whether one of the Defendants, ASORT, is subject to suit at all.  ASORT asserts that it is immune from suit under the same principles that immunize municipal police departments, whereas the Plaintiffs assert, and Judge McHargh found, that "ASORT is an unincorporated association which is amenable to suit under federal law."  (R&R at 24.)  The Court analyzes this issue somewhat differently than either the Plaintiffs or the Defendants suggest, but ultimately adopts Judge McHargh's recommendation as to ASORT's legal status.

---

[6] This category includes deliberately indifferent training or supervision, *Canton*, 489 U.S. at 390; *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), deliberately indifferent hiring, *Brown*, 520 U.S. at 410-11; *see also Doe v. Magoffin County Fiscal Court*, 174 Fed. Appx. 962, 967 (6th Cir. 2006), and deliberately indifferent failure to adopt policies necessary to prevent constitutional violations, *Conn v. City of Reno*, 572 F.3d 1047, 1064 (9th Cir. 2009); *see also Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

**A.  The Structure and Scope of ASORT**

ASORT is an entity whose professed purpose is to provide SWAT-type tactical teams for use by area municipalities when called upon.  ASORT was formed by a private entity, the Richland County Chiefs of Police Association (RCCPA).  (R&R at 12.)[7]  ASORT's designated 30(b)(6) deponent explained that the RCCPA:

> meet[s] every Wednesday morning at 7:30 basically for breakfast and just [to] have general discussion about what is going on in the community.  <u>We probably are more of a social organization than anything</u>.

(Doc. 110 ("Messer Dep.") at 20:11-20) (emphasis added).  This "social organization" sets at least some aspects of ASORT policy.  (*See* Doc. 113 ("Combs Dep.") 22:14–15 ("The [RCCPA] really makes decisions concerning personnel and/or training.").  Although ASORT has been represented by counsel throughout this litigation, that counsel does not appear to know how he came to be retained.  (*See* 9/24/09 Hrg. Tr. at 9:23 – 10:15.)[8]

---

[7] The ASORT manual refers to the Richland County Association of Chiefs of Police, which it abbreviates "RCACP." (Doc. 169-5.)  The Court gathers from the record evidence that the "RCACP" referenced in the ASORT manual is the same as the "RCCPA" referenced by the Defendants in depositions.  For consistency, the Court will refer to this organization as the "RCCPA" throughout this opinion, even when referencing the ASORT manual.

[8] The Court's exchange with counsel on this point follows:

| | |
|---|---|
| THE COURT: | Okay.  Let me ask you, who retained you to act on behalf of ASORT? Who is your client? |
| COUNSEL: | Well, the client would be the home departments ultimately that we represent, but – |
| THE COURT: | Do you have a representation agreement with every home department that's been sued?  Is that how you represent ASORT? |
| COUNSEL: | I don't believe so, Your Honor.  I can't specifically answer that question here today. |
| THE COURT: | You don't know who your client is? |
| COUNSEL: | Well, I understood who my clients were as far as the municipalities involved, but my understanding was there was an agreement that we would represent ASORT in this matter through our representation of those municipalities. |

The Commander of ASORT reports to the RCCPA.  (Doc. 169-5 ("ASORT Manual") at 9.)[9] The ASORT Commander at the time of the events in question, Lance Combs, testified, , however, that he has never actually attended an "official" RCCPA meeting.  (Combs Dep. at 24:16–17 ("I've had to attend Chiefs' breakfasts as opposed to really official Chiefs' meetings.").)  Indeed, Commander Combs testified that he does not know how it is he became the Commander of ASORT:

> QUESTION:  And how did you get selected as the commander?
>
> ANSWER:  My guess is that the [RCCPA] made that selection.  I wasn't privy to the selection process.
>
> QUESTION:  Did you apply for it?
>
> ANSWER:  No.

(Combs Dep. at 21:5-11.)  In sum, then, ASORT was formed by a private social organization and is governed to some extent by that private social organization.  This is a marked departure from the usual structure for multijurisdictional law enforcement agencies or teams.  *See, e.g., Petty v. United States*, 80 Fed. Appx. 986, 987 (6th Cir. 2003) (describing "a multi-jurisdictional task force directed by the Federal Bureau of Investigation . . . ."); ED WITTENBERG, EUCLID, SHAKER HEIGHTS, SOUTH EUCLID,

---

| | |
|---|---|
| THE COURT: | All right.  But you don't know if you actually represent the municipalities? |
| COUNSEL: | Oh, I represent the City of Lexington and the City of Shelby. |
| . . . . | |
| THE COURT: | So is it Shelby and Lexington that is paying for you to represent ASORT? |
| COUNSEL: | I think ultimately it comes through an insurance defense agreement through an insurance carrier. |
| THE COURT: | Does ASORT have independent insurance? |
| . . . . | |
| COUNSEL: | I'm not exactly sure, Your Honor. |

(9/24/09 Hrg. Tr. at 9:23-11:9.)

[9] ASORT Team Members report to their ASORT Team Leaders, who in turn report to the ASORT Commander.  (ASORT Manual at 9.)

University Heights Eye Joint SWAT Team (April 8, 2010, available on-line at http://www.cleveland.com) ("The councils of all four cities will need to approve legislation . . . for the plan [forming a regional SWAT team] to take effect."); Trenton, Ohio Council Meeting Minutes (January 15, 2009) ("An Ordinance Authorizing the City Manager of the City of Trenton, Ohio to Enter Into a Memorandum of Understanding for Regional S.W.A.T. Team . . . ." (capitalization changed throughout)).

Membership in ASORT is voluntary, but limited to law enforcement officials from the various police departments in Richland County.  While ASORT itself is regulated by the RCCPA, the members of ASORT are subject to a variety of benefits and restrictions that are specific to their "home" police departments.  Most notably, each municipality in Richland County has agreed to fund the cost of training and equipment for any one of their law enforcement officials that joins ASORT.  (*Id.* at 15-16; Messer Dep. at 20:12-23:8.)[10]  ASORT members, as well, are governed by both ASORT policies and the policies of their home law enforcement agencies when on ASORT assignment.  (Combs Dep. at 54:24-55:2.)  Finally, ASORT asserts that home departments are responsible for discipline of their members (R&R at 13), although the record indicates that no home department has ever disciplined a member of ASORT for actions taken when deployed by ASORT.[11]

If ASORT members are bound in scope by certain requirements of their home departments, ASORT itself is not.  ASORT may choose to accept or reject requests for assistance from any of the area municipalities.  (Combs Dep. at 91:16-17 ("The [ASORT] team leader has the authority to accept or

---

[10] Each municipality determines how many ASORT Team Members it can afford to fund, which sets a limit on how many law enforcement officials from a given municipality may volunteer to join ASORT.

[11] ASORT argues that individual departments are responsible for the training of their own members (R&R at 15), but this assertion conflicts with testimony from ASORT Commander Combs (Combs Dep. at 22:18-19 ("[W]hen it came time for decision-making, that authority, especially for training, the authority rested with me.")).  For purposes of summary judgment, then, the Court assumes that ASORT training is provided through ASORT itself.

13

deny [a] mission.").)  So, too, ASORT may enter a municipality even when no official from that municipality has requested their help directly and even without notice to any official in that municipality.  (*See* 9/24/09 Hrg. Tr. at 48:21 – 49:8.)

### B. The Parties' Arguments

ASORT argues that it is not subject to suit because it is a "government unit."  ASORT asserts that it:

> is a statutorily authorized cooperative between municipalities, specifically assembled for the purposes of furthering law enforcement.  Were [ASORT] simply a police unit of a single municipality, the police unit would not have capacity to be sued, and Plaintiffs' claims would be treated as against the municipality.  Indeed, the Magistrate Judge implied that if the incident in question involved an impromptu, collective response from various police departments, there would be not capacity to sue the collective.  [ASORT's] cooperative configuration does not present a situation so different as to apply Fed.R.Civ.P. 17(b) where it would not normally be applied to governmental units.

(Doc. 215 ("ASORT Obj.") at 3) (citations omitted) (emphasis added).  ASORT, however, is not part of any particular municipality, which raises the question as to whom, if anyone, ASORT believes is subject to suit if an ASORT policy (as distinct from home department policies) proximately causes the deprivation of a constitutional right.

ASORT adopted a somewhat cryptic stance when confronted with that question:

| | |
|---|---|
| THE COURT: | Okay.  If in fact I find that a constitutional violation occurred, so say hypothetically Mansfield calls out ASORT for a search in Mansfield and I find that members of the ASORT team, not necessarily Mansfield officers, but members of the ASORT team engaged in conduct that would constitute a constitutional violation . . . is then Mansfield [potentially] liable for their activities because they have called them in and therefore deputized them for purposes of their own governmental activity, or do you believe that each entity that sent someone there is responsible for their activities, or is nobody responsible for their activities? |
| ASORT COUNSEL: | Well, Your Honor, we would argue that it is the home department municipality that is ultimately bearing the responsibility for the officers.  It is a collective group of those police departments and those municipalities, and we would consider that they are dictated by their own policies.  Therefore, if the officer from a specific home department acts outside the scope of those policies or creates |

14

a constitutional violation through his actions, that home department municipality employer would be the entity that is actually capable of being sued.

. . . .

THE COURT:       All right.  So you don't believe in the hypothetical that I have posed that Mansfield would have any responsibility for calling out these members, other than for the activities of its own officers, if they happen to even be on the team?

ASORT COUNSEL:  That's correct, Your Honor  I would propose to you that again, the ASORT team members are voluntarily signing up to be part of this, and each collective home department allows them to volunteer for that purpose.   Based upon that, I guess, volunteering of the officers, the home department policy still dictates . . . .

(9/24/09 Hrg. Tr. at 4:9-6:4) (emphasis added).

ASORT seems to argue that it does not truly have its own policies when it contends that ASORT "would consider [team members' actions to be] dictated by their" home department policies.  But there is substantial testimony and evidence indicating that ASORT *does* have its own policies, for example, there is an ASORT manual that contains policies (*See* Doc. 169-5 ("ASORT Manual")), Commander Combs testified that he is responsible for ASORT training (Combs Dep. at 22:18-19), and ASORT counsel argued that the RCCPA is responsible for ASORT training (4/9/09 Hrg. Tr. at 44:5-8 ("THE COURT: So this social organization [the RCCPA], as you call it, sets the standards for the training? COUNSEL:  Correct.  And it is actually in the ASORT policy manual."); *contra Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) ("Because the Task Force was nothing more than a joint effort of four counties in the State of Indiana to implement existing law enforcement policies, no new or unique

policies were needed.").  ASORT, then, does not provide a plausible argument as to what entity it believes is subject to suit if one of ASORT's policies leads to a constitutional violation.[12]

The Plaintiffs dispute the Defendants' characterization of ASORT and contend that Judge McHargh was correct to conclude that ASORT is subject to suit as an unincorporated association.  *See* Fed. R. Civ. P. 17(b)(3)(A) ("[A] partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws."); (*see also* R&R at 11.)  The Plaintiffs offer a number of reasons in support of this assertion, most straightforwardly that ASORT cannot be said to be a part of any particular municipal or state agency and that ASORT must be *something*.  (*Cf.* R&R at 14 ("ASORT does not contend that it is a subdivision of a governmental agency or that it is itself a police department.").)

### C. Analysis

The implication that follows from ASORT's arguments – that the Plaintiffs have no recourse if ASORT's policies and procedures have proximately caused the deprivation of their constitutional rights – is a radical one.  ASORT's attempt to minimize this contention by way of analogy to a municipal police department misses the point.  A suit against that police department is simply a suit against the municipality, because a tort "by the police department" is actually a tort by the municipality.  In contrast, ASORT appears to contend that citizens who are subjected to a tort "by ASORT" have no recourse against anyone at all.

The Defendants' contention is particularly troubling because ASORT was formed by a private organization.  The suggestion that a private social organization could form a SWAT-type team that

---

[12] The Court has considered the possibility that a home department should be understood to "adopt" ASORT policies whenever its officers are deployed by ASORT.  The municipal defendants specifically declaim that they have designated any policymaking authority to ASORT, however.  (*See* Doc. 72-1 ("Mansfield MSJ") at 35 ("[T]here is no showing of a final policymaker of Mansfield directed any of the actions on the raid that night . . . .").)

would be immune from suit certainly goes against the original intent behind § 1983, which was enacted to allow recourse against a private "law enforcement" entity whose policies, practices, and procedures deprived citizens of their civil rights. *See Gay-Straight Alliance v. Sch. Bd.*, 477 F. Supp. 2d 1246, 1250 (S.D. Fla. 2007) (discussing the history of § 1983); *cf. Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005) ("[W]hen the state delegates a power traditionally reserved to it alone - the police power - to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" (citations omitted)).[13]

ASORT's claim that it is not subject to suit as an "unincorporated association" because it is a "government unit" is based upon a mistaken understanding of Rule 17[14] and is not well-taken: ASORT is governed by a private entity, and it appears that no municipality exercises any control over ASORT or its activities. ASORT meets the definition of an unincorporated association under Rule 17(b)(3)(A) and is subject to suit as such. So, too, although ASORT contends various forms of immunity under Ohio law, no provision of state law alters this conclusion. [15] The Court explains this analysis below.

### 1. Whether ASORT is a "Government Unit"

As previously explained, ASORT contends that it is not subject to suit because it is a "government unit." (ASORT Obj. at 2 (quoting *Dean v. Barber*, 951 F.2d 1210, 1215 n.4 (11th Cir.

---

[13] The Court does not intend to imply any other similarity between ASORT and the organization that led to the passage of § 1983.

[14] Civil Rule 17 governs the capacity to sue or be sued in federal court. The capacity to sue or be sued for parties other than individuals or corporations is determined by the law of the state where the court is located, with two exceptions. Fed. R. Civ. P. 17(b)(3). The relevant exception here provides: "a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws." Fed. R. Civ. P. 17(b)(3)(A) (emphasis added).

[15] To be precise, as explained below, *either* ASORT is subject to suit under Rule 17(b)(3) because it is subject to suit under Ohio law *or* ASORT is subject to suit under Rule 17(b)(3)(A) because it is not.

1992).)  To evaluate this contention, the Court must begin by considering the meaning of the term "government unit."  It is not found within the Federal Rules, but is, rather, a term employed by the Eleventh Circuit to explain that a state or municipal entity otherwise not amendable to suit is not made subject to suit in that circuit through the operation of Rule 17(b)(3)(A).  *See id.*  In particular, the Eleventh Circuit has reasoned that only private parties can be unincorporated associations within the meaning of Rule 17(b)(3)(A).  *See Dean*, 951 F.2d at 1215 n4; *but see North Carolina League of Municipalities v. Clarendon Nat'l Ins. Co.*, 733 F. Supp. 1009 (E.D.N.C. 1990) ("Plaintiff . . . is an unincorporated association of various units of local government within North Carolina . . . .").

The problem for ASORT, even assuming that the Sixth Circuit would follow the Eleventh on this issue, is that ASORT is not a "government unit[], subdivision[,] or agenc[y]."  ASORT is governed by a *private* organization, and, to the extent there is evidence in the record that the leader of ASORT reports to any authority higher than himself for purposes of setting ASORT's policy, practices, or procedures, that authority is vested in this same *private* organization.  This alone would seem to establish that ASORT is not a "government unit[], subdivision[,] or agenc[y]."

Although ASORT points this Court to an Ohio statute that allows municipalities to form multijurisdictional police task forces, that statute does not somehow transform ASORT into a unit of government.  The relevant statute, which authorizes municipalities to "allow [their] police officers to work in multijurisdictional . . . task forces," provides in full:

> The legislative authority of any municipal corporation, in order to obtain police protection or to obtain additional police protection, or to allow its police officers to work in multijurisdictional drug, gang, or career criminal task forces . . . may enter into contracts . . . for services of police departments or the use of police equipment or for the interchange of services of police departments or police equipment within the several territories of the contracting subdivisions.

O.R.C. § 737.04.  This statute does not address the public or private character of the tasks forces themselves, however.  The agreement between the municipal defendants in this case, conspicuously absent from ASORT's briefing, emphasizes this:

> [T]he law enforcement agencies of Richland County agree to be called upon to send available units to assist in emergency calls for service in the other Richland County law enforcement jurisdictions, and all law enforcement agencies request immediate assistance through 911/ or Mansfield, Shelby, Ontario, and Lexington dispatch if any dispatching agency is unable to reach the affected agency's contact points.  In the event an agency receives an emergency call for service for another agency's jurisdiction and can't reach the agency's contact point, that agency shall notify the closest unit(s) available to respond to the emergency call for service.  The dispatching agency shall continue to try to contact the affected agency jurisdiction until that agency is notified and responds and/or handles all follow-up investigation.
>
> All law enforcement agencies of Richland County also agree to send specialized unit [sic], (e.g., <u>Allied Special Response Team members</u>, K-9 Officers, Dive Team members) when available, to assist with emergency calls for service.  Agencies may call for mutual aid for other calls as agreed upon at the time of calls.

(*Cline, et al. v. City of Mansfield, et al.*, Case No. 10cv1068 (N.D. Ohio) (Doc. 103-3 at 1)) (emphasis added).  While this agreement provides that the various municipalities in Richland County will allow members of ASORT to participate in ASORT when called, it does not describe the creation of a joint task force within the meaning of § 737.04 and does not describe ASORT as a unit of government.[16]

ASORT also seems to argue that it is a government entity because it is performing a traditional municipal function, but this is exactly wrong: that ASORT is performing a traditional municipal function is what makes it *subject* to suit under § 1983, not what makes it *immune* from it.  *See Romanski*, 428 F.3d at 637 ("[W]hen the state delegates a power traditionally reserved to it alone - the police power - to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" (citations omitted)).  It is true, of course, that the members of ASORT are themselves public officials who receive

---

[16] If contracting municipalities *had* formed a public task force, the contracting municipalities would presumably be exposed to liability to the extent they have "contracted" for the use of personnel or equipment within their jurisdiction – i.e., the task force members would become contract employees of the jurisdiction or jurisdictions seeking their services.  Precisely which municipality or municipalities would be subject to liability if such a task force proximately caused the deprivation of a constitutional right is an important question, but one that is reserved for another case.

their equipment and salaries from local municipalities, but this does not automatically make ASORT a part of those municipalities.  As the Eighth Circuit explained in an analogous context:

> the [defendant entity] was not created by the Constitution or by any statute . . . and . . . it is not 'the State' or an 'agency of the State' as are agencies like the . . . Highway Department, or the . . . Game & Fish Commission . . . .  Rather, the [defendant is] established and supported by local school systems . . . on a voluntary basis.  Thus, it is not immune from suit.

*Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 27 (8th Cir. 1974) (quoting the district court)).  This same distinction applies here: that ASORT is supported by municipalities does not make it a part of those municipalities.[17]

In sum, the Court concludes that, because ASORT is formed and governed by a private organization, it is not a government unit, subdivision, or agency.  Whatever the reach of the Eleventh Circuit's reasoning, it does not extend to an entity such as ASORT, which is not part of a state, municipality, or group of municipalities.

### 2.  Whether ASORT is an Unincorporated Association Under Rule 17(b)(3)(A)

Given that ASORT is not a government unit, the Court must still define what, precisely, it might be.  The Plaintiffs suggest, and the R&R found, that ASORT is an "unincorporated association" under Rule 17(b)(3)(A).  This Court agrees.

Although the term "unincorporated association" is not defined in the Federal Rules, the "Supreme Court has defined an unincorporated association as 'a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise.'" *Hazel v. Beta Omicron Chptr. of Sigma Nu Fraternity House Corp.*, Case No. 4:08cv46, 2009 U.S. Dist. LEXIS 19878, at *6-7 (E.D. Tenn. Mar. 12, 2009) (citations omitted).  It has

---

[17] Similarly, that ASORT members are guided by certain municipal policies even when performing a mission for ASORT, does not make ASORT itself in some way governed by municipalities.  The record seems to indicate the opposite: ASORT operates in a manner that appears fully autonomous from any official municipal supervision.

been said that "voluntary and knowing membership is the hallmark of" such an association.  *Boynton v.*

*Headwaters, Inc.*, 252 F.R.D. 397, 401 (W.D. Tenn. 2008).

> As Judge McHargh explained, this definition is apt here:

> In the case before this court, the formation and purpose of ASORT, and the structure and composition of ASORT and its teams, was not "left to chance."  A structure and manual were put into place to govern the composition and procedures of ASORT and its teams. Similarly, the decision to deploy ASORT to serve the search warrant, and the composition, role, and procedures of the ASORT team which served the warrant were not random events, but deliberate choices, guided by ASORT policies.  The ASORT team which served the warrant was a pre-existing group (with two additions from the other ASORT team), organized in advance for the very purpose of serving warrants, not a random group of police officers from different jurisdictions spontaneously composed for mutual assistance, for example, to respond to an unexpected disaster or riot.

(R&R at 23-24) (internal citations omitted).  ASORT itself notes that it "was formed by [a private entity]

in order to respond to tactical operations and high risk situations" and that membership in ASORT "is

purely voluntary."  (Doc. 70-1 ("ASORT MSJ") at 1.)  In other words, ASORT is "a body of persons

united without a charter," each of whom is a "voluntary and knowing" member.  *See Boynton*, 252

F.R.D. at 401.[18]  Indeed, ASORT all but concedes that it meets this definition: it simply argues that it

should be considered a government unit and that government units are by definition not unincorporated

---

[18] ASORT argues "that if the incident in question involved an impromptu, collective response from various police departments, there would be no capacity to sue the collective [, and ASORT's] cooperative configuration does not present a situation so different as to apply Fed.R.Civ.P. 17(b)." (ASORT Obj. at 3.)  This is incorrect.  First, it is difficult to see how any ad hoc group could ever be subject to suit under Rule 17(b)(3)(A), because "voluntary and knowing membership is the hallmark of an unincorporated association."  *Boynton*, 252 F.R.D. at 401.  Second, such a group would have been formed by municipalities, not a private organization.  Finally, at least some of the municipalities in such a hypothetical would be liable to the extent that the policies of those municipalities or that task force proximately caused a constitutional violation.  *See Neace v. Perry Twp.*, No. 04cv545, 2006 U.S. Dist. LEXIS 65678, at *32-33 (N.D. Ohio Sept. 14, 2006).

associations.[19]   As discussed above, ASORT is not a government unit and there are no grounds to concluded that it is; ASORT, rather, is an unincorporated association.[20]

### 3.  Ohio Law Does Not Immunize ASORT from Suit in Federal Court

ASORT contends that, if it is an unincorporated association, Ohio law acts to immunize ASORT from suit.  While Ohio law allows suits against unincorporated associations, *see* O.R.C. §1745,  ASORT contends that it is impermissible to sue both an unincorporated association and its members under that law.[21]   There are three reasons why this argument is not well-taken.   First, state procedural law ordinarily does not govern the right to sue in federal court.  *Solectron United States, Inc. v. FedEx Ground Package Sys.*, 520 F. Supp. 2d 904, 910 (W.D. Tenn. 2007) ("[T]he right to sue in federal court is different from the right to sue in state court, and the [right to sue in federal court] is governed by federal [procedural law] rather than state law." (quoting *Long v. Richardson*, 525 F.2d 74, 79 (6th Cir. 1975))).   Even if the courts of Ohio were to force state litigants to choose between suits against an

---

[19] This Court adopts, as well, Judge McHargh's well-reasoned departure from those cases holding that intergovernmental task forces may only be sued when there is some specific grant of statutory authority from the relevant state.  *Contra Harris v. City of Hammond*, Case No. 07-3890, 2008 U.S. Dist. LEXIS 110881, at *7 (E.D. La. Sept. 30, 2008) ("[T]here are several cases relating to intergovernmental drug task forces, which stand for the general proposition that a plaintiff must point to some grant of statutory authority to show that such task forces may be sued." (collecting cases)).  Although the disposition of those cases may well have been correct on the facts presented there, to the extent that those cases could be read to create an exception to Rule 17(b)(3)(A) whenever an entity refers to itself as an intergovernmental task force, regardless of the underlying characteristics of that entity, such a reading is unsupportable.

[20] ASORT does not dispute that unincorporated associations are amenable to suit under § 1983 when they engage in state action.  *See Jund v. Hempstead*, 941 F.2d 1271, 1279 (2d Cir. 1991) ("The Supreme Court has repeatedly recognized that unincorporated associations may be held liable . . . . [w]e find no barrier to application of [that] reasoning . . . in the context of a section 1983 claim."); *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1144 (3d Cir. 1995) (collecting cases in which volunteer fire associations, some of which are unincorporated, have been held liable under § 1983 when they act under color of law).

[21] ASORT contends that the definition of "unincorporated association" in O.R.C. § 1745 mirrors that of "unincorporated association" in Rule 17(b)(3)(A).  The Court assumes, without deciding, that this is correct.

unincorporated association and its members in all cases, it is not clear that such a rule would have any force in federal court.

Second, it does not appear that Ohio procedural law bars a plaintiff from bringing suit against both an unincorporated association and its members as ASORT contends. The statute itself certainly contains no such express limitation. It is unlikely, moreover, that the dicta in the 1961 Ohio Supreme Court case upon which ASORT relies for this proposition, *Lyons v. American Legion Post Realty Co.*, could override the plain reading of the statute. The question before the court in *Lyons* was whether O.R.C. § 1745.01 abrogated the right to sue individual members of an unincorporated association, a question that court answered in the negative: "[w]e think the new statutes are no more than cumulative and do not abrogate the right to sue the members of the associations if the suitor chooses to proceed in that way." *Lyons v. American Legion Post Realty Co.*, 175 N.E.2d 733, 736 (Ohio 1961). The 1961 court also wrote, however, that "[w]here a statute gives a new remedy without impairing or denying one already known to the law, the rule is, to consider it as cumulative, allowing either the new <u>or</u> the old remedy to be pursued at the option of the party seeking redress." *Id*. at 735 (emphasis added) (quotation marks and citation omitted). There was no particular reason for the *Lyons* court to consider the question of whether the remedies were mutually exclusive, however, since the unincorporated association was not a named defendant in that case. It does not seem, moreover, that any court has ever read the *Lyons* dicta as does ASORT. Subsequent Ohio courts, in fact, have allowed plaintiffs to sue both an unincorporated association and its members. *See East Canton Educ. Ass'n v. McIntosh*, Case No. 96-CA-0293, 1997 Ohio App. LEXIS 3957, at *37 (Ohio Ct. App. Aug. 18, 1997); *Recknagel vs. Bd. of Managers of Edenwood Condominium Owners Association*, No. 1736, 1983 Ohio App. LEXIS 14099, at *1 (Ohio Ct. App. May 9, 1983).

Finally, to the extent that the dicta in *Lyons* might require an election of remedies in some circumstances, it would not do so on these facts, where the basis of liability against the unincorporated

association is different from the basis of liability against the unincorporated association's members. ASORT is only liable to the extent that it, *as distinct from its individual members*, proximately caused the deprivation of a constitutional right.  *See Petty*, 478 F.3d at 349; *Austin*, 195 F.3d at 728.  The individual members of ASORT, for their part, are only liable to the extent that they, *as distinct from ASORT itself*, proximately caused the deprivation of a clearly established constitutional right.  *See Petty*, 478 F.3d at 349; *Champion*, 380 F.3d at 901.  Conversely, *Lyons* involved a situation in which the basis for liability against the unincorporated association and its members was identical.

For each of these three reasons, the argument that *Lyons* acts to immunize ASORT from suit is not well-taken.

### D.  ASORT is Subject to Suit as an Unincorporated Association

In sum, the Court agrees with Judge McHargh that ASORT is subject to suit as an unincorporated association and **DENIES** ASORT's Motion for Summary Judgment (Doc. 171) to the extent that it is based on the argument that ASORT is not *sui juris*.  ASORT is not a government entity, meets the definition of an unincorporated association under Rule 17(b)(3)(A), and is not somehow shielded from suit by Ohio law.  Whether ASORT is actually liable in this action, of course, will depend upon whether it proximately caused a violation of a constitutional right.  *See Petty*, 478 F.3d at 349; *Austin*, 195 F.3d at 728.

### V.  EVENTS GIVING RISE TO THE CURRENT DISPUTE

On December 26, 2006, 17-year-old Krysten Blevins and her young child moved into 2610 Park Avenue East in Richland County, Ohio to live with Gilbert Rush, Jr. and Melissa Hendrick.  (R&R at 8.) Blevins had suffered abuse at the hands of her previous foster mother, Deandrea Whyel, who had forced her to steal from Wal-Mart and a number of other stores.  (*Id.*)  This apparently was not an isolated event; Whyel was part of a retail theft ring.  (R&R at 9.)  Blevins ultimately complained to the Richland County Juvenile Court about her treatment by Whyel, and that court approved her move into the

Rush/Hendrick household, appointing Gilbert Rush to serve as Blevins' legal guardian.  (*Id.*)  Over the next two months, Richland County Children's Services visited the Rush/Hendrick home on a number of occasions to check-in on Blevins.  (*Id.*)  While in the home, the Richland County officials specifically noted that the guns in the household were stored safely in cabinets.  (*Id.*)

On February 11, 2007, Blevins and Gilbert Rush called the Richland County Sheriff's office seeking assistance.  (Doc. 106-2 at 46-47 ("Ohio Uniform Incident Report").)[22]  They reported that they had received a call in which the unidentified caller had threatened to kill them.  (*Id.*)  On February 14, 2007, the sheriff was again called for assistance, when Hendrick tried to kill herself.  (*Id.* at 48-50.)  Both of these calls were recorded in official incident reports (*see Id.* at 46-50), available in summarized form in a database searchable by Richland County law enforcement officials (*see* Doc. 106 ("Bosko Dep.") at 106:17-107:10).

### A.  Deandrea Whyel Implicates Her Former Foster Daughter

Sometime in late 2006 or early 2007, Mansfield Juvenile Unit Detective Eric Bosko uncovered Whyel's involvement in the theft ring. (R&R at 9.)[23]  He recruited her as a confidential informant, and she provided him information leading to the recovery of stolen property from two separate addresses. (Doc. 170-2 ("Warrant") at 5.)  After providing Bosko this information, she told him to investigate Blevins and to search the Rush/Hendrick home for property that Blevins had stolen.  (R&R at 9.)  Whyel informed Bosko incorrectly that the Rush/Hendrick home was dangerous; of particular relevance, she told Detective Bosko that there had been a "fairly recent" shooting at the Rush/Hendrick home (Bosko Dep. at 145:13-146:20), that Hedrick always had a loaded gun at the ready (Doc. 110 ("Messer Dep.") at 5:24-25), and that there were loaded firearms throughout the Rush house (Bosko Dep. at 116:1-7).

---

[22] In certain cases, many different documents were filed so that they appear as one document number in the Court's electronic filing system.  The Court's initial abbreviation of these documents, consequently, is listed after the page number.

[23] At the time of these events, Detective Bosko reported to Mansfield Police Lieutenant John Wendling.

### B.  Juvenile Unit Detective Bosko's Investigation

Bosko's investigation of Blevins was atypical.  While he knew that Blevins was a minor who had been one of Whyel's foster children (*id.* at 120:20-25), he did not appear to consider this relevant, nor is there any evidence that he attempted to determine why Blevins had been removed from Whyel's care. He did not attempt to determine if Blevins had any previous involvement with the juvenile court (*id.* 124:1-6), place any weight in a report that Blevins and Gilbert Rush had called the police seeking protection from death threats (*id.* at 98:16 – 99:16; 102:4-103:4.), obtain police records indicating that the police had been called to the home because of a recent suicide attempt by Hedrick, nor observe that no evidence (i.e., a police report) supported Whyel's contention that there had been a shooting incident at the Rush/Hedrick home.  He did, on the other hand, as advised by Whyel, talk to Whyel's ex-husband Robert Whyel.  (Doc. 118-3 ("Bosko Tr.") at 2.)

It appears that the only information Bosko believed relevant to his investigation came from the Whyels.  (Bosko Dep. at 94:10-96:14; 145:25-147:2.)  Viewing the facts in the light most favorable to the non-moving party, as the Court must on summary judgment, a reasonable jury could conclude, indeed, that Bosko essentially performed no independent investigation whatsoever.  (*See, e.g.*, *id.* at 94:10-96:14; 54:1-8; 145:25-147:2; *cf.* Doc. 141-1 ("Lyman Rep.") at 23 ("[Bosko] failed to conduct a proper and thorough investigation. . . . [which] resulted in an overreliance on false or misleading information.").)

### C.  The February 28, 2007 Search Warrant

On February 28, 2007, Detective Bosko applied for a search warrant for the Rush/Hendrick household.  (*See* Warrant.)  His affidavit was based entirely on the information he obtained from the Whyels.  (Bosko Tr. at 2.)  Detective Bosko stated that:

- Krysten had stolen some items from a Wal-Mart, which were at the Rush house.[24]

---

[24] Baby clothes, DVDs, PlayStation® games, and a DVD player.

- John Rush was a felon who had previously stolen a handgun, car stereo, and speakers, which were located at the house.

- Melissa Hedrick, a resident of the house, was in possession of illegally obtained prescription medication, which made her paranoid.  She possesses a loaded handgun at all times.

- Residents in the house had numerous firearms, all of which were positioned so as to be available for self-defense.

- Two dogs were on the exterior of the residence.

(*See* Warrant.)  Little of this information would prove true.  For example, while Hedrick does suffer from bipolar disorder, she takes a prescription obtained legally to treat this illness.  (Doc. 232 ("Hedrick Dep.") at 17:1-8.)

### 1.   Detective Bosko Requests the Assistance of ASORT

After securing a warrant, Detective Bosko went to the home office of Mansfield Police Chief Phil Messier and requested authorization to use ASORT.  Chief Messier explained that when Bosko came to Chief Messer's house:

> I asked [Bosko] what the foundation was [for the request to use ASORT].  There's – obviously there's a policy that broadly dictates when a tactical team is to be used.  He shared with me that a couple of occupants in the house were known to have weapons in the house.  I believe the male occupant was known, according to his informant, to have a weapon near the kitchen or inside the house and that a female occupant was known to have a handgun as she moved about the house.
>
> And for that reason, they were seeking a nighttime search warrant, which I believe at that time had already been approved by a judge, and that they sought permission to additionally use the tactical team, which I approved.

(Messer Dep. at 5:16-6:5.)[25]  Detective Bosko told Chief Messer that the search warrant was for stolen property and drugs (*id.* at 6:23-7:1), although Detective Bosko did not tell Chief Messer any particular information about the quantity or type of drugs, nor the value of the property (*id.* at 7:2-17).  Indeed,

---

[25] Mansfield Captain Michelle Webb also came to the Chief's house and apparently did at least some of the speaking, but no party maintains that Captain Webb had any type of material involvement in this litigation.

Chief Messier did not ask any additional questions, nor was he given any additional facts.  (*Id.* at 6:6-12.)[26]  Based on this information, Messer authorized Detective Bosko to seek help from ASORT.  (*Id.* at 5:17 – 6:5.)

The Rush/Hedrick home was outside of Mansfield, within the jurisdiction of the Richland County Sherriff.  (Doc. 109 ("Sheldon Dep.") at 7:17-20.)  Richland County Sheriff Jesse Stephen Sheldon explained, however, that neither he nor any other Richland County official needed to give permission for Mansfield to deploy ASORT there.  (*Id.* at 7:21-8:14; *cf. id.* at 10:14-17 ("I did not go into the briefing [prior to the raid on the Rush/Hedrick home].  I just went behind the Mifflin Fire Department to be there after they executed the search warrant as an observer just to see how the warrant went.").)

### 2.  Detective Bosko Briefs ASORT

Detective Bosko describes what happened next:

I talked to [ASORT] team leader [and Mansfield Police Officer] Rich Miller on the phone that evening . . . [I] briefed him on information I had . . and that I had obtained a nighttime search warrant.  He agreed with that.  When we briefed or met at the Mansfield Police Department, I physically had transported Rich Miller out there to do the drive-by, or what they call a scouting report.

After doing a scouting report at the residence at 2619 Park Avenue East, he made a determination based on the fact of the information we had at hand, the layout of the structure, the dwelling at 2619 Park Avenue East, that it would be too dangerous for detectives to provide perimeter of the residence, that they would call additional team members to handle that. We then went back to the station. We then went back to METRICH[27] where we conducted the formal briefing. . . .

[At the briefing] I provided them information as to the information I had on the persons in the house, the information I received from the confidential informants, and I had actually met with the confidential informant before going to the briefing and received information not to do the search warrant on the weekend due to the fact that the occupants at 2619 would engage in heavy drug and alcohol usage and there would be a

---

[26] Additionally, Bosko's direct supervisor, Lieutenant Wendling, never questioned the information provided by Bosko, nor did Wendling read the warrant that Detective Bosko prepared for the Magistrate.  (Doc. 108 at 6-7.)

[27] METRICH is a law enforcement task force in Richland County.

likelihood of violence if we attempted to do anything on the weekend. I relayed that to the ASORT members.

(Bosko Dep. at 138:24 – 142:14.)

Neither Team Leader (and Mansfield Police Officer) Richard Miller nor ASORT Commander (and Shelby Police Captain) Michael Lance Combs asked any questions to confirm the accuracy of this information, notwithstanding that it was presented by a detective in the juvenile crimes unit who was investigating the theft of some property from a local retail store.  (Doc. 124-5 ("Miller Dep.) at 29:3-5 (explaining that Miller did not consider it his responsibility to confirm the accuracy of information); *id.* at 27:24-28:4 (explaining that Miller did not know if it was Bosko's responsibility to ensure that the information he provided ASORT was reliable); *id.* at 27:12-17 (explaining, when questioned a second time, that Miller assumed that it would be Bosko's responsibility to ensure that information passed to ASORT was accurate);  Doc. 229 ("Combs Dep.") at 104:14-21 (Question: So you don't get involved in determining the credibility or the reliability of the information relied upon [prior to deploying ASORT]; is that fair?  Answer:  I would have no way of doing that.  We don't get involved in the investigating preceding the raid or the warrant.").)  Although the warrant was valid for another three days, moreover, ASORT and Bosko chose to execute the warrant approximately five hours after Bosko first received it. (*See* Warrant.)  No member of ASORT appears to have considered it their responsibility to question whether Detective Bosko had learned any other information that might arguably be relevant, or to attempt to discover any other relevant information themselves (i.e., that the targets of this raid had themselves requested police assistance less than two weeks prior).  (Doc. 109 ("Sheldon Dep.") at 78:18-23 ("The ASORT team has a specific function.  The ASORT team was directed that they needed to gain entry into this house.  They had nothing to do with the investigation.").)

29

### 3.  The Execution of the Search Warrant

Based entirely on Bosko's briefing and a "drive-by" that ASORT Team Leader Miller had done of the property, Miller developed an operational plan for the service of the search warrant.  (Miller Dep. 17:24-18:5.)  ASORT did not deviate from this plan.  (Combs Dep. at 184:6-11.)

At approximately 11:00pm that evening, ASORT arrived at the Rush/Hedrick home to execute the search warrant.  (*Id.* at 7; Doc. 169 ("Mansfield MSJ") at 10.)  When ASORT arrived, the lights were off in the home and there was no sign that anyone might be awake.  (R&R at 8.)  Gilbert Rush, in particular, was asleep.  (*Id.* at 31.)

Combs threw a flash grenade into the air.  (*Id.* at 34.)  This was designed to confuse the residents of the Rush/Hedrick home.  (*See* Combs Dep. at 151:17-19 (explaining that the purpose of the flash grenade was to cause a "substantial distraction").)  The other law enforcement personnel on the scene simultaneously began to shout police and bang on the door.  (R&R at 35; 9/2/09 Hrg. Tr. at 36:18-21 ("THE COURT:  So the 'knock and announce' you are saying is 'grenade and announce'?  MANSFIELD ATTORNEY: Correct. Correct. And that's what the testimony shows.").)[28]  So, too, the ASORT members pointed their assault weapons at the windows of the house, although these were equipped with extremely bright lights that prevented residents from making a visual identification of the

---

[28] It is the general practice of ASORT for the entire team to announce that they are the police. (Doc. 115 ("Mack Dep.") at 32:20-33:2 ("Once we usually hear the knock on the door, it's usually the whole team, just about the whole team says police search warrant. . . . It's just been the way we've done things as long as I've been on the team.").)  ASORT, moreover, does not usually discuss in advance of the execution of a particular warrant how long team members should wait prior to forcing entry.  (*Id.* at 39:9-12.)

police.  (*Id.*)[29]  From inside the house, the residents could not hear that it was the police – they merely heard "banging and yelling."  (*Id.*)  During this time, Officer Wheeler used a battering ram to enter the residence.  (Mack Dep. 81:11-15; Doc. 169-22 ("Wheeler Ex.") at 4.)

As the above events transpired, Gilbert Rush awoke and retrieved a firearm.  He turned on the kitchen light and appeared at the window holding his single-shot shotgun.  (R&R at 10.)  Richland County Sherriff's Deputy Robert Gouge then shot at Rush.  (*Id.*; *id.* at 36.)  Rush responded to that gunfire (*id.*) and multiple assault weapons were then discharged into the kitchen (*id.* at 10).  ASORT Team Members Jason Bammann and Raymond Frazier forced entry into the house through the front-door.  (*Id.*; *id.* at 40; Doc. 170 ("ASORT MSJ") at 32.)  They yelled "police, search warrant!" and ran into the kitchen.  (*Id.*)  There, they encountered Gilbert Rush, who was seated on the floor with blood running down his face.  (R&R at 10.)  His unloaded shotgun was pointing at Bammann and Frazier, who then shot Gilbert Rush, killing him.  (*Id.* at 10, 40.)

### D.  The Aftermath of the Search

In the minutes after the fatal shooting, Sheriff Sheldon called one of his investigators, Captain Larry Faith, to conduct an investigation "[t]o determine all what happened, who was there and what were all the circumstances surrounding it."  (Sheldon Dep. at 22:8-10.)  Sheldon explained why he chose Faith:

> Captain Faith is an excellent, excellent detective.  He's been with the Sheriff's Office probably for about 35 years, probably one of the best investigators I know. He was in charge of the detective bureau for a long time. He retired and I brought him back as a fiduciary employee, at-will employee and he works directly for me as an administrative

---

[29]  The Defendants argue that ASORT uniforms clearly indicate that they are police. (Doc. 169 at 14-15.)  Given that it was 11pm and the ASORT team members were pointing lights described as "insanely bright" and "blinding" (Doc. 181-6) at the house, their clothing is not relevant to an analysis of anything that occurred outside of the home.  Construing the facts in the light most favorable to the non-moving party, an objectively reasonable law enforcement official would not believe that it would be possible for a citizen to make a visual identification of police officers utilizing such devices in this manner.

assistant and he handles what I would consider high profile cases and/or internal affairs investigations.

(*Id.* at 21:9-17.)  Sheldon also called the Bureau of Criminal Investigation ("BCI") for additional assistance with the gathering of physical evidence because "they have better equipment and more equipment such as cameras and lighting and they're more CSI capable than what the Sheriff's Office is and/or in my opinion the Mansfield Police Department."  (*Id.* at 20:12-17.)[30]  Chief Messer explained, as well, that he relied upon Sherriff Sheldon's and Captain Faith's judgment with respect to the investigation.  (*See* Messer Dep. 110 at 18:22-19:8 ("I was told that the sheriff designated Captain Larry Faith to be the lead investigator.  He's a sheriff's deputy. . . . I was to appoint a liaison officer to work with Larry to help facilitate whatever he would need." (question omitted)).)

Captain Faith could not recall whether he had ever been asked to investigate the use of force before, but believed that he "probably" had.  (Doc. 230 ("Faith Dep.") at 11:15-18.)  Captain Faith describes what happened when he arrived at the Rush/Hedrick home briefly after the shooting:

> Then [Sherriff Sheldon] and I walked up towards the house.  We both walked in the house, and he showed me the outside of the house where windows had been shot out. And then we walked in the house. I walked in through the breezeway, into the house, and then into the kitchen.  And once I got into the kitchen, I saw the body of Gilbert Rush, Jr. lying on the floor. I just gave a quick look around and walked out through the kitchen, dining room, through the living room and went outside.

(*Id.* at 14:8-16.)  After the walk-through, Sherriff Sheldon explained to Captain Faith that Faith would need to investigate the shooting officially. (*Id.* at 15:9-12.)  Captain Faith testified that he considered this investigation no different than any other homicide investigation he might perform:

> Q.    And what kind of investigation did you understand that you would be in charge of?
>
> A.    Finding out what occurred, what happened.
>
> Q.    Was this a homicide investigation?

---

[30] The BCI is an investigative law enforcement agency for the state of Ohio.

32

A.  I don't know if I thought of it as a homicide investigation or a shooting and a man was killed. I don't know in my mind at that time, I don't know. All I thought about was that there was a shooting and a subject ended up being killed and I was going to try to find out – I was supposed to find out what happened

. . .

Q.  So was this any different than the case where you got called out when the woman came up missing or any other homicide?

A.  I didn't think it was any different than any other case I would investigate.

Q.  Did you approach it differently?

A.  No.

. . .

Q.  And what policies and procedures were you considering as you proceeded with your investigation?

A.  Use of force.

Q.  Any others?

A.  I think that was it.

Q.  In the course of designing your investigation and thinking about it, did you apply any policies and procedures with respect to the use of confidential informants?

A.  No.

(*Id.* at 15:13-17:12.) Faith explained that he evaluated the use of force procedures based upon the Richland Sherriff, Mansfield Police, and ASORT policies and that he believed that all of these were followed. (*Id.* at 18:1-20:19.) Several aspects of Captain Faith's investigation merit particular mention. He:

- made no determination as to whether Bosko had relied appropriately upon the confidential informants. (*See id.* at 25:9-13)

- made no determination as to whether it was appropriate to call a SWAT-type team under the circumstances. (*See id.* at 27:11-18)

- determined that the Rush/Hedrick residents knew it was the police based on the testimony of two police officers outside the household, despite contrary testimony from the residents of the home. (*See id.* at 31:22-34:7)

33

- interviewed all of the Rush/Hedrick residents immediately after the events and separately (*see id.* at 32:24-33:15 (confirming, as well, that all of the residents had been separated from each other and were kept separate shortly after the shooting), but did not separate the law enforcement officials from each other after the shooting (*see id.* at 77:24-78:2).

- relied on law enforcement statements prepared several days after the shooting, as opposed to interviews, to determine what had occurred from the perspective of the ASORT team members at the scene.  (*See id.* at 78:3-81:17 (admitting, as well, that Faith did not know whether attorneys had helped any of the officers prepare these statements).)

- took a walkthrough with the officers and the officers' attorneys during daylight to see what had happened, but recorded no statements made by the officers during that walk-through and could remember no such statements.  (*See id.* at 82:9-83:6.)

- concluded that Gilbert Rush had shot first (*see id.* at 90:23 – 91:15), although ASORT Team Member (and Mansfield Officer) Gauge has testified during these proceedings that Gauge himself shot first (*see* Doc. 124-8 ("Gauge Dep.") at 42:18-43:19).

Captain Faith presented his report to the prosecutor and the grand jury, and the prosecutor explained that he believed no laws had been broken based on that report.  (*See* Sheldon Dep. at 30:19 – 31:11.)  Richland County Sheriff Sheldon did not feel any additional investigation or action on his part was needed and testified that all Richland County policies were followed appropriately during the ASORT raid.  (*Id.* at 38:6-13.)  Mansfield Chief Messer concluded similarly.  (*See* Messer Dep. at 21:21-24:10 (explaining that he relied upon Faith's investigation, and the resulting lack of an indictment, to conclude that his officers acted properly and followed all relevant departmental policies).)  Combs, as well, confirmed that nothing went "wrong in the execution of this search warrant."  (Combs Dep. at 184:6-11; *see also* Doc. 229-7 "Combs Rep." (explaining that all procedures were followed); Messer Dep. at 36:19-37:10 ("Question: Did anything go wrong?  Answer: By wrong, did you mean that we lost a life there?  I would say yes.  Procedurally that the police department or ASORT had done anything wrong, I'm not aware of anything that was done wrong.").

On April 11, 2007, the Plaintiffs commenced this lawsuit.

## VI. THE PLAINTIFFS' CLAIMED CONSTITUTIONAL DEPRIVATIONS

The Plaintiffs present their claim as "the unreasonable seizure of the family through the use of excessive force."  (Plaintiffs' Obj. at 16.)  An examination of the Plaintiffs' arguments, however, reveals that this is not really an accurate characterization of their lawsuit.  To understand the confusion, it is important to begin with an understanding of excessive force jurisprudence within the Sixth Circuit.[31] Judge McHargh explained excessive force jurisprudence in this Circuit correctly:

> Claims that officers used excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Brosseau*, 543 U.S. at 197; *Saucier*, 533 U.S. at 204; *Graham*, 490 U.S. at 394-95.  Determining whether the officer's actions were objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest."  *Graham*, 490 U.S. at 396; *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992). If the amount of force used to accomplish the arrest is objectively reasonable, then no constitutional violation occurred. *Michaels v. City of Vermillion*, 539 F.Supp.2d 975, 983-984 (N.D. Ohio 2008) (citing *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006)).
>
> In particular, the reasonableness of the officer's decision depends on the officer's "knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."  *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2nd Cir. 2003) (quoting *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996)).  *See also Dunigan*, 390 F.3d at 494; *Dickerson v. McClellan*, 101 F.3d 1151, 1161-1162 (6th Cir. 1996) (citing cases).  The Sixth Circuit has rejected the argument that police officers "should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry."  *Dickerson*, 101 F.3d at 1161; *see also Chappell v. City of Cleveland*, 584 F.Supp.2d 974, 991 (N.D. Ohio 2008) (quoting *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)).
>
> The law is clearly established "that if a suspect threatens an officer with a weapon or threatens another person with serious physical harm or death, deadly force is authorized in self-defense or defense of another person."  *Dickerson*, 101 F.3d at 1163 (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).  *See also Whitlow v. City of Louisville*, No. 00-6557, 2002 WL 1455317, at *9 (6th Cir. July 1, 2002.)

---

[31] As is clear from the case law discussed below , the confusion also arises from the fact that some cases to assess the use of SWAT team entries refer to such entries as uses of or shows of "force," and even, at times, use the phrase, "excessive force."  Properly understood, however, the Fourth Amendment claim arising in such contexts focuses on reasonableness of the intrusion.

"If the officer reasonably (even if wrongly) believes that his conduct is reasonable under the circumstances, summary judgment based on qualified immunity is appropriate. Qualified immunity can apply even in the case of an officer's mistaken belief, if that belief is reasonable." *Wilson v. City of Des Moines*, 293 F.3d 447, 450 (8th Cir. 2002) (citing *Saucier*, 533 U.S. at 206).

In *Dickerson*, the Sixth Circuit adopted a "segmenting" approach to excessive force cases. *Whitlow*, 2002 WL 1455317, at *9; *Dickerson*, 101 F.3d at 1161-1162; *Chappell*, 584 F.Supp.2d at 991 (quoting *Livermore*, 476 F.3d at 406). Under this analysis, the court examines "whether the force used . . . was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Livermore*, 476 F.3d at 406 (quoting *Dickerson*, 101 F.3d at 1161).

(R&R at 28-30.)  In an exhaustive opinion, Judge McHargh went on to conclude that, because no individual officer employed excessive force during the execution of the search warrant, none of the Defendants should be held liable.  (*Id*. at 28-68.)

The Plaintiffs agree that the Sixth Circuit's segmenting analysis and the Sixth Circuit's jurisprudence regarding the propriety of using deadly force when confronted with an armed suspect – regardless of why the suspect may happen to have been armed – would prohibit such a claim in this case.  (*See* Plaintiffs' Obj. at 8-9); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009).  They argue, instead:

Plaintiffs did not sue Officer Gouge or Officers Bammann and Frazier, who in the last moments of the raid, fired the deadly shots.  Under existing precedent (particularly that requiring a segmenting analysis) those officers did not act unreasonably and/or would be entitled to qualified immunity.  But the fact that particular individuals may not be liable does not mean that Plaintiffs did not suffer a constitutional violation or that other Defendants are free of liability.  Plaintiffs correctly sued the entities and persons who placed the ASORT team in this dangerous position as they executed a warrant seeking stolen property in a manner that masked their identity as police officers. . . .  It was this plan that was set at night utilizing blinding lights; this plan that triggered a huge disorienting explosion simultaneously with the knock and announce; this plan that relied on misleading intelligence to improperly ramp up the arsenal used to confront the Rush/Hedrick family over stolen property; this plan, in short, that caused the individual ASORT officers to fire the deadly and terrorizing shots at a confused and surprised Gilbert Rush and his family.  The plan was the moving force behind the constitutional violation.  The Defendants responsible for this plan violated the Fourth Amendment rights of the Plaintiffs.

(*Id.*; *see also* Plaintiffs' Obj. at 21-22 ("[M]isrepresentations made the Rush home seem more dangerous than it was and a flawed raid plan provoked defensive actions that would not have taken place had the plan been executed without the blinding lights and ineffective self-identification by team members.")).

Based on this argument, the Plaintiffs are asserting two somewhat interrelated claims.  The Plaintiffs' claim first that the decision to use ASORT in the above manner was not reasonable under the circumstances.[32]  In other words, the Plaintiffs contend that the search and seizure would have been unconstitutional even if Gilbert Rush never had been shot and killed.  (R&R at 28 ("Rush contends that 'the injury was caused by the severely flawed raid plan itself'"); Plaintiffs' Obj. at 48 ("The militarization of this standard police warrant was itself excessive and unreasonable.").  While claims of this nature are usually intertwined with a challenge to the warrant itself, they need not be: "[i]t is well established that those who execute lawful search warrants must do so in a reasonable manner." *United States v. Keszthelyi*, 308 F.3d 557, 569 (6th Cir. 2002) (*quoting Stack v. Killian*, 96 F.3d 159, 162 (6th Cir. 1996)); *Ramage v. Louisville/Jefferson County Metro Gov't*, No. 08cv338, 2010 U.S. Dist. LEXIS 63688, at *13 (W.D. Ky. June 25, 2010) (evaluating whether the decision to use a SWAT team was reasonable under the circumstances); *Solis v. City of Columbus*, 319 F. Supp. 2d 797, 809 (S.D. Ohio 2004) ("[S]omething more than probable cause is required in order for a hyper-intrusive search to be reasonable [and] something more than usual care in the execution of such a search is constitutionally required.").

The Plaintiffs' also claim that the Defendants failed to identify themselves in a constitutionally reasonable manner.  (*See* R&R at 28-29 ("[The Plaintiffs] contend that the method of entry was

---

[32] The Defendants assert that "Plaintiffs' arguments concerning their new theory of liability against ASORT based on its operation plane [sic] is waived, as Plaintiffs have failed to raised [sic] this issue for review before the Magistrate."  (Doc. 224 at 5.)  The R&R, however, begins its analysis by quoting the Plaintiffs' argument "that 'the injury was caused by the severely flawed raid plan itself'" (R&R at 28 (quoting Doc. 192 at 26).)  While the Magistrate Judge may have not analyzed this precise claim, there is no doubt it was raised.  The Defendants' waiver argument is not well-taken.

unreasonable, in that the officers failed to effectively knock and announce . . . ."); Plaintiffs' Obj. at 22 ("[I]neffective self-identification by team members.").)  Thus, the Plaintiffs assert that the Defendants did not properly knock-and-announce their presence.  *See Dickerson*, *v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996); *see also Hudson v. Michigan*, 547 U.S. 586, 594 (2006).[33]

In light of these claims, an additional threshold issue remains: what measure of damages is recoverable if the execution of the warrant is unreasonable, but the decision to use deadly force was not excessive when made?  It does not appear that any court within the Sixth Circuit has considered previously whether a defendant may be liable for physical injury resulting from the improper execution of a warrant absent a viable claim of excessive force.  On this issue, there is some tension between the Sixth Circuit's segmenting approach to use of force claims and the Supreme Court's concern that the unconstitutional service of a warrant might itself give rise to the need for excessive force, and, thus, to physical harm.  As the Supreme Court said in *Hudson*:

> The interests protected by the knock-and-announce requirement . . . . [include] the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. *See, e.g., McDonald v. United States*, 335 U.S. 451, 460-61 (1948) (Jackson, J., concurring). *See also Sabbath*, 391 U.S., at 589; *Miller*, 357 U.S., at 313, n. 12.

*Hudson*, 547 U.S. at 594; *see also id*. at 603 (Kennedy, J., concurring) ("[C]ivil remedies, such as those available under 42 U.S.C. § 1983, Rev. Stat. § 1979 . . . provide restitution for discrete harms.  These

---

[33] The R&R states:

> The Rush plaintiffs do not specifically allege a discrete Fourth Amendment violation in the initial attempt to enter.  However, they contend that the method of entry was unreasonable, in that the officers failed to effectively knock and announce, and failed to effectively identify themselves as police officers.  (Doc. 192, at 14-15.)

(R&R at 30-31.)  The Court cannot adopt the R&R's reasoning in this regard.  The Plaintiffs' contention that "officers failed to effectively knock and announce" is a discrete Fourth Amendment violation.  *See Dickerson*, 101 F.3d at 1162; *cf. Hudson*, 547 U.S. at 602 (Kennedy, J., concurring) ("[T]he knock-and-announce requirement protects rights and expectations linked to ancient principles in our constitutional order.").

remedies apply to all violations, including, of course, exceptional cases in which unannounced entries cause severe fright and humiliation." (emphasis added).)

There is also some tension between *Hudson's* concerns and the principle that the exclusionary rule does not apply in § 1983 actions – *i.e.*, that an initial constitutional violation does not taint all later actions taken by law enforcement officers.  *See Chatman v. Slagle*, 107 F.3d 380, 382 (6th Cir. 1997) (explaining that the exclusionary rule does not apply in civil rights cases); *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) (noting that the fruit of the poisonous tree doctrine is not applicable in § 1983 cases).  These apparent tensions are reconcilable, however.  All of these cases address the same key issue: proximate causation.  In each line of cases, courts have exercised care to only hold law enforcement officers liable for harms that proximately flow from their unconstitutional conduct.

Thus, where no unconstitutional use of force occurs at the point when force is employed, the Sixth Circuit's segmenting approach assures that officers are not held liable for their earlier constitutional actions, no matter how negligent or unwise.  A review of the Sixth Circuit's published opinions employing segmenting analysis confirms this understanding – all consider situations in which defendants acted, at worst, imprudently.  *See Schreiber v. Moe*, 596 F.3d 323, 328 (6th Cir. 2010) ("[E]xigent circumstances justified [the Defendant's] warrantless entry into [the Plaintiff's] home."); *see also Morrison v. Bd. of Trs.*, 583 F.3d 394, 398-99 (6th Cir. 2009) (evaluating the use of force during a constitutionally appropriate detention); *Chappell*, 585 F.3d at 914 (containing no assertion of an independent constitutional violation); *Harris v. City of Circleville*, 583 F.3d 356, 360 (6th Cir. 2009) (evaluating the use of force after the plaintiff had been arrested constitutionally); *Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) ("[Plaintiff] argues that [Defendant] acted negligently . . . ." (emphasis added)); *Phelps v. Coy*, 286 F.3d 295, 297 (6th Cir. 2002) (examining the use of force on a lawfully arrested suspect); *Claybrook v. Birchwell*, 274 F.3d 1098, 1105 (6th Cir. 2001) ("[T]he officers' decision to approach [the Plaintiff] in the manner that they did was in clear contravention of

Metro Nashville Police Department policy."); *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996) (finding that officers had <u>not</u> failed to knock-and-announce). Understood properly, these cases explain that the reasonable use of force is not rendered unconstitutional simply because officials exercise poor judgment that is distinct from the otherwise reasonable use of force, even where that poor judgment may have helped create the circumstances necessitating the later use of force. None of the cases hold, however, that officers are immune from harms that flow proximately from their own unconstitutional conduct simply because a later use of deadly force might not be unconstitutionally excessive.

Similarly, the exclusionary rule cases require that a plaintiff prove that the harm to which he or she points was proximately caused by an officer's unconstitutional acts—plaintiffs are not freed from the burden of proving causation because the encounter begins with an unconstitutional act. *Townes*, 176 F.3d at 146 (explaining that while the exclusionary rule applies principles of taint and attenuation, § 1983 actions "employ the principle of proximate causation"). These cases do not go so far, however, as to insulate officers from harm caused by their unconstitutional acts simply because their later dealings with a plaintiff may not be independently actionable. *See Reich v. Minnicus*, 886 F. Supp. 674, 685-86 (S.D. Ind. 1993) ("[A plaintiff who] suffers a constitutional deprivation early on may, under § 193, recover for his later injuries, even during later constitutional stages in the process, if the injuries are reasonably foreseeable consequences of the earlier deprivation of rights." (citations omitted)).

It is this basic principle of proximate cause that *Hudson* applies: "an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson*, 547 U.S. at 594. The rule is simple: when a constitutional violation occurs, liability attaches for harm that is the direct and proximate result of that constitutional violation, but only for such harms.[34] Applying that principle to this case, then, if the Defendants failed to knock-and-announce their presence as required by the Fifth

---

[34] To the extent any unpublished Sixth Circuit opinion appears at odds with this principle, *Hudson* makes clear those cases sweep too broadly.

Amendment, or otherwise committed a constitutional violation when executing the warrant, and if that failure was the proximate cause of Gilbert Rush's death, the Plaintiffs may recover under § 1983 for that harm.

## VII.   WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCEMENT OFFICIALS CONDUCTED THE SEARCH IN AN UNREASONABLE MANNER

As explained above, the Plaintiffs' first claim is that it was unreasonable to deploy a SWAT team in the manner employed under the particular facts and circumstances of this case.  While the R&R analyzed comprehensively whether any particular defendant employed excessive force during the moments of the raid (R&R at 26-49), it did not consider the Plaintiffs' attack on the raid itself.  The Plaintiffs objected properly to the R&R's failure to consider the events prior to the ASORT raid:

> The family suffered an unreasonable seizure. They were accused of receiving and possessing a minor amount of stolen property, a nonviolent property crime. When the plan to execute the warrant was designed, objective facts demonstrate that the Rush/Hedrick family posed no danger to law enforcement. . . . The very deployment of ASORT on these facts was unreasonable. . . .

(Plaintiffs' Obj. at 15; *see also* Plaintiffs' Obj. at 48 ("The militarization of this standard police warrant was itself excessive and unreasonable.").)

### A.  Whether the Plaintiffs' Suffered the Deprivation of a Constitutional Right

The question before the Court is whether a jury could conclude that the Plaintiffs were subjected to an unreasonable search and seizure on the facts of this case.  *Keszthelyi*, 308 F.3d at 569; *accord Deering v. Reich*, 183 F.3d 645, 650 (7th Cir. 1999) ("[Police do] not need to consider all feasible alternatives in serving [a] warrant. . . .  But that is not the same as saying that any specific alternative is per se reasonable.").  In answering this question, the Court is mindful that the Fourth Amendment is not offended merely because innocent citizens are harmed, no matter how tragic that harm may be:

> The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty.  Valid warrants will issue to search the innocent, and people like [respondents] unfortunately bear the cost.  Officers executing search warrants on occasion enter a house when residents are engaged in private activity; and the resulting

41

> frustration, embarrassment, and humiliation may be real, as was true here. When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated.

*L.A. County v. Rettele*, 550 U.S. 609, 609-16 (2007). This being said, "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979); *Keszthelyi*, 308 F.3d at 569 (citation omitted); *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992) ("When police obtain a warrant to search the home of a citizen, they concomitantly receive certain limited rights to occupy and control the property. . . . Together with the right to conduct these activities on a citizen's property goes the obligation to do so in a reasonable manner.); *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir. 1989) ("On the separate question . . . as to whether the *manner* in which the warrant was executed was reasonable . . . . we remand three questions for trial to a jury: were the officers reasonable in breaking open the front door, in detaining [a plaintiff] at gunpoint, and in conducting a search as extensive as this one was?" (emphasis in original)); *cf. United States v. Bates*, 84 F.3d 790, 796 (6th Cir. 1996) ("The police never attempted to knock on the defendant's door before breaking it down and lobbing a stun grenade into the apartment." (citing *United States v. Stewart*, 867 F.2d 581, 583 (10th Cir. 1989))).

While officers are allowed *considerable* leeway in determining how best to execute a search warrant, a court within the Southern District of Ohio has explained rightly that "a municipality must require its officers to be particularly vigilant in executing an extraordinarily intrusive search." *Solis*, 319 F. Supp. 2d at 809. Put another way, "the decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests." *Holland*, 268 F.3d at 1190; *cf. Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005) ("[The] decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of 'the totality of the circumstances.'" (citations omitted)); *Alexander v. City & County of San Francisco*, 29 F.3d 1355,

42

1367 (9th Cir. 1994) ("The force which was applied must be balanced against the need for that force. . . . If the jury were to find that the officers entered in order to help the inspectors inspect – as defendants contend on appeal – then the jury may also conclude that the force used (deployment of a SWAT team) was excessive in relation to the purpose for which it was used (ensuring the immediate execution of a forcible entry inspection warrant)."); *Alexander*, 29 F.3d at 1368 (Kozinski, J., concurring) ("[S]eeking a warrant could have made a difference here.  I seriously doubt a reasonable judicial officer would have authorized the immediate storming of Quade's residence by a heavily armed tactical team."); *Mlodzinski v. Lewis*, No. 08-cv-289, 2010 U.S. Dist. LEXIS 72030, at *20 (D.N.H. 2010) ("[T]he Court . . . must register its concern over the use of the [SWAT] team to execute the warrants against Rothman by sending as many as ten officers, dressed in military fatigues and armed with assault rifles, into his family's apartment after breaking down the door with a battering ram at 4 a.m."); *Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 383 (S.D.N.Y. 2008) ("[A] reasonable jury could find that there was no legitimate law enforcement need for a heavily armed SWAT team to extract a 56-year old prosecutor from his home when he was not accused of any actual violence and was not believed to have a gun.").

Viewing the facts in the light most favorable to the Plaintiffs, the Defendants deployed a SWAT team that was directed to use a considerable amount of force – Defendants' own counsel admitted readily that the search and seizure began with a "grenade and announce" – without asking even the most cursory questions to assure themselves that such deployment was appropriate.  (*See, e.g.*, Bosco Dep. at 94:10-96:14; 54:1-8; 145:25-147:2; *cf.* Lyman Rep. at 23 ("[Bosko] failed to conduct a proper and thorough investigation. . . . [which] resulted in an overreliance on false or misleading information.").) The highly intrusive search and seizure at issue in this litigation occurred notwithstanding: (1) the absence of any real exigency (highlighted by the petty nature of the crime being investigated); (2) easily obtainable knowledge that residents of the house, including the primary target of the search, had called

law enforcement officials recently for help; (3) actual knowledge that law-abiding citizens would be present; (4) exclusive reliance on the Whyels as a source of information about the danger the officers were likely to face and; (5) knowledge that the primary target of the search was a minor suspected of a petty, non-violent, crime.  (*See* Bosko Dep. 98:16-124:6; Bosko Tr. at 2.)  While the Court emphasizes the fact-bound nature of its holding, a reasonable jury could find that the use of ASORT, under these circumstances and in this manner, was unreasonable.  *See Dalia*, 441 U.S. at 258; *Keszthelyi*, 308 F.3d at 569; *Bills*, 958 F.2d at 697; *Hill*, 884 F.2d at 277; *cf., e.g., Ramage*, 2010 U.S. Dist. LEXIS 63688, at *13 (approving of the use of a SWAT team when officers were pursuing a dangerous suspect suspected of a serious crime).

### B.  The Propriety of Recovery Against Any Particular Defendant

#### 1.  The Individual Officers

##### a.  Detective Eric Bosko

Detective Bosko is the officer who determined that it would be appropriate to use ASORT to execute the warrant at issue in this case; indeed, he alone briefed ASORT.  Viewing the facts in the light most favorable to the Plaintiffs, he made this determination in the absence of exigency and without any meaningful investigation.  As explained above, this clearly was unreasonable.  Recovery against Bosko is only proper, however, if an objectively reasonable officer in his position would have understood that probable cause to conduct a search in the abstract did not give him license to conduct a search in this particular manner on these particular facts.

Put simply, it seems evident that police cannot simply call in the SWAT team to investigate a minor who is suspected of a petty crime without *some* investigation beyond a tip from a confidential informant, at least where there is no exigency and information indicating that the use of a SWAT team is inappropriate is readily available – indeed, where the 17-year-old non-violent target of the search,

suspected of only a petty crime,[35] called the police mere weeks earlier to report a death threat. *Accord Solis*, 319 F. Supp. 2d at 809 ("[S]omething more than probable cause is required in order for a hyper-intrusive search to be reasonable [and] something more than usual care in the execution of such a search is constitutionally required."); *cf. Keszthelyi*, 308 F.3d at 569 ("It is well established that those who execute lawful search warrants must do so in a reasonable manner . . . ." (citation omitted)).

No Sixth Circuit case discusses the specific reasonableness of a decision to use a SWAT team, however. The question is whether these cases can be read together to have placed a reasonable officer in Bosko's position on notice that the unreasonable use of a SWAT team is a discrete constitutional violation. While a close question, the Court ultimately concludes that it was not. Although the Court finds much in the case law to support the conclusion that law enforcement officials must exercise a reasonable degree of care under the circumstances prior to deploying a SWAT team to effectuate a seizure and that it is unconstitutional not to do so, *see Keszthelyi*, 308 F.3d at 569; *Bills*, 958 F.2d at 697; *Hill*, 884 F.2d at 277; *Solis*, 319 F. Supp. 2d at 809; *accord Marasco*, 430 F.3d at 149; *Holland*, 268 F.3d at 1190, the law was not so clearly developed in this Circuit or the Supreme Court to deprive Detective Bosko of qualified immunity in this case.

Eric Bosko's Motion for Summary Judgment (Doc. 169), then, is **GRANTED** as to this count.

### b. Lieutenant Wendling

The Plaintiffs allege that Lieutenant Wendling is liable because he failed to review "the reliability of the information secured from confidential informants." (Plaintiffs' Obj. at 45.) The Plaintiffs, however, point to no particular actions taken or not taken by Wendling to establish his

---

[35] The Defendants argue that the non-violent and petty nature of the crime is a "red herring." (Doc. 224 at 4.) This is not correct. The nature of the crime informs the police as to the likelihood that a danger is posed by execution of a search. In this case, the reasonably prudent police officer would have taken *some* independent step to ensure that the use of a SWAT team was appropriate.

liability.  The Plaintiffs appear to be suggesting, rather, that Wendling is liable solely because he was Bosko's direct supervisor.

The Plaintiffs misunderstand supervisory liability under § 1983: "supervisors[] are liable for the actions of their subordinates only under specific and limited circumstances."  *Patterson v. Godward*, No. 08-1951, 2010 U.S. App. LEXIS 5825, at *5 (6th Cir. 2010) (citing *Miller v. Calhoun County*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)).  In particular, "[l]iability under this theory must be based upon more than a mere right to control employees and cannot be based upon simple negligence."  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999); *see also Smith v. Heath*, 691 F.2d 220, 232 (6th Cir. 1982) ("In order for a supervisor to be held liable under § 1983, he must personally participate in the acts complained of, or at least affirmatively authorize or direct them.").

Because the Plaintiffs have not pointed this Court to evidence that would support a valid theory of liability against him, John Wendling's Motion for Summary Judgment (Doc. 169) is **GRANTED**.[36]

### c.  Commander Combs, Team Leader Mack, and Team Leader Miller

The Plaintiffs contend that "Combs, Miller[,] and Mack are the most culpable officers because they are the ones who orchestrated the raid."  (Plaintiffs' Obj. at 50.)  They have not, however, cited any particular facts that would enable a reasonable jury to agree.

The Plaintiffs' primary argument – perhaps their only argument – is that Combs, Miller, and Mack should not have relied upon Detective Bosko's and Chief Messer's determination that the use of ASORT was appropriate.  But such an argument is foreclosed by the "collective knowledge" doctrine, also known as the "fellow officer" rule.  *See United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997) ("[L]aw enforcement officials cooperating in an investigation are entitled to rely upon each other's

---

[36] While Chief Messer's decision to authorize a request for ASORT without any meaningful inquiry of Bosko would arguably make him liable for the unnecessary use of the SWAT team, with its attendant tactical policies, he, like Bosko, would be qualifiedly immune from a claim premised on that choice, given the state of the law on February 28, 2007.

knowledge of facts" (citing *United States v. Ventresca*, 380 U.S. 102, 111 (1965)); *United States v. Anderson*, No. 07cr0023, 2007 U.S. Dist. LEXIS 45137, at \*17 (N.D. Ohio June 21, 2007) ("[A]n officer generally is entitled to rely on a report from another officer under the 'collective knowledge' doctrine or 'fellow officer' rule . . . ." (citing *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989)). However imprudent it may have been, even without the benefit of hindsight, for Combs, Miller, and Mack to rely solely on the discretion of a juvenile unit detective investigating a petty crime, they cannot lose the presumption of qualified immunity merely because they relied upon information provided by another officer. *See id.*[37]

Lance Combs', David Mack's, and Richard Miller's Motions for Summary Judgment (Docs. 169, 170) are thus **<u>GRANTED</u>** as to this claim.

### 2.  The Entity Defendants

#### a.  City of Mansfield

The Plaintiffs assert two theories of liability against the City of Mansfield.  First, they assert that the City of Mansfield is liable because it ratified Bosko's actions.  (Plaintiffs' Obj. at 42 ("[N]o independent review of Bosko was accomplished.").)  In the alternative, they argue that the City of Mansfield is liable because Bosko was a final policymaker "with respect to presenting information to the tactical teams who will act on that information."  (Plaintiffs' Obj. at 45.)  After careful consideration, the Court finds merit to both theories on the unusual facts of this case.

#### i.  Liability Through Ratification

As explained above, a plaintiff can establish that a municipality is the proximate cause of a violation when a municipality ratifies the unconstitutional acts of its employees by failing to

---

[37] To the extent that the Plaintiffs claim that aspects of the plan would have been flawed even if Bosko had performed a proper investigation and/or all of his information had been accurate, that claim seems limited to the alleged failure by ASORT to announce its presence properly, a discrete constitutional violation discussed below.

meaningfully investigate and punish allegations of unconstitutional conduct.  *See Wright*, 138 F. Supp. 2d at 966 (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1990); *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985)); *see also Praprotnik*, 485 U.S. at 127*; Gill v. Kovach*, No. 08cv01839, 2010 U.S. Dist. LEXIS 75470, at *38 (N.D. Ohio July 27, 2010); *Otero v. Wood*, 316 F. Supp. 2d 612, 628 (S.D. Ohio 2004); *accord Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002); *Christie v. Iopa*, 176 F.3d 1231, 1240 (9th Cir. 1999).  A ratification claim has two elements.  A plaintiff must show that "(1) a final municipal policymaker approved an investigation . . .  (2) . . . so inadequate as to constitute a ratification of the[] alleged" constitutional violation.  *Wright*, 138 F. Supp. 2d at 966.

The Plaintiffs have demonstrated clearly that Mansfield Police Chief Messer approved of Captain Faith's investigation.  (*See* Messer Dep. at 21:21-24:10 (explaining that he relied upon Faith's investigation, and the resulting lack of an indictment, to conclude that his officers acted properly and followed all relevant departmental policies).)[38]  The only question is thus whether Faith's investigation "was so inadequate as to constitute a ratification" of Bosko's alleged constitutional violation.  *Wright*, 138 F. Supp. 2d at 966.  The R&R concluded that it was not:

> Here, the court finds Rush has failed to demonstrate that Faith did not conduct a meaningful investigation.  Faith reviewed the statements of the witnesses involved (both the family and the police), and reviewed the physical evidence at the scene.  Although it might have been preferable to interview the officers, Faith was prevented from doing so by legal concerns, not by a failure to pursue that avenue of investigation.  Faith also considered the application of the relevant use of force policies.  The court cannot find that the investigation was so inadequate as to constitute a ratification of the alleged use of excessive force.

(R&R at 66.)  The Plaintiffs objected to this portion of the R&R and argued:

> The Magistrate failed to give due weight to the opinion in *Wright*.  For example, in *Wright* the investigator failed to interview the physician who was a central witness in the misconduct.  Similarly here, Faith failed to interview the officers who did the shooting.

---

[38] The City of Mansfield does not dispute that Chief Messer is a final policymaker for purposes of disciplining Mansfield law enforcement officials.  Based on Chief Messer's deposition, this seems an accurate characterization.  (*See, e.g.,* Messer Dep. at 22:14 (referring to himself as the "CEO" in connection with Captain Faith's investigation).)

48

The Magistrate applied the incorrect standard and erred when he concluded that "Rush has failed to demonstrate that Faith did not conduct a meaningful investigation." Doc. 212, p.64. In fact, a reasonable jury could conclude based on the glaring omissions in the Faith investigation that it was pursued solely as a cover-up and that by adopting the report the entities were ratifying the constitutional violations in this case.

(Plaintiffs' Obj. at 42.)  The Defendants' respond:

Plaintiffs contend that the failure of Faith to interview the shooters constituted ratification of the alleged excessive force. [Doc. 214, p. 37.] This is completely contradictory of Plaintiffs contentions that the shooters involved in this incident committed no constitutional violations and are entitled to qualified immunity. [Doc. 214, p. 3.] In any event, the Magistrate did not error and properly distinguished *Wright v. City of Canton*, 138 F. Supp.2d 955 (N.D. Ohio 2001) on the basis that *Wright* involved a series of incidents with a pattern of misconduct rather than one single incident.  Captain Faith reviewed the statements of the witnesses involved, reviewed the physical evidence at the scene, and considered applicable use of force policies.

(Doc. 223 ("Richland Resp.") at 5.)

The Plaintiffs are correct.  This case, indeed, involves an investigation *less* reasonably calculated to determine the events in question than the one at issue in *Wright*.

In *Wright*, Judge James S. Gwin considered the allegation that police officers "used excessive force in effecting" the plaintiff's arrest and that the defendant municipality "ratified this unconstitutional use of force by failing to adequately investigate" the police officers' conduct.  *Wright*, 138 F. Supp. 2d at 957-58.[39]  The plaintiff in *Wright* sustained severe injuries during the course of his arrest that necessitated emergency room treatment.  *See id*. at 959-60.  The doctor who admitted the plaintiff harbored concerns about the extent of the plaintiffs' injuries, and asked the arresting officers what had transpired.  *See id*.  Those officers provided her conflicting stories, and the doctor ultimately contacted the municipal police department.  *See id*.  As a result, the department opened an investigation into the

---

[39] *Wright* did not involve "a series of incidents with a pattern of misconduct."  *See generally Wright*, 138 F. Supp. 2d at 966.  The R&R noted that two of the Sixth Circuit cases relied upon by *Wright* involved a pattern of misconduct, although it did not conclude that *Wright* was wrongly decided. Nor does this Court – no precedent indicates that ratification applies only when there is a pattern of wrongdoing.  *See Praprotnik*, 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. (emphasis added)).

events of the arrest. *See id.* The investigation continued "for a little more than one month," during which the investigating officer spoke with both officers who had arrested the plaintiff, the plaintiff, two paramedics who treated the plaintiff, and an additional witness. *See id.* He did not, however, speak to the doctor who had originally contacted the police. *See id.* Judge Gwin concluded that the plaintiff had offered "evidence showing the investigation was not designed to discover what actually happened." *Id.* at 967. In particular, Judge Gwin found that, because the investigating officer never interviewed the admitting physician, the investigation concluded without information that would have enabled the investigating officer to make an accurate assessment of the events of the night. *See id.*[40]

The investigation in this case fell short of even the investigation in *Wright*; Captain Faith failed to interview *any* relevant law enforcement official – rather, he allowed the police officers to prepare statements a few days later. (*See id.* at 78:3-81:17 (admitting, as well, that Faith did not know whether attorneys had helped any of the officers prepare these statements).) The R&R's reasoning that Faith was excused from such interviews because "legal concerns" prevented him from interviewing the officers at the scene cannot be adopted by this Court. Taken to its logical conclusion, this reasoning would allow municipalities to decline to conduct effective investigations any time individual officers feared a lawsuit, and, of course, *this is precisely when such investigations are necessary.*

While the above, standing alone, would put this case squarely within the theory of liability articulated by *Wright*, there is more. Captain Faith did not even *attempt* to determine whether Bosko acted appropriately in calling a SWAT-type team without performing any independent investigation to assure himself that the use of such a team was appropriate. (*See* Faith Dep. at 25:9-13, 27:11-18.) Yet, this is one of the central constitutional questions posed by Bosko's actions. So, too, Captain Faith's investigation was so deficient that it resolved one of the central factual issues incorrectly: Faith

---

[40] In particular, the admitting physician attested that the arresting officers told her conflicting stories about the way in which the plaintiff had been injured, and she believed that the officers ultimate description of events could not have led to such extensive injuries.

concluded that Gilbert Rush shot first (*see id.* at 90:23-91:15), although ASORT Team Member (and Mansfield Officer) Gauge fired the initial shot. (Gauge Dep. at 42:18-43:19).[41]

Construing all facts in the light most favorable to the Plaintiff, then, a reasonable jury could find that the City of Mansfield ratified Bosko's unconstitutional actions by approving an investigation "not designed to discover what actually happened." *Wright*, 138 F. Supp. 2d at 967.

### ii.  Liability Through the Actions of a Final Policymaker

The Court now considers whether Bosko was a final policymaker for the City of Mansfield with respect to the manner in which ASORT was briefed. *See Pembaur*, 475 U.S. at 473-77 (holding that a county prosecutor's determination that police officers should break down a doctor's door was a policy decision); *Paeth v. Worth Twp.*, No. 08-13926, 2010 U.S. Dist. LEXIS 34978, at *27 (E.D. Mich. Apr. 9, 2010) ("The Sixth Circuit has clarified that a public official has final policymaking authority if that official's decisions are 'final and unreviewable and are not constrained by the official policies of superior officials.'" (quoting *Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006))). As explained above, Bosko alone briefed ASORT and determined the contents of that briefing. There is, as well, apparently no official policy governing what Bosko was to present in this briefing or how Bosko was to present it. For example, no policy advised Bosko that he should inform ASORT of any knowledge tending to indicate that ASORT might need to take special care in execution of this raid relative to, say, a raid on a drug dealer's "office" because of the presence of a minor who had called the police recently for assistance.

Although it is difficult frequently to determine whether a municipal employee has final policymaking authority or is merely vested with discretion, an unpublished Sixth Circuit case suggests strongly that Bosko was a final policymaker. *See Monistere v. City of Memphis*, 115 Fed. Appx. 845,

---

[41]  Of course, an internal investigation may be reasonably calculated to uncover the truth and simply fail to do so.

851 (6th Cir. 2004).  In *Monistere*, the Sixth Circuit considered a claim by two officers who were strip

searched unconstitutionally by an internal affairs investigator.  The Plaintiffs' claimed:

> [The city's] practice of allowing [internal affairs] sergeants . . . to conduct their
> investigations without any defined parameters [supports municipal liability].  It is their
> collective belief that, even though the City did not maintain any written policy relating to
> administrative investigations, [the internal affairs investigator] was vested with the
> authority to conduct these investigations and the authority to determine the policy and
> manner of conducting these investigations.

*Monistere*, 115 Fed. Appx. at 851.  At trial, the Plaintiffs presented evidence

> that although the police manual did not specify the manner in which administrative
> investigations were conducted, the "unwritten manner" was to allow the lead investigator
> to make decisions as to how to conduct the investigations.  Similarly, [the internal affairs
> investigator] admitted that it was "standard practice" for the lead investigator to make
> decisions as to how to proceed with an investigation.

*Id*.  Based on this evidence, the Sixth Circuit affirmed on the issue of municipal liability.  *Id*.  ("[I]t is

our determination that it was reasonable for a jury to conclude that the City had a practice of granting its

lead investigators the complete discretion to conduct their own investigations."); *see also Kammeyer v.

City of Sharonville*, No. 01cv649, 2006 U.S. Dist. LEXIS 24058, at *31-36 (S.D. Ohio Apr. 26, 2006)

("A reasonable jury could conclude that . . . [the city] had a policy of delegating final decision-making

authority to the lead detective on a particular case . . . ."); authority to the lead detective on a particular

case . . . ."); *La Panaderia La Diana, Inc. v. Salt Lake City Corp*., 342 F.Supp.2d 1013, 1037-38 (D.

Utah 2004), *aff'd*, No. 05-4098, 2006 U.S. App. LEXIS 18691 (10th Cir. July 26, 2006) (finding a

tactical commander to be a final policymaker with respect to the execution of warrants).

The reasoning of *Monistere*, *Kammeyer*, and *La Panaderia*, that an individual police officer can

be a final policymaker for purposes of a particular aspect of an investigation, is applicable here.  A jury

could conclude properly that Bosko had discretion to brief ASORT in a manner entirely unfettered by

any supervisor, policy, or custom and that, accordingly, his discretion was "final and unreviewable and

[is] not constrained by the official policies of superior officials."  *Waters v. City of Morristown*, 242

F.3d 353, 362 (6th Cir. 2001) (citations omitted).[42]  Bosko's decision in this respect was the decision of the municipality: it is not respondeat superior to hold that a municipality is liable for the decisions made by a juvenile unit detective when it maintains a policy of allowing that detective unconstrained discretion.  *See Monistere*, 115 Fed. Appx. at 851; *see also Pembaur*, 475 U.S. at 473-77.

### iii.  Conclusion

For both of the independently sufficient reasons discussed above the City of Mansfield's Motion for Summary Judgment (Doc. 169) is **DENIED** as to this claim.

### b.  ASORT, Richland County, City of Shelby, City of Ontario, and City of Lexington

The Plaintiffs allege that ASORT, Richland County, the City of Shelby, the City of Ontario, and the City of Lexington should be held responsible for any constitutional violations that occurred as the result of the raid plan because "the execution of the warrant . . . followed ASORT policy" (Plaintiffs' Obj. at 22) and "each of these [municipalities] has designated to ASORT the task of training team members, developing operation plans, assigning equipment and personnel appropriate to each operation, and pursuing the operation" (Plaintiffs' Obj. at 39).  As explained above, however, the only viable constitutional allegation against members of ASORT with respect to the raid plan concerns allegations that the plan did not comport with the requirement that police "knock-and-announce" their presence because the members of ASORT were entitled to rely on Bosko's representations that the use of ASORT was appropriate under the circumstances.  For this reason, the knock-and-announce claim, discussed

---

[42] There is, of course, a meaningful distinction between the manner in which ASORT was briefed and the determination that ASORT should be briefed at all, much as there is a meaningful distinction between the manner in which an internal investigation is conducted and the determination that an internal investigation is appropriate in the first instance.  *See Monistere*, 115 Fed. Appx. at 851. In other words, that Bosko required Messer's permission to deploy ASORT in the first instance does not lessen the unfettered discretion enjoyed by Bosko in dictating the manner in which ASORT would be deployed.

below, is the only potentially viable allegation against ASORT itself, or against the above municipalities, with respect to the raid plan.

### VIII.   WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCEMENT OFFICIALS FAILED TO PROPERLY KNOCK-AND-ANNOUNCE THEIR PRESENCE

The Plaintiffs' second discrete claim is that the Defendants are liable because they failed to properly knock-and-announce their presence.  The R&R disagreed:

> The plaintiffs point out that the police "have a duty to properly identify themselves."  *Id.* at 14.  *See generally Hudson v. Michigan*, 547 U.S. 586, 589 (2006).  "Not one of the residents . . . understood that the police were outside their home on February 28, 2008.  Initiating the encounter with a huge and disorienting explosion obscured any 'announcement' that may have been made by the [ASORT] team."  *Id.*  Although the residents heard yelling outside, they "were unable to discern any particular words until after the police broke down the front door."  *Id.* at 14 n.49. . . .

> The occupants testified that, although they heard people yelling outside, and banging on the doors, they could not understand what the people outside were saying. (Doc. 183, Blevins dep., at 21; doc. 124, Jacob Rush dep., at 21, 75; doc. 178, John Rush dep., at 36-37.)  They saw bright lights shining into the windows, but could not see who was holding the lights. (Doc. 178, John Rush dep., at 19, 88-90; doc. 177, Hedrick dep., at 12, 15, 18.)  None of the occupants testified to hearing "police" or "search warrant" until the ASORT team burst through the front door.  (Doc. 178, John Rush dep., at 19; doc. 177, Hedrick dep., at 25-26; doc. 174, Dick dep., at 28, 31, 61; doc. 124, Jacob Rush dep., at 50, 101.)

> The Fourth Amendment requirement is that the police knock and announce their presence, then wait a reasonable time before a forced physical entry.  *See, e.g.*, *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995) (Fourth Amendment violation "if police officers enter without prior announcement"); *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir.), cert. denied, 540 U.S. 912 (2003) (citing cases).  There is no constitutional requirement that they be heard or understood, so long as the announcement is loud enough to be audible.  *See generally Brigham City, Utah v. Stuart*, 547 U.S. 398, 406-407 (2006) (officer could not be heard above tumult within residence); *United States v. Banks*, 540 U.S. 31, 33 (2003) (resident was in shower and heard nothing until door breached); *Pierce v. Burkart*, No. 03-74250, 2005 WL 1862416, at *5 (E.D. Mich. Aug. 4, 2005) ("Testimony by occupants of the home that they did not hear the police knock and announce does not give rise to a reasonable inference that the police failed to do so and thus is insufficient to defeat summary judgment").  Under the Rush plaintiffs' theory, the flash-bang had already been detonated, which woke the residents. Although the residents claim that they could not understand what was being said, they did testify to hearing audible yelling outside and banging on the doors. (Doc. 192, at 14 n.49.)  Several of the residents responded to the noise by running into the kitchen to investigate.  The officers identify the "yelling" and banging as their announcement of "police." (Doc. 169, at 8; doc. 170, at 7-8; see, e.g., doc. 173, Wheeler dep., at 62, 82-83; doc. 124, Miller

dep., at 52-53; doc. 115, Mack dep. at 77.). . . .

The most favorable view of plaintiffs' facts is that, after the detonation of the flash bang outside of the home, they encountered individuals who were "banging and yelling," whom they could not visually identify because of distracting light coming from lights pointed into the windows. Such facts fail to support a reasonable inference that the officers neglected to knock and announce their presence, <u>sufficient to preclude qualified immunity under the circumstances</u>.

(R&R at 30-35) (emphasis added).

The Plaintiffs argue that the R&R erred by failing to hold the entity defendants liable:

The Magistrate erred by conflating the liability of non-defendants (the officers who did the shooting) with the question of whether there was a constitutional violation.  There was surely a constitutional violation.  A reasonable jury could find that  . . . a flawed raid plan provoked defensive actions that would not have taken place had the plan been executed without the blinding lights and ineffective self-identification by the team members.

(Plaintiffs' Obj. at 21-22.)  They also contend that the R&R erred in its finding of qualified immunity because "ASORT Commander Combs and Team Leaders Miller and Mack established and implemented [the unconstitutional] operational plan."  (Plaintiffs' Obj. at 49.)

### A.  Whether the Defendants Failed to Announce Their Presence Properly Prior to Entry

Law enforcement officers are generally required to knock-and-announce their presence.  *Hudson*, 547 U.S. at 590 ("The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." (citation omitted)); *see also United States v. Pennington*, 328 F.3d 215, 220 (6th Cir. 2003) ("[A] unanimous Supreme Court held that the Fourth Amendment prohibition on unreasonable searches and seizures includes the general rule that an officer's unannounced entry into a home, absent special circumstances, is unconstitutional." (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995))).  This well-established rule protects important interests:

including 1) reducing the potential for violence to both the police officers and the occupants of the house into which entry is sought; 2) curbing the needless destruction of private property; and 3) protecting the individual's right to privacy in his or her house.

*United States v. Dice*, 200 F.3d 978, 982 (6th Cir. 2000) (citing *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996)); *see also United States v. Hardin*, 106 Fed. Appx. at 444 (6th Cir. 2004) ("An integral part of the knock-and-announce rule is the requirement that officers wait a reasonable period of time after a knock before physically forcing their way into a residence, so that the resident has the opportunity to allow peaceable entry." (quoting *Dice*, 200 F.3d at 983) (internal quotations omitted)); *Accord United States v. Buchanan*, 78 Fed. Appx. 933, 935 (5th Cir. 2003) ("[T]he knock-and-announce rule . . . allow[s] residents of a home an opportunity to respond to and cooperate with the police presence in lieu of having to face an unexpected and threatening intrusion.").  As noted earlier, the Supreme Court has cautioned that "an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson,* 547 U.S. at 594 (citations omitted).[43]

There is no question that the purpose of the raid was to seek evidence of a teenage girl's involvement in a theft ring and that the thefts of which she was suspected were of low-cost items

---

[43] There are well-established exceptions to this general rule, <u>none of which the Defendants contend apply</u>.  Officials need not announce their presence if they have a "reasonable suspicion . . . under the particular circumstances" that they face the "threat of physical violence [if they knock-and-announce]," that "evidence would likely be destroyed if advance notice were given, or if knocking and announcing would be futile[.]"  *Hudson*, 547 U.S. at 590 (internal quotation marks omitted) (internal citations omitted); *see also United States v. Bethal*, 245 Fed. Appx. 460, 473 (6th Cir. 2007) (quoting same); *United States v. Pelayo-Landero*, 285 F.3d 491, 498 (6th Cir. 2002) ("Forcible entries without announcement of purpose and a refusal of admittance have been approved where: (1) there would be a danger to the officer; (2) there would be danger of flight or destruction of evidence; (3) a victim or some other person is in peril; or (4) it would be a useless gesture such as when the person within already knew the officer's authority and purpose." (quoting *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (internal quotation marks omitted)).  Even if the Defendants had raised one of these exceptions, however, it would not have been well-taken.  *See, e.g., Bellotte v. Edwards*, No. No. 10-111, 2011 U.S. App. LEXIS 520, at *13 (4th Cir. W. Va. Jan. 11, 2011) (Wilkinson, J.) ("[T]he constitutional standard of reasonableness demands a particularized basis before dispensing with the requirement to knock and announce—a particularized basis not presented by these facts.").  Law enforcement officials executing a search warrant in search of evidence of petty crime may not forgo the knock-and-announce requirement simply because residents of a given dwelling own guns.  It would seem, instead, that references to weapons in the home, in the absence of any record of violence by the participants, would counsel in favor of assuring that officers' presence is known, thereby avoiding the very scenario *Hudson's* majority feared.

shoplifted from a commercial establishment.  There was, moreover, no threat that the items sought could

be easily destroyed or discarded in the moments required to make an officer's presence known.  In these

circumstances, officers may not choose to forgo their obligations to knock-and-announce their presence

and to allow the residents of the home a reasonable opportunity to respond.[44]

The facts surrounding the Defendants' entry are not in substantial dispute.  The Defendants

contend that they complied with the constitutional requirement that they knock-and-announce their

presence because ASORT members were collectively shouting "police."  They assert that it is

immaterial that they uttered these words only immediately after commencing their search and seizure

with the detonation of a grenade and while directing lights at the house that prevented their visual

identification:

| | |
|---|---|
| COUNSEL: | . . . . Here, the reason that summary judgment is warranted here is because there is no unconstitutional act by any of the officers, as plaintiffs concede to some extent, but they also don't identify any unconstitutional policy of the defendants. |
| THE COURT: | Are you saying the obligation to knock and announce is essentially satisfied by the use of the grenade? |
| COUNSEL: | No.  I'm not at all. |
| THE COURT: | The knock and announce, the case law implies some passage of time, right? |
| COUNSEL: | Correct. |
| THE COURT: | But the testimony is pretty clear that the grenade and the knock occurred at essentially the same time. |
| COUNSEL: | What happened here, according to the undisputed evidence, is that the flash-bang was detonated while the knock-and-announce was taking place. |

---

[44] Notably, Defendants make no effort to claim that an analysis of the facts and circumstances occurred in this case, such that a reasoned decision to enter the home so aggressively actually was made. Defendants apparently concede, instead, that, once ASORT is called in, a grenade-based entry is <u>always</u> used.

| THE COURT: | Right.  I mean, the officer testified it was simultaneous. |
|---|---|
| COUNSEL: | Correct. But the knock and announce continued thereafter. The officers are still outside the home, announcing their presence.  And at that point in time, they are faced with an occupant of the home, in the window, with a shotgun.  They don't even enter the house. |
| THE COURT: | So the "knock and announce" you are saying is "grenade and announce"? |
| COUNSEL: | Correct. Correct.  And that's what the testimony shows. |

(9/2/09 Hrg. Tr. at 35:5-36:21) (emphasis added).  The Plaintiffs, for their part, argue that these actions failed to comply with the constitutional requirement that the officers knock-and-announce their presence.

The Court cannot accept Defendants' argument that a grenade-and-announce is sufficient to comply with knock-and-announce, particularly where the police combine the grenade with "blinding beams" that prevent their visual identification as police.  The knock-and-announce requirement is not an abstract requirement that officers utter the talismanic word "police" at some point prior to entry, but a requirement that law enforcement officials afford residents "an opportunity to respond to and cooperate with the police presence in lieu of having to face an unexpected and threatening intrusion." *Buchanan*, 78 Fed. Appx. at 935.[45]   Grenade-and-announce does not give occupants the opportunity to cooperate

---

[45] Whether they have done so in a particular case is subject to a totality of the circumstances analysis. *See United States v. Banks*, 540 U.S. 31, 41 (2003).  The unanimous Court in *Banks* explained:

> [I]n the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door. It is hard to be more definite than that, without turning the notion of a reasonable time under all the circumstances into a set of sub-rules. . . . Suffice it to say that the need to damage property in the course of getting in is a good reason to require more patience than it would be reasonable to expect if the door were open.  Police seeking a stolen piano may be able to spend more time to make sure they really need the battering ram.

"in lieu of having to face an unexpected and threatening intrusion."  The grenade *is* the "unexpected and threatening intrusion."  *See, e.g., United States v. Jones*, 214 F.3d 836, 837 (7th Cir. 2000) (Easterbrook, J.) ("[P]olice cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash-bang device.'");  *see also United States v. Dawkins*, 83 Fed. Appx. 48, 51 (6th Cir. 2003) (collecting cases).  A reasonable jury could find that these Defendants failed to comply with the constitutional requirement that they identify themselves as the police prior to commencing their seizure.

---

*Id.* (emphasis added); *see also Hardin*, 106 Fed. Appx. at 445 ("Important factors include the object of the search, possible defensive measures taken by residents of the dwelling, the time of day, and the method of announcement." (citing *United States v. Pinson*, 321 F.3d 558, 566 (6th Cir. 2003))).  Of particular relevance here, law enforcement is usually required to wait a longer period of time to give residents an opportunity to comply peacefully in the middle of the night.  *Pinson*, 321 F.3d at 567 (explaining that it was unreasonable to wait a mere thirty seconds at 1:40 a.m. because at that time of night, "most people are in bed, and many are asleep" (quoting *United States v. Spikes*, 158 F.3d 913, 927 (6th Cir. 1998) (quoting *Griffin v. United States*, 618 A.2d 114, 121 (D.C.App. 1992))); *Pennington*, 328 F.3d at 221; *cf. United States v. Miller*, 21 Fed. Appx. 397, 402 (6th Cir. 2001) (per curiam) ("[T]he officers not only announced their presence by repeatedly pounding on the front door of the residence and by activating their blue police lights, but also by directing announcement toward Miller's bedroom." (citation omitted)).

One aspect of the totality analysis bears mention.  The R&R notes correctly that many cases have found that the fact that residents do not happen to hear the police does not establish a Fourth Amendment violation, and this Court has held recently that a sleeping occupant of a residence who claims that she would have awoken if the police had performed a knock-and-announce cannot defeat summary judgment when faced with sworn testimony that a *proper* knock-and-announce was, in fact, performed.  *See Bowles v. City of Mansfield,* Case No. 1:07-CV-2276, 2010 U.S. Dist. LEXIS 103537, at *71-72 (N.D. Ohio Sept. 30, 2010).  To the extent, however, that the R&R reasoned that whether occupants can identify the police or not is wholly irrelevant, this is incorrect.  *United States v. Crippen*, 371 F.3d 842, 847 (D.C. Cir. 2004) ("Only if a knock and announcement is loud enough to be heard . . . is there a constructive refusal of admittance to the premises." (citing *United States v. Leichtnam*, 948 F.2d 370, 374 (7th Cir. 1991))); *Greathouse v. Couch*, No. 06-166, 2008 U.S. Dist. LEXIS 23725, at *11 (E.D. Ky. Mar. 25, 2008); *cf. Antrim*, 389 F.3d at 282 ("[T]here was no background noise (e.g., television) such as might suggest to the officers that Bavaro would have had any trouble hearing the police announcements."); *Favors*, 75 Fed. Appx. 377, 381 ("The Defendants do suggest that no one heard the officers announce their presence using the bullhorn.").  If law enforcement officials unreasonably create a situation where they cannot be identified, those officers cannot be said to be complying with the constitutional requirement that they make their presence known so that the occupants have an opportunity to show that they intend to cooperate.  *See Hardin*, 106 Fed. Appx. at 444.  While an officer has the right to believe that he is making his presence known, even at times where he has not effectively done so, that belief must be objectively reasonable, not imagined.

**B.  The Propriety of Recovery Against Any Particular Party**

    **1.  The Individual Defendants**

The Plaintiffs argue that a jury could properly find that ASORT Team Leader Miller, ASORT Commander Combs, and ASORT Team Leader Mack are each personally liable for ASORT's failure to knock-and-announce.  (*See* Plaintiffs' Obj. at 50.)  The threshold inquiry for each of these Defendants is whether an objectively reasonable officer would have understood that the knock-and-announce in this case was constitutionally deficient in light of clearly established law on February 28, 2007.  *See Champion*, 380 F.3d at 901.  If so, the Court must then consider which Defendants could be found by a jury to have caused the constitutional deprivation.  *See Petty*, 478 F.3d at 349.

As suggested above, the first prong of the Court's inquiry is not a particularly close question. Viewing the facts in the light most favorable to the non-moving party, as the Court must, no reasonable officer could have thought that he was complying with the clearly established "requirement that officers wait a reasonable period of time after a knock before physically forcing their way into a residence, so that the resident has the opportunity to allow peaceable entry." *Hardin*, 106 Fed. Appx. at 444 (quoting *Dice*, 200 F.3d at 983); *see also Hudson,* 547 U.S. at 594; *Banks*, 540 U.S. at 41; *Pennington*, 328 F.3d at 220; *Buchanan*, 78 Fed. Appx. at 935.  These officers, executing a search warrant issued because a minor was suspected of stealing items such as a baby stroller, did not wait at all before entering the residence, in direct contravention of Supreme Court and Sixth Circuit precedent.  *See Banks*, 540 U.S. at 41 ("Police seeking a stolen piano may be able to spend more time to make sure they really need the battering ram."); *Pinson*, 321 F.3d at 566 (explaining that it is unreasonable to wait 30 seconds at 1:30 in the morning because this did not give residents the opportunity to awaken and answer the door).  Indeed, these officers went an order of magnitude further than the defendants in those cases by performing what they admit was a "grenade-and-announce." *Cf. Jones*, 214 F.3d at 837 (finding the per se use of flash grenades unconstitutional, even when searching for drug dealers).  Accordingly, the Court now turns to

which, if any, of the individual defendants could be said to have caused this clearly established constitutional deprivation.  *See Petty*, 478 F.3d at 349.

The Plaintiffs have alleged that all three of ASORT's leaders share responsibility for the knock-and-announce.  A reasonable jury could not reach such a conclusion, however.  In particular, while David Mack is an ASORT Team Leader, the Plaintiffs point to no evidence that suggests that he was functioning in a leadership role during these events.  To the contrary, the evidence appears to indicate that Mack was present during this raid simply because Miller requested additional manpower.  (*See* Mack Dep. at 55 19-23 ("ASORT structure has two teams on it. . . .  Captain Combs is commander of both teams.  This was a Team 2 call out, therefore [Rich Miller was] the team leader . . . .  I was just there to help." (emphasis added))).[46]  Plaintiffs, as well, point the Court to no other potential basis of liability for Mack.  Mack's motion for Summary Judgment (Doc. 170), then, must be **GRANTED** as to this claim.  *See Petty*, 478 F.3d at 349.

At the opposite end of the spectrum from Mack is Team Leader Richard Miller.  A reasonable jury could conclude that Miller was the primary author of the raid plan (Miller Dep. at 17:24-18:5), that he had discretion to determine the manner in which the knock-and-announce would be performed (*see* Sheldon Dep. at 37:19-38:5; Mack Dep. at 56:2-8), and that his plan was followed as intended (*see* Combs Dep. at 184:6-11).  A jury could thus find that Miller was the cause of the underlying deprivation, and his Motion for Summary Judgment (Doc. 169) is **DENIED**.  *See Petty*, 478 F.3d at 349.

A somewhat closer question is presented with respect to Miller's superior officer, Commander Lance Combs.  Delegating authority to a subordinate who misuses that authority, without more, is not a constitutional violation.  In this case, however, two facts independently compel the conclusion that a

_____

[46] One portion of Combs' deposition is in some tension with Mack's testimony.  (*See* Combs Dep. 108:14-109:1 (indicating that Mack gave input into the raid plan)).  The Plaintiffs did not develop this evidence, however, and there is no basis in the record for a reasonable jury to conclude that, assuming Mack's role exceeded that of any other team member, Mack "caused" the unconstitutional knock-and-announce.

reasonable jury could find that Combs "caused" the constitutional deprivation at issue here.  First, Combs was present throughout the briefing and the operation.  (*See* Combs Dep. at 109:12-17.)  In other words, Combs had the knowledge, authority, and opportunity to prevent the unconstitutional entry, but failed to do so.  *Cf. Cline v. City of Mansfield*, No. 07-1070, 2010 U.S. Dist. LEXIS 103520, at *89 (N.D. Ohio Sept. 30, 2010) ("There need not be a Sixth Circuit or Supreme Court case specifically stating that a supervisor has the responsibility to supervise to make it so.").  Second, there is evidence in the record that Combs exercised his independent judgment in determining that he should throw the flash grenade prior to ASORT identifying itself properly.  (*See* Miller Dep. 46:18-47:8 (explaining that Combs was to determine when to detonate the grenade based on the timing of the knock-and-announce); *see also* R&R at 34.)  For both of these reasons, then, a jury could conclude that Combs "caused" the unconstitutional knock-and-announce, *see Petty*, 478 F.3d at 349, and his Motion for Summary Judgment (Doc. 170) must be **DENIED**.[47]

## 2.  ASORT

The Plaintiffs argue that ASORT is liable because the knock-and-announce was defective constitutionally, and ASORT has stated expressly that the knock-and-announce complied with their procedures.  (*See* Combs Rep.; *see also* Messer Dep. at 36:19-37:10 ("Question: Did anything go wrong?  Answer: By wrong, did you mean that we lost a life there?  I would say yes.  Procedurally that the police department or ASORT had done anything wrong, I'm not aware of anything that was done wrong."); (Combs Dep. at 184:6-11 (confirming that nothing went "wrong in the execution of this search

---

[47] There is tension between the facts that a jury would have to find in order to hold Miller liable and the facts that a jury would have to find to hold Combs liable.  In particular, there is some testimony indicating that Miller had unfettered discretion to plan the raid and that the raid was executed exactly as he intended (*see, e.g.*, Miller Dep. at 17:24:18:5), and there is other testimony indicating that Combs had input into the raid plan (*see* Combs Dep. 108:14-109:1) and the individual authority to control the manner of the knock-and-announce (*see* Miller Dep. 46:18-47:8).  The Court need not determine at this time, however, whether a reasonable jury could find *both* Combs and Miller liable, what is important for present purposes is that there is sufficient evidence in the record as currently developed to allow a reasonable jury to find *either* of them liable.

warrant")).  On this point, there is no dispute in the record that ASORT employs one type of tactical entry – the one employed here.  In other words, ASORT members, by policy, make no individualized assessment of the facts and circumstances giving rise to the entry in order to assess what type of knock-and-announce is needed.  They use an aggressive tactical approach in all cases.  ASORT does not respond to this argument apart from its contention that no constitutional violation occurred.  The Court, accordingly, finds this a straightforward determination at this stage of litigation: a reasonable jury could find that the failure of ASORT members to give residents of the Rush/Hedrick home the opportunity to cooperate "in lieu of having to face an unexpected and threatening intrusion," *Buchanan*, 78 Fed. Appx. at 935, was caused by ASORT's express policy, *Monell*, 436 U.S. at 660-61 or "widespread practice that, although not authorized by written law or express . . . policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *Praprotnick*, 485 U.S. at 127.[48]

Accordingly, ASORT's Motion for Summary Judgment (Doc. 171) is **<u>DENIED</u>** as to the Defendants' failure to properly knock-and-announce.

### 3. Richland County and the City of Mansfield

The Plaintiffs contend that Richland County and the City of Mansfield are liable because they ratified Captain Larry Faith's investigation, an argument that is well-taken.[49]  As explained above, there is no dispute that City of Mansfield Police Chief Messer is a final policymaker for purposes of investigating allegations of unconstitutional conduct by his officers.  Similarly, Richland County does not dispute that Sherriff Sheldon, who appointed Captain Faith, is their final policymaker for this same

---

[48] So, too, a reasonable jury could find that this constitutional violation is attributable to ASORT through subsequent ratification, as indicated below with respect to the municipal defendants, *see Wright*, 138 F. Supp. 2d at 957-58, or through the actions of Commander Combs and Team Leader Miller, who had unfettered discretion to determine the manner in which the knock-and-announce would be performed (*see* Doc. 109 ("Sheldon Dep.") at 37:19-38:5).

[49] The Plaintiffs appear to make this same contention about the other municipal defendants, but this is without support.  They do not even attempt to point to any "final policymaker" from the City of Shelby, City of Lexington, or City of Ontario who approved of Faith's investigation.  *See Wright*, 138 F. Supp. 2d at 957.

purpose. So, too, neither Defendant disputes that their final policymakers adopted Faith's investigation. Finally, the Court concluded above that a reasonable jury could find that Faith's investigation was not calculated to meaningfully investigate and punish allegations of unconstitutional conduct.

The Plaintiffs, consequently, may sustain their theory that Richland County and the City of Mansfield ratified the failure by ASORT (and by the Richland County and Mansfield law enforcement officials within ASORT) to give residents of the Rush/Hedrick home the opportunity to cooperate "in lieu of having to face an unexpected an threatening intrusion," *Buchanan*, 78 Fed. Appx. at 935.[50]

Richland County's and the City of Mansfield's Motions for Summary Judgment (Docs. 168, 169) are **DENIED**.

### 4. The City of Lexington, the City of Shelby, and the City of Ontario

The Plaintiffs argue that the City of Lexington, the City of Shelby, and the City of Ontario are liable for the actions of ASORT because they have "delegated to ASORT the task of training team members, developing operation plans, assigning equipment and personnel appropriate to each operation, and pursuing the operation." (Plaintiffs' Obj. at 39.) The problem here is a straightforward one: the Plaintiffs have presented essentially no evidence about the relationship between Lexington, Shelby, Ontario, and ASORT.[51] There is no record evidence supporting the contention that Lexington, Shelby, and Ontario should be held liable for any of ASORT's actions, even when those actions were not initiated by or conducted in these municipalities.

Their Motions for Summary Judgment (Docs. 167, 170) are **GRANTED**.

---

[50] In its initial analysis of Faith's investigation, the Court observed that Faith had not even attempted to determine whether Bosko's actions were reasonable. So, too, the Defendants point to no record evidence that Faith attempted to determine whether the officers properly knocked-and-announced their presence.

[51] It is true, of course, that the Commander of ASORT, Lance Combs, is a Shelby law enforcement official, but the Plaintiffs point to no record evidence indicating that Combs' actions as the Commander of ASORT are charged properly to Shelby. To the contrary, this was the argument made by Shelby and ASORT and rejected by the Plaintiffs and this Court.

## IX. MOTION TO EXCLUDE TESTIMONY AND MOTION TO STRIKE

The Plaintiffs ask this Court to exclude certain expert testimony proffered by the Defendants from consideration in this order.  (Doc. 158.)  Because the Court ultimately found that expert testimony immaterial to this opinion, the Court finds the Plaintiffs' Motion (Doc. 158) to be **MOOT**.

The Defendants, for their part, ask the Court to strike a video proffered by the Plaintiffs.  (Doc. 203.)  This motion (Doc. 203) must be **DENIED** for the simple reason that it does not exist under the Federal Rules.  *See Tucker v. Potter*, No. 06cv2359, 2009 U.S. Dist. LEXIS 61060, at *33 (N.D. Ohio July 6, 2009).  The procedural rule that discusses a court's authority to strike items from the record is Fed. R. Civ. P.12(f), which permits striking matters only from pleadings.  While some courts have employed Fed. R. Civ. P.12(f) to strike an affidavit or a brief, or portions thereof, there is no basis in the Federal Rules for doing so.  *McLaughlin v. Copeland*, 435 F. Supp. 513 (D. Md. 1977).  In fact, a decision in this district, affirmed by the Sixth Circuit Court of Appeals, refused to employ Fed. R. Civ. P. 12(f) to strike an affidavit because "the rule relates only to pleadings and is inapplicable to other filings." *Dawson v. City of Kent*, 682 F. Supp. 920 (N.D. Ohio 1988), *aff'd*, 865 F.2d 257 (6th Cir. 1988); *see also Zerman v. City of Strongsville*, No. 1:04cv2493, 2006 U.S. Dist. LEXIS 70503, at *21-26 (N.D. Ohio Sept. 28, 2006), *aff'd*, 259 Fed. Appx. 723 (6th Cir. 2008).[52]

## X.  STATE LAW CLAIMS

The Defendants have moved for summary judgment on all of the Plaintiffs' state law claims: wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and assault and battery.  The Court now turns to these motions.

---

[52] The Defendants' substantive contention, that the video is inadmissible and thus improper for the Court to consider on summary judgment, is moot: the video did not affect the Court's disposition of the matters before it.

**A.  Municipal Defendants**

The Plaintiffs assert wrongful death and negligent infliction of emotional distress against the municipal defendants.  (*See* Plaintiffs' Opp. at 65.)  The municipal defendants argue that they are absolutely immune from such a claim under Ohio law, which provides in relevant part:

> Except as provided [below], a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function. . . .
> (B)
> (1) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees . . . .
>
> (2) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.
>
> (3) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads. . . .
>
> (4) [P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function . . . .
>
> (5) [A] political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code . . . .

O.R.C. § 2744.02(A)(1) & (B)(1-5).  Accordingly, the municipal defendants could be liable only if some section of the Revised Code expressly imposes liability upon them, as none of the other bases for immunity could apply: this action does not involve a motor vehicle (*see* O.R.C. § 2744.02 (B)(1)), proprietary function (*see* O.R.C. § 2744.02 (B)(2)),[53] public road (*see* O.R.C. § 2744.02 (B)(3)), or public building (*see* O.R.C. § 2744.02 (B)(4)).

---

[53] The Revised Code makes clear that the provision of police services is a government function. O.R.C. § 2744.01(C)(2)(a) ("The provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection [is a government function].").

The Plaintiffs assert that the Revised Code creates an exception to liability when municipal employees act "wantonly and recklessly." (Plaintiffs' Opp. at 192.)  The section of the Revised Code to which they refer provides, in relevant part:

> (A) In a civil action brought against a political subdivision . . . <u>the following defenses or immunities may be asserted to establish nonliability</u> . . . .
>
> (5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

O.R.C. § 2744.03(A)(5) (emphasis added).  The problem for the Plaintiffs is that this section of the Revised Code provides *defenses* to liability if one of the exceptions in § 2744.03(B) is implicated: it cannot be used as an independent basis to *impose* liability. *Cater v. City of Cleveland*, 697 N.E.2d 610, 617 (Ohio 1998) ("Appellants further contend that R.C. 2744.03(A)(5) provides an independent basis for imposing liability on the city. We reject this contention. . . . R.C. 2744.03(A)(5) is a defense to liability; it cannot be used to establish liability.").[54]

Accordingly, the municipal defendants Motions for Summary Judgment (Docs. 167-170) are **<u>GRANTED</u>** as to the Plaintiffs' state law claims.

---

[54] *Cater* is a plurality opinion, and thus not binding, particularly given that the Sixth Circuit reserved the question of whether § 2744.03(A)(5) can provide an independent basis for liability, albeit in an unpublished opinion. *See Justice v. Marion County Sheriff's Dep't*, Case No. 99-3123, 2000 U.S. App. LEXIS 498, at *18 (6th Cir. Jan. 6, 2000).  The Court follows *Cater* here, however, because it concludes, as have all of the cases that this Court has seen reach this issue subsequent to *Justice*, that it is inappropriate to read a statute that provides defenses to liability as imposing an independent basis for liability. *See, e.g.*, *Moore v. County of Lake*, 2010 Ohio 825, ¶35 (Ohio Ct. App. 2010); *Wright v. Mahoning County Bd. of Comm'rs*, 2009 Ohio 561, ¶25 (Ohio Ct. App. 2009); *Krokey v. City of Cleveland*, 765 N.E.2d 889, 893 (Ohio Ct. App. 2001).

### B.  ASORT

The Plaintiffs appear to allege all four state law claims against ASORT.  As a threshold matter, ASORT argues that if this Court finds it to be an entity at all, it is immune from suit because it is a "political subdivision" under O.R.C. §2744.01(F).  (Doc. 201 ("Shelby Rep.") at 34-35.)

There is nothing in § 2744.01, however, that would justify extending the definition of "political subdivision" used there to a private entity such as ASORT.  *See Ryll v. Columbus Fireworks Display Co., Inc.*, 769 N.E.2d 372, 378 (Ohio 2002) (Douglas, J., concurring) ("[P]ursuant to R.C. Chapter 2744, political subdivisions are no longer subject to suits in the same manner as private parties."); *Adamsky v. Buckeye Local Sch. Dist.*, 653 N.E.2d 212, 216 (Ohio 1995) ("[T]he only significant classification created by R.C. 2744.04(A) is a classification based on the nature of the defendant, *i.e.*, whether the defendant is a political subdivision or a private entity."); *Bratton v. Couch*, 2003 Ohio 3743, ¶23 (Ohio Ct. App. 2003) ("Appellant claims the trial court erred in . . . extending political subdivision immunity to a private corporation . . . . We agree.").  For the reasons expressed when determining that ASORT is an unincorporated association, the Court finds particularly probative the comparison to a volunteer fire department, which is not immune under Ohio law unless it is directly controlled by a municipality.  *See Lish v. Coolville Volunteer Fire Dep't*, 70 Ohio Misc. 2d 74, 79 (Ohio C.P. 1995); *Cincinnati Ins. Co. v. Rose*, 63 Ohio Misc. 2d 1, 7 (Ohio C.P. 1992) (Frost, J.).

ASORT also has moved for summary judgment on the grounds that the Plaintiffs cannot sustain their state law claims as a matter of substantive law.  (Shelby Rep. at 34.)  Given the posture of the case, this argument is not well-taken.  ASORT contends primarily that it should not be held liable because certain individual defendants were not liable, but individual defendants have avoided liability through qualified immunity, which does not apply to ASORT.

Accordingly, ASORT's Motion for Summary Judgment (Doc. 170) as to Plaintiffs' state law claims is **<u>DENIED</u>**.

### C.  Individual Defendants

The question of which state law claims are asserted against which individual defendants presents something of a difficult question.  The Plaintiffs' approach to these claims is indicative of their approach generally: they allege a tremendously large number of troubling facts and expect Judge McHargh or this Court to explain to them what particular causes of action might arise from those facts.  But the Defendants do not really press this problem to its logical conclusion, simply asserting instead that all defendants are immune under state law.  Consequently, the Court will consider a narrow question, which is whether any of the violations of federal law also give rise to the state law claims asserted by the Plaintiffs.[55]

Individuals, unlike municipalities, do not enjoy a blanket grant of immunity under O.R.C. § 2744.02.  Instead, the relevant provision of Ohio law explains that an individual is "immune from liability unless" his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner . . . ."  O.R.C. § 2744.03 (A)(6)(b).  The Plaintiffs do not suggest that any of the Defendants acted "with malicious purpose" or "in bad faith," the question is thus whether the Plaintiffs can show that any of the individual defendants acted in a wanton or reckless manner in a way that proximately caused some injury.

Although claims of "wanton or reckless" behavior are not always coextensive with the analysis of qualified immunity, under the facts of this particular case, the state law immunity analysis is not distinguishable from the analysis of qualified immunity.  Accordingly, Defendants Combs' and Miller's Motions for Summary Judgment (Docs. 169, 170) are **DENIED**.  The Court, concludes, however, that because the Plaintiffs have failed to carry their burden with respect to setting forth state law claims

---

[55] The state law claims, of course, are not necessarily identical to the claims under federal law. The Plaintiffs, however, do not point the Court to any record evidence that would allow this Court to determine precisely what incremental state law claims the Plaintiffs might be making.

against Bosko, Mack, and Wendling, and **GRANTS** their motions for summary judgment (Docs. 169, 170) on this claim.

## XI. CONCLUSION

For the aforementioned reasons, the Motion to Exclude Testimony (Doc. 158) is **MOOT**, the Motion to Strike (Doc. 203) is **DENIED**, the Motion for Summary Judgment brought by ASORT as to its capacity for suit (Doc. 171) is **DENIED**, the Motion for Summary Judgment brought by ASORT as to the substantive claims against it (Doc. 170) is **GRANTED IN PART AND DENIED IN PART**, the City of Mansfield's and Richland County's Motions for Summary Judgment (Docs. 168, 169) are **GRANTED IN PART AND DENIED IN PART**, all other municipal Defendants' Motions for Summary Judgment (Docs. 167, 170) are **GRANTED**, and the individual Defendants' Motions for Summary Judgment are **GRANTED IN PART AND DENIED IN PART** (Docs. 169, 170).


**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY***

**Dated: February 11, 2011**


***United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.**